IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **ANCHOR BLUE RETAIL GROUP, INC., et al.,**[1] | ) ) ) | **Case No. 09-11770 (PJW)** |
| | ) | **Jointly Administered** |
| **Debtors.** | ) ) | |
| | ) | Objection Deadline: June 23, 2009 at 4:00 p.m. (EDT) |
| | ) | Hearing Date: June 30, 2009 at 9:30 a.m. (EDT) |

## APPLICATION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF CRG PARTNERS GROUP LLC *NUNC PRO TUNC* TO THE PETITION DATE

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") file this application (the "Application") for entry of an order, substantially in the form attached hereto as Exhibit A, authorizing the Debtors to retain and employ CRG Partners Group LLC ("CRG") as special financial advisor to the Debtors *nunc pro tunc* to May 27, 2009, pursuant to sections 327(a), 328(a) and 330 of title 11 of the United States Code (the "Bankruptcy Code"). In support of the Application, the Debtors rely on the Declaration of Jeff Nerland (the "Nerland Declaration"), a copy of which is annexed hereto as Exhibit C, and the *Affidavit of Scott Rosner, Senior Vice-President, Finance and Chief Financial Officer of Debtors and Debtors-In-Possession, in Support of First Day Motions* (the "First Day Affidavit"), filed on May 27, 2009, and respectfully state as follows:

---

[1] The Debtors in these cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Anchor Blue Retail Group, Inc. (4718), Hub Distributing, Inc. (0682), Hub Designs, Inc. (6076), Anchor Blue Purchasing Corp. (6120) and MOST Purchasing Corp. (6052). The Debtors' corporate offices are located at 2501 E. Guasti Road, Ontario, CA 91761.

RLF1-3401587-1

## JURISDICTION

1. This Court has jurisdiction over this Application under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Application in this District is proper under 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are sections 327(a) and 328(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2014-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND

### A. Introduction

2. On May 27, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief (collectively, the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code.

3. The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

### B. Overview of the Debtors' Corporate Structure and Business

4. A predecessor to Anchor Blue Retail Group, Inc. ("ABRG"), Hub Distributing, Inc. ("HUB"), was founded in 1972 as a retailer of causal men's apparel under the name "Millers Surplus" (later renamed "Millers Outpost"). Millers Outpost was a specialty retailer of casual apparel with a male-oriented image, principally selling Levi's® branded clothing. Throughout the 1970s, Millers Outpost grew to become one of the world's largest retailers of Levi's® products. In 1980, American Retail Group (formerly known as Amcena Corporation) purchased

2

RLF1-3401587-1

HUB, the parent of the Millers Outpost business. The following year, Millers Outpost developed its own proprietary brand of private label denim under the Anchor Blue name. By 1989, there were more than 300 Millers Outpost stores, with locations in Arizona, Arkansas, California, Louisiana, Nevada, New Mexico, Texas and Utah.

5. In 1990, ABRG's predecessor opened the first Levi's® Outlet By MOST store and, over the next several years, the Levi's® Outlet by MOST business grew to become a leading outlet center retailer offering a variety of men's, women's and children's apparel and accessories at value prices. Today, Hub Distributing, Inc. and Hub Designs, Inc. hold the exclusive third-party U.S. license for Levi's® and Dockers® outlet stores in the United States and Puerto Rico, and sell a variety of overrun, and irregular Levi's® and Dockers® branded clothing, as well as private label merchandise. The license agreement authorizes the Levi's® and Dockers® division of ABRG ("LDO") to use certain Levi Strauss & Co. trademarks in connection with the operation of its Levi's® Outlet by MOST, Levi's® Outlet by Designs, Dockers® Outlet by MOST and Dockers® Outlet by Designs stores. While not provided for in the license agreement, LDO does purchase and re-sell an assortment of first-quality merchandise under the Levi's® and Dockers® label. LDO currently operates 74 outlet stores in 31 states and Puerto Rico and is projected to generate sales of $146.6 million during the fiscal year ending January 31, 2010 ("FYE 2010").

6. In 1996, the first Anchor Blue store was opened. Beginning in 2001, a process began whereby the Millers Outpost stores were converted to the Anchor Blue banner. Currently, there are five (5) stores with the Millers Outpost banner, all of which operate as clearance or outlet stores. Today, Anchor Blue is a mall-based retailer of contemporary fashion basics and

accessories for the high growth teen and young adult markets. ABRG operates 178 Anchor Blue stores in 12 states and is projected to generate sales of $192.7 million in FYE 2010.

7. In 2003, ABRG's business was acquired by Sun Capital Partners, Inc. ("Sun Capital"). In November 2004, ABRG acquired the Designs business from Casual Male Retail Group and became the exclusive Levi's® and Dockers® licensee for outlets in the United States and Puerto Rico. Thereafter, in March, 2005, ABRG and Sun Capital completed a leveraged recapitalization and sold a minority equity stake to Ares Management LLC in July, 2005.

8. Today, the Debtors are a leading specialty apparel retailer, offering compelling value on high quality branded casual apparel and accessories, through their two retail formats, Anchor Blue stores and Levi's® and Dockers® outlets. The Debtors lease their 425,000 square foot corporate headquarters and distribution facility in Ontario, California (the "Ontario Facility"). All of the Debtors' corporate management functions (for both the Anchor Blue and Levi's® and Dockers® outlet businesses) are conducted at the Ontario Facility. As of May 23, 2009, the Debtors had 2,814 employees, 808 of which are full-time employees and 2,006 of which work on a part-time basis. All 251 of the retail stores are subject to leases with aggregate annual rent in excess of $55.6 million. On a consolidated basis, the Debtors project to generate sales of $339.3 million and EBITDA of $16.6 million for FYE 2010. For the fiscal year ending January 31, 2009, the Debtors recorded net sales of approximately $370.6 million and incurred a net pre-tax loss of approximately $33.4 million.

C. **The Debtors' Debt Structure**

9. The Debtors are parties to that certain Amended and Restated Loan and Security Agreement, dated as of March 7, 2005, among Hub Distributing, Inc. ("Hub Distributing"), Hub Designs, Inc. ("Hub Designs"), Anchor Blue Purchasing Corp. ("AB Purchasing"), and Most

4

Purchasing Corp. ("Most Purchasing" and together with Hub Distributing, Hub Designs and AB Purchasing, collectively, the "Borrowers"), ABRG, formerly known as Hub Holding Corp., as guarantor, Wachovia Bank, National Association, successor by merger to Congress Financial Corporation (Florida), as administrative agent, Ableco Finance LLC, as term loan agent, the lenders named therein, as lenders (collectively, the "Prepetition Lenders") and the other parties thereto under which the Prepetition Lenders provided loans of up to $120 million to the Borrowers (as amended, the "Prepetition Loan Facility"). The Prepetition Loan Facility consists of a $85 million term loan and a $35 million revolving loan.

10. Amounts outstanding under the Prepetition Loan Facility are secured by a continuing security interest in, among other things, all of the Debtors' intellectual property, inventory, equipment, deposit accounts, personal property and fixtures, accounts receivable, general intangibles, chattel paper, instruments, and letter of credit rights. As of the Petition Date, an aggregate amount of $90.5 million was outstanding under the Prepetition Loan Facility.

### D. Events Leading to the Bankruptcy Filings

11. Due primarily to the underperformance of the Anchor Blue segment, the Debtors have sustained pre-tax operating losses for the past three (3) years. The decline in the housing market and the tightening of the credit markets have led to a decline in consumer discretionary spending and to a tightening of credit terms by the Debtors' suppliers. This dramatic slowdown in consumer spending became even more acute during 2008 and the first several months of 2009 thereby exacerbating the Debtors' financial condition and leaving the Debtors operating under tight liquidity constraints.

12. Given the foregoing factors, the Debtors have determined that chapter 11 affords them the best possible tool to preserve and realize upon the value of their businesses through

closing a limited number of uneconomic and underperforming retail stores in the Anchor Blue and Levi's® and Dockers® outlet businesses and the pursuit of the prompt sale of their remaining operations. In consultation with their professionals and after careful examination by the Debtors' Board of Directors, the Debtors have determined that chapter 11, combined with an expeditious sale of the substantial segment of their Levi's® and Dockers® outlet and Anchor Blue operations through an auction process, is the best and most efficient way to maximize a return for the Debtors, their estates, and all parties-in-interest.

## RELIEF REQUESTED

13. By this Application, the Debtors seek to employ CRG, effective as of the Petition Date, to perform the advisory services set forth below and pursuant to the terms and conditions of the engagement letter between CRG and the Debtors, dated May 20, 2009, and attached hereto as Exhibit B (including all Exhibits and Schedules thereto, the "Engagement Letter").

14. Since May 20, 2009, CRG has been working closely with the Debtors' management and other professionals to review strategic options in connection with the sale of the Debtors' businesses in these chapter 11 cases. The Debtors have selected CRG as their special advisor with respect to these matters because of their experience and knowledge of the Debtors' businesses, financial affairs and capital structure, in addition to their expertise in business reorganizations under chapter 11 of the Bankruptcy Code. Accordingly, the Debtors believe that CRG is well qualified to represent them in these chapter 11 cases.

## QUALIFICATIONS OF CRG

15. In consideration of the size and complexity of their business, as well as the exigencies of the circumstances, the Debtors have determined that the services of CRG will substantially enhance their attempts to maximize the value of their estates.

6

RLF1-3401587-1

16. CRG has extensive experience in providing restructuring and financial advisory services in reorganization proceedings, and has an excellent reputation for the services it has rendered in chapter 11 cases on behalf of debtors and creditors throughout the United States. The professionals of CRG have been employed in a number of troubled company situations. As such, the Debtors believe that CRG is well-qualified and able to advise the Debtors in a cost-effective, efficient, and timely manner.

17. The CRG professionals will be led by Jeff Nerland, a Partner of CRG and T. Scott Avila, a Managing Partner of CRG. Both Mr. Nerland and Mr. Avila specialize in helping operationally and financially distressed organizations through out-of-court workouts and chapter 11 reorganizations. Mr. Nerland received his bachelor's degree in business management from Indiana University and an MBA from the University of Southern California. Mr. Avila received his bachelor's degree in business administration from California State University at Hayward and an MBA from the University of Southern California. Both Mr. Nerland and Mr. Avila are seasoned restructuring professional with more than 20 year of experience helping operationally and financially distressed organizations through out-of-court workouts and Chapter 11 reorganizations.

18. CRG, with Mr. Nerland and Mr. Avila, is also familiar with the Debtors' business, financial affairs, and capital structure. Since the firms' initial retention on May 18, 2009, CRG has worked closely with the Debtors' management and other professionals to understand the Debtors' business and coordinate the professional services necessary for the Debtors' restructuring and other vital aspects of preparing for these chapters 11 cases. Consequently, the Debtors believe that CRG has developed significant relevant experience and expertise regarding the Debtors. Accordingly, the Debtors submit that the retention of CRG on the terms and

conditions set forth herein and in the Engagement Letter is necessary and appropriate, is in the best interests of their estates and creditors, and all other parties in interest, and should be granted.

## SERVICES TO BE PROVIDED

19. Subject to the allocation of assignments among the Debtors' professionals, as described herein, the Debtors seek authority to employ and retain CRG to review GOB bids and other GOB issues in connection with the sale of the Debtors' businesses (as more fully described in the First Day Affidavit), review the Debtors' cash disbursements, and such other services as are agreed to by the Debtors and CRG.

20. Since the filing of these cases, the Debtors also have submitted applications to retain (a) Richards, Layton and Finger, P.A.[2] as bankruptcy counsel in these cases; (b) Kurtzman Carson Consultants LLC[3], as claims agent, and (c) Duff & Phelps Securities, LLC, as financial advisors[4]. Each of these firms work under the direction of the Debtors' management. The Debtors are committed to minimizing any duplication of services. To that end, CRG is prepared to work closely with each professional to ensure that there is no duplication of effort or cost.

## PROFESSIONAL COMPENSATION

21. The Debtors have agreed to compensate CRG for professional services rendered on an hourly basis and reimbursement of expenses incurred in connection with these chapter 11 cases, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, guidelines established by the Office of

---

[2] See *Application of the Debtors and Debtors-In-Possession to Employ and Retain Richards, Layton and Finger, P.A. as Counsel to the Debtors Nunc Pro Tunc to the Petition Date* [Docket No. 56].

[3] See *Motion of the Debtors and Debtors-In-Possession for Entry of an Order Appointing Kurtzman Carson Consultants LLC as Claims, Noticing and Balloting Agent* [Docket No. 9].

[4] See *Application of the Debtors for an Order (I) Authorizing the Retention and Employment of Duff & Phelps Securities, LLC as Financial Advisors to the Debtors Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code and (II) Waiving Certain Reporting Requirements Pursuant to Delaware Local Rule 2016-2(G)* [Docket No. 60].

the United States Trustee for the District of Delaware (the "U.S. Trustee"), and any other applicable procedures and orders of the Court. CRG's hourly rates and corresponding rate structure for these chapter 11 cases are consistent with and typical of arrangements entered into by CRG and other comparable firm in connection with the rendering of similar services under similar circumstances. These rates and the rate structure reflect that such restructuring and other complex matters are typically national in scope and involve great complexity, high stakes, and severe time pressures.

22. CRG's hourly rates are set at a level designed to fairly compensate CRG for the work of its professionals. Hourly rates vary with the experience and seniority of the individuals assigned. These hourly rates are subject to periodic adjustments to reflect economic and other conditions and are consistent with the rates charged elsewhere. In particular, CRG's current hourly rates as of May 20, 2009 for matters related to these chapter 11 cases and agreed to by the Debtors pursuant to the Engagement Letter range will range between $175 and $625 per hour depending on the staff member assigned to the project. However, CRG expects that the costs that it will incur in connection with its representation of the Debtors will not exceed $50,000.

23. The following professionals are presently expected to have primary responsibility for providing services to the Debtors: Jeff Nerland, Scott Avila and Rick Rosenbloom (current billing rates are $495, $625 and $485, respectively). In addition, from time to time, other professionals of CRG will provide required services to the Debtors.

24. CRG received a pre-petition retainer in the amount of $25,000 (the "Retainer") in connection with the services to be provided by CRG pursuant to the terms of the Engagement Letter. The Retainer will constitute a general retainer for post-petition services, will not be segregated by CRG in a separate account, and will be held as an evergreen retainer until the end

of these chapter 11 cases and applied to CRG finally approved fees in these proceedings. For services rendered under the terms contained in the Engagement Letter, the Debtors have deducted $5,803.75 from the retainer representing actual and estimated fees earned and expenses earned to date pre-petition. No amounts are due to CRG as of the Petition Date.

## BASIS FOR RELIEF

25. The Debtors submit that the retention of CRG is appropriate under sections 327(a) and 328(a) of the Bankruptcy Code. Section 327(a) of the Bankruptcy Code empowers a debtor, with the Court's approval, to employ attorneys "that do not hold or represent an interest adverse to the estate, and that are disinterested persons. . . ." 11 U.S.C. § 327(a). Section 101(14) of the Bankruptcy Code defines "disinterested person" as a person that:

(a) is not a creditor, an equity security holder, or an insider;

(b) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and

(c) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

26. To the best of the Debtors' knowledge and except as otherwise set forth herein and in the Nerland Declaration, the partners, managing directors, senior directors, directors, senior associates, associates, analysts and administration of CRG: (a) do not have any connection with the Debtors or their affiliates, their creditors, the U.S. Trustee, or any person employed in the office of the U.S. Trustee, or any other party in interest, or their respective attorneys and accountants, (b) are "disinterested persons," as that term is defined in section 101(14) of the Bankruptcy Code, and (c) do not hold or represent any interest adverse to the Debtors' estates.

27. If any new relevant facts or relationships are discovered or arise, CRG will use reasonable efforts to identify such further developments.

RLF1-3401587-1

28. Subject to this Court's approval and in accordance with sections 330 and 331 of the Bankruptcy Code, the applicable Bankruptcy Rules, the Local Rules, and other procedures that may be fixed by the Court, the Debtors request that CRG be compensated on an hourly basis and that CRG receive reimbursement of actual and necessary expenses incurred in connection with its representation of the Debtors in these cases.

## NOTICE

29. No trustee, examiner or creditors' committee has been appointed in these Chapter 11 Cases. The Debtors have provided notice of this Application to: (a) the U.S. Trustee, (b) each of the Debtors' creditors holding the thirty (30) largest unsecured claims on a consolidated basis, (c) counsel to the agent for the Debtors' proposed postpetition secured lenders, (d) counsel to the agents for the Debtors' prepetition secured lenders, (e) the Internal Revenue Service, (f) the Securities and Exchange Commission, (g) the United States Department of Justice, (h) counsel to the Debtors' controlling shareholder and (i) all parties requesting notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. The Debtors respectfully submit that no further notice of this Application is required.

## NO PRIOR REQUEST

30. No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein and in the First Day Affidavit, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, granting the relief requested herein and such other and further relief the Court deems just and proper.

Dated: May 29, 2009
Wilmington, Delaware

Anchor Blue Retail Group, Inc. (4718);
Hub Distributing, Inc. (0682);
Hub Designs, Inc. (6076);
Anchor Blue Purchasing Corp. (6120); and
MOST Purchasing Corp. (4718)

*/s/ Scott Rosner*

Name: Scott Rosner
Title: Senior Vice President, Finance and Chief Financial Officer of Anchor Blue Retail Group, Inc., Hub Distributing, Inc., Hub Designs, Inc., Anchor Blue Purchasing Corp. and MOST Purchasing Corp.