# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ANCHOR BLUE RETAIL GROUP, INC., et al.,[1] | ) ) ) | Case No. 09-11770 (PJW) |
| | ) | Jointly Administered |
| Debtors. | ) ) | |
| | ) ) | Objection Deadline (Requested): August 18, 2009 at 12:00 p.m. (noon) (EDT) |
| | ) ) ) | Hearing Date (Requested): August 19, 2009 at 9:30 a.m. (EDT) |

**EMERGENCY[2] MOTION OF DEBTORS AND DEBTORS-IN-POSSESSION FOR AN ORDER APPROVING THAT CERTAIN "AMENDMENT NO. 2 TO ASSET PURCHASE AGREEMENT" IN CONNECTION WITH (I) THAT CERTAIN** *ASSET PURCHASE AGREEMENT BY AND AMONG HUB DISTRIBUTING, INC., HUB DESIGNS, INC., AND ANCHOR BLUE RETAIL GROUP, INC., AND ABLECO FINANCE LLC,* **DATED AS OF MAY 27, 2009, AND (II) THIS COURT'S "ORDER (1) APPROVING ASSET PURCHASE AGREEMENT BETWEEN DEBTORS AND BUYER, (2) APPROVING SALE OF SUBSTANTIALLY ALL ANCHOR BLUE ASSETS AND ASSUMPTION OF CERTAIN LIABILITIES FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (3) APPROVING ASSUMPTION, ASSIGNMENT AND SALE OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (4) DETERMINING AMOUNTS NECESSARY TO CURE SUCH EXECUTORY CONTRACTS AND UNEXPIRED LEASES" DATED JULY 30, 2009 [DOCKET NO. 497]**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") by and through their undersigned counsel, hereby submit this motion (the "Motion") for entry of an order pursuant to sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") approving that certain *Amendment No. 2 to*

---

[1] The Debtors in these cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Anchor Blue Retail Group, Inc. (4718), Hub Distributing, Inc. (0682), Hub Designs, Inc. (6076), Anchor Blue Purchasing Corp. (6120) and MOST Purchasing Corp. (6052). The Debtors' corporate offices are located at 2501 E. Guasti Road, Ontario, CA 91761.

[2] Contemporaneously with the filing of this Motion, the Debtors have filed a motion seeking an expedited hearing on this Motion.

*Asset Purchase Agreement*, dated August 12, 2009 (the "APA Amendment"[3]), in connection with the Debtors' sale, free and clear of liens, claims, interests and encumbrances, of certain assets and the assignment of certain liabilities as identified in that certain *Asset Purchase Agreement By and Among HUB Distributing, Inc., HUB Designs, Inc., and Anchor Blue Retail Group, Inc., and Ableco Finance LLC*, dated as of May 27, 2009 (the "APA"[4]), by and between three of the Debtors, Hub Distributing, Inc., a Florida corporation (formerly known as Anchor Blue Enterprises, Inc.), Hub Designs, Inc., a Florida corporation (formerly known as Most Enterprises, Inc.), Anchor Blue Retail Group, Inc., a Delaware corporation (collectively, "Selling Debtors"), and Ableco Finance LLC, as Term Loan Agent on behalf of the Term Loan Lenders under the Loan Agreement and not in its individual capacity (together with its assignee or designee hereunder, "Buyer"). In support of this motion (the "Motion"), the Debtors respectfully represent as follows:

## Jurisdiction

This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code.

## Background

### A. General

1. On May 27, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief (collectively, the "Chapter 11 Cases") under chapter 11 of the

---

[3] A copy of the APA Amendment, in substantially final form, is attached hereto as Exhibit A.

[4] A copy of the APA is attached hereto as Exhibit B.

Bankruptcy Code.

2. The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases. On June 5, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed a five-member official committee of unsecured creditors (the "Creditors' Committee").

1. **Overview of the Debtors' Corporate Structure and Business**

3. A predecessor to Anchor Blue Retail Group, Inc. ("ABRG"), Hub Distributing, Inc. ("HUB"), was founded in 1972 as a retailer of causal men's apparel under the name "Millers Surplus" (later renamed "Millers Outpost"). Millers Outpost was a specialty retailer of casual apparel with a male-oriented image, principally selling Levi's® branded clothing. Throughout the 1970s, Millers Outpost grew to become one of the world's largest retailers of Levi's® products. In 1980, American Retail Group (formerly known as Amcena Corporation) purchased HUB, the parent of the Millers Outpost business. The following year, Millers Outpost developed its own proprietary brand of private label denim under the Anchor Blue name. By 1989, there were more than 300 Millers Outpost stores, with locations in Arizona, Arkansas, California, Louisiana, Nevada, New Mexico, Texas and Utah.

4. In 1990, ABRG's predecessor opened the first Levi's® Outlet By MOST store and, over the next several years, the Levi's® Outlet by MOST business grew to become a leading outlet center retailer offering a variety of men's, women's and children's apparel and accessories at value prices. Today, Hub Distributing, Inc. and Hub Designs, Inc. hold the exclusive third-party U.S. license for Levi's® and Dockers® outlet stores in the United States and Puerto Rico, and sell a variety of overrun, and irregular Levi's® and Dockers® branded clothing, as well as private label merchandise. The license agreement authorizes the Levi's®

3

and Dockers® division of ABRG ("LDO") to use certain Levi Strauss & Co. trademarks in connection with the operation of its Levi's® Outlet by MOST, Levi's® Outlet by Designs, Dockers® Outlet by MOST and Dockers® Outlet by Designs stores. While not provided for in the license agreement, LDO does purchase and re-sell an assortment of first-quality merchandise under the Levi's® and Dockers® label. LDO currently operates 74 outlet stores in 31 states and Puerto Rico and is projected to generate sales of $146.6 million during the fiscal year ending January 31, 2010 ("FYE 2010").

5. In 1996, the first Anchor Blue store was opened. Beginning in 2001, a process began whereby the Millers Outpost stores were converted to the Anchor Blue banner. Currently, there are five (5) stores with the Millers Outpost banner, all of which operate as clearance or outlet stores. Today, Anchor Blue is a mall-based retailer of contemporary fashion basics and accessories for the high growth teen and young adult markets. ABRG operates 178 Anchor Blue stores in 12 states and is projected to generate sales of $192.7 million in FYE 2010.

6. In 2003, ABRG's business was acquired by Sun Capital Partners, Inc. ("Sun Capital"). In November 2004, ABRG acquired the Designs business from Casual Male Retail Group and became the exclusive Levi's® and Dockers® licensee for outlets in the United States and Puerto Rico. Thereafter, in March, 2005, ABRG and Sun Capital completed a leveraged recapitalization and sold a minority equity stake to Ares Management LLC in July, 2005.

7. As of the Petition Date, the Debtors were a leading specialty apparel retailer, offering compelling value on high quality branded casual apparel and accessories, through their two retail formats, Anchor Blue stores and Levi's® and Dockers® outlets. The Debtors lease their 425,000 square foot corporate headquarters and distribution facility in

Ontario, California (the "Ontario Facility"). All of the Debtors' corporate management functions (which, as of the Petition Date, was on account of both the Anchor Blue and Levi's® and Dockers® outlet businesses) are conducted at the Ontario Facility. As of May 23, 2009, the Debtors had 2,814 employees, 808 of which are full-time employees and 2,006 of which work on a part-time basis. All 251 of the retail stores are subject to leases with aggregate annual rent in excess of $55.6 million as of the Petition Date. On a consolidated basis, the Debtors project to generate sales of $339.3 million and EBITDA of $16.6 million for FYE 2010. For the fiscal year ending January 31, 2009, the Debtors recorded net sales of approximately $370.6 million and incurred a net pre-tax loss of approximately $33.4 million.

2. **The Debtors' Debt Structure**

8. The Debtors are parties to that certain Amended and Restated Loan and Security Agreement, dated as of March 7, 2005, among Hub Distributing, Inc. ("Hub Distributing"), Hub Designs, Inc. ("Hub Designs"), Anchor Blue Purchasing Corp. ("AB Purchasing"), and Most Purchasing Corp. ("Most Purchasing" and together with Hub Distributing, Hub Designs and AB Purchasing, collectively, the "Borrowers"), ABRG, formerly known as Hub Holding Corp., as guarantor, Wachovia Bank, National Association, successor by merger to Congress Financial Corporation (Florida), as administrative agent, Ableco Finance LLC, as term loan agent, the lenders named therein, as lenders (collectively, the "Prepetition Lenders") and the other parties thereto under which the Prepetition Lenders provided loans of up to $120 million to the Borrowers (as amended, the "Prepetition Loan Facility"). The Prepetition Loan Facility consists of a $85 million term loan and a $35 million revolving loan.

9. Amounts outstanding under the Prepetition Loan Facility are secured by a continuing security interest in, among other things, all of the Debtors' intellectual property, inventory, equipment, deposit accounts, personal property and fixtures, accounts receivable,

general intangibles, chattel paper, instruments, and letter of credit rights. As of the Petition Date, an aggregate amount of $90.5 million was outstanding under the Prepetition Loan Facility. As of the date hereof, approximately $24,074,588 is outstanding under the Prepetition Loan Facility, inclusive of deferred interest.

B. **Background to APA Amendment**

10. On May 28, 2009, the Debtors filed and served the *Motion of Debtors and Debtors in Possession for Entry of Orders (I) Approving Bidding Procedures for the Sale of Certain Anchor Blue Assets Free and Clear of All Liens, Claims and Encumbrances Pursuant to Section 363 of the Bankruptcy Code, (II) Approving Certain Bidding Protections, (III) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases, (IV) Scheduling an Auction and Sale Hearing and (V) Approving Such Sale* [Docket No. 26] (the "Bidding Procedures and Sale Motion"). Pursuant to the Bidding Procedures and Sale Motion, the Debtors sought the entry of (i) an order (a) approving proposed bidding procedures (the "Bidding Procedures"), as well as certain proposed bid protections, in connection with the sale (the "Sale") of certain of the Debtors' assets relating to its Anchor Blue business (the "Assets"), (b) scheduling an auction (the "Auction") and a hearing to consider approval of the Sale; and (c) approving the form and manner of notice of the Auction and the notice of the proposed assumption and assignment of executory contracts and unexpired leases; and (ii) an order approving the sale of the Assets free and clear of all liens, claims and encumbrances to the stalking horse bidder or such other party that is the successful bidder at the Auction.[5]

---

[5] As set forth in the Sale Motion and as described in the APA, Buyer was the stalking horse bidder for the Assets.

RLF1-3423753-1

11.     On June 12, 2009, following an initial hearing in connection with the Bidding Procedures and Sale Motion, this Court entered its *Order (I) Approving Bidding Procedures for the Sale of Certain Anchor Blue Assets Free and Clear Of All Liens, Claims and Encumbrances (II) Approving Certain Bidding Protections, (III) Approving the Form and Manner of Notice of The Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases, (IV) Scheduling an Auction and Sale Hearing* [Docket No. 140] (the "AB Bidding Procedures Order"). Pursuant to the AB Bidding Procedures Order, the Court approved the Bidding Procedures, among other things, (i) fixing July 24, 2009 at 5:00 p.m. (Eastern Daylight Time) as the deadline for submitting Qualifying Bids (as such term is defined in the AB Bidding Procedures Order); (ii) scheduling the Auction (only to be held in the event that a Qualifying Bid was received); and (iii) scheduling a hearing to approve the Sale of the Assets for July 30, 2009 at 10:00 a.m. (Eastern Daylight Time) (the "Sale Hearing").

12.     Following the entry of the AB Bidding Procedures Order, the Debtors conducted a sale process in accordance with the terms of that order. In that regard, the Debtors marketed their Anchor Blue business by notifying potential bidders of the Auction and Sale. With input from the Debtors, the Debtors' financial advisor, Duff & Phelps Securities, LLC ("D&P"), prepared a confidential information memorandum ("CIM") for the purposes of soliciting interest in the Anchor Blue business. D&P contacted a total of 178 parties comprised of leading private equity firms and logical strategic parties identified by the Debtors and D&P. Approximately fifteen potential bidders entered into confidentiality agreements and received a copy of the CIM. Six of the parties that received a copy of the CIM requested additional information. The parties that expressed interest in consummating a transaction and that requested additional information were provided access to an online data site that contained

detailed information and financial data with respect to the Anchor Blue business, and representatives of the Debtors personally conferred with a number of interested parties and provided varying levels of information directly to them. Although two parties indicated that they were seriously considering submitting a bid for the Assets (each of whom received a significant amount of additional information from the Debtors), neither party ultimately submitted a qualifying bid. Consequently, notwithstanding the significant efforts of the Debtors and their advisors to generate interest in the Assets, no Qualifying Bids (as such term is defined in the AB Bidding Procedures Order) were received by the bidding deadline set in the AB Bidding Procedures Order. Consequently, at the Sale Hearing, the Debtors sought approval of the Sale of the Assets to Buyer.

13. Following the Sale Hearing, on July 30, 2009, the Court entered its *Order (1) Approving Asset Purchase Agreement Between Debtors and Buyer, (2) Approving Sale of Substantially All Anchor Blue Assets and Assumption of Certain Liabilities Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (3) Approving Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases, and (4) Determining Amounts Necessary to Cure Such Executory Contracts and Unexpired Leases* [Docket No. 497] (the "Sale Order").[6]

14. Pursuant to the Sale Order the Court approved the APA and the Sale of the Assets to Buyer. Among other things, the APA contemplates that the Debtors will assume and assign various contracts and leases to Buyer in connection with the Sale. Specifically, Schedule 1.1(c) of the APA "Purchased Contracts" lists those contracts and leases that the Debtors propose to assign to Buyer. In that regard, Section 2.1 of the APA provides that "[o]n the terms and

---

[6] A copy of the Sale Order is attached hereto as Exhibit C.

subject to the conditions set forth in this Agreement, at the Closing Buyer shall purchase, acquire and accept from Sellers ... all Purchased Contracts." See APA at § 2.1(h). Conversely, Section 2.2 of the APA provides that "[n]othing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest to ... all Excluded Contracts." See APA at § 2.2(c). Consequently, as currently formulated, the APA contemplates that all of the Selling Debtors' contracts and leases fall into one of two categories --- those to be assumed and assigned to Buyer upon the closing of the Sale and those to be retained by the Debtors (and, presumably, rejected given the wind-down of the Debtors' remaining business operations).[7]

15. Since the APA was approved by the Sale Order, however, the Debtors have identified eleven (11) executory contracts and leases (collectively, the "Designated Contracts"[8]) that are important to the Debtors' business operations (and, by extension, will

---

[7] Pursuant to prior orders of this Court, the Debtors have already closed on a sale transaction with respect to their LDO business unit (see Docket No. 273) and, either on their own or with the assistance of a Court approved liquidation firm, are conducting (or have conducted and completed) store closing sales at approximately 60 of their Anchor Blue stores (see Docket Nos. 182 and 228). Following the completion and consummation of these transactions, along with the closing of the Sale to Buyer, the Debtors will no longer have any ongoing retail operations and, absent assumption and assignment of any remaining leases and contracts to Buyer, would likely reject any such remaining agreements.

[8] The Designated Contracts are as follows: (i) *The Fleet Management Services Agreement*, dated as of August 21, 1991, between Automotive Rentals, Inc. ("ARI") and Hub Distributing, Inc., as amended; (ii) *Lease Agreement*, dated as of November 9, 1989, between ARI and Hub Distributing, Inc., as amended; (iii) AT&T Capital Services, Inc. ("AT&T") *Lease* for store routers, phones and VOIP equipment - Schedule #4; (iv) AT&T *Lease* for store routers, phones and VOIP equipment - Schedule #6 (Lessor listed as Ameritech Capital Corporation (d/b/a SBC Capital Services, Inc.); (v) AT&T *Lease* for store routers, phones and VOIP equipment - Schedule #8; (vi) *Master Installment Payment Agreement (Microsoft Enterprise Agreement Financing)*, dated March 24, 2008, between CIT Technology Financing Services, Inc. ("CIT") and Hub Distributing, Inc.; (vii) *Business and Services Agreement*, dated March 26, 2008, made by Hub Distributing, Inc. and Microsoft Licensing, GP ("Microsoft"), and related enrollments and agreements; (viii) *Lease*, dated December 28, 1997, between M-K Associates ("M-K") and Hub Distributing, Inc., as amended, pertaining to the premises located at 2501 Guasti Road, Ontario, California; (ix) *The Service Agreement*, dated as of January 21, 2005, between Schwarz Paper Company (d/b/a Schwarz Retail Services) ("Schwarz") and Hub Distributing, Inc.; (x) *Master Services Agreement*, dated April 16, 2008, between UPS Supply Chain Solutions, Inc. ("UPS" and, collectively along with (Continued)

continue to remain important to the operation of the business following the closing of the Sale) but with respect to which the Buyer is currently unable to determine whether such contracts should be "Purchased Contracts" or "Excluded Contracts" pursuant to the APA prior to the closing of the Sale.

16. Consequently, the Selling Debtors and Buyer have entered into the APA Amendment to provide for a mechanism for addressing the Designated Contracts.[9] Specifically, the APA Amendment provides that the Debtors will continue to provide Buyer, at Buyer's sole expense, with the rights and benefits under the Designated Contracts through September 30, 2009, or such other date as is mutually agreed to by Buyer and Sellers (the "Designation Period"). Following the expiration of the earlier of the Designation Period or such other date as agreed by the parties, the Debtors will then take action in this Court to either (i) assume and assign the Designated Contracts to Ableo or (ii) reject the Designated Contracts. As such, after discussions and negotiations with Buyer, the Selling Debtors have agreed, subject to the approval of this Court, to enter into the APA Amendment to provide for a sound mechanism for addressing the Designated Contracts.

**Relief Requested**

17. By this Motion, the Debtors seek this Court's approval of the APA Amendment. Significantly, except as specifically set forth in the APA Amendment, the APA Amendment does not alter any other terms of the APA including, without limitation, the Assets

---

ARI, AT&T, CIT, Microsoft, M-K and Schwarz, the "Designated Parties") and Hub Distributing, Inc.; and (xi) *Master Services Agreement*, effective February 17, 2005, between UPS and Hub Distributing, Inc., and any currently effective schedules thereto.

[9] Section 13.4 of the APA expressly contemplates that the APA may be amended and provides that "[t]his Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment ... is sought ..." See APA at § 13.4.

subject to the Sale (other than potentially the Designated Contracts themselves), the purchase price or the representations and warranties of the parties in connection with the APA. Indeed, the APA Amendment expressly provides that "[e]xcept as expressly set forth in this Amendment, the Purchase Agreement shall remain in full force and effect and shall not be deemed to have been modified or amended by this Amendment." See APA Amendment at ¶ 3.

18. On or about August 12, 2009, the Selling Debtors and Buyer entered into the APA Amendment, the principal terms of which are as follows:[10]

- **Definitions:** The APA Amendment amends Section 1.1 of the APA by adding the following definition in its proper alphabetical location:

  ""Designation Period" shall have the meaning set forth in Section 13.10."

- **Addition of Designated Contracts:** The APA Amendment further amends the APA to provide for the additional of new Section 13.10 of the APA following Section 13.9 of the APA which provides as follows:

  "Section 13.10 Designated Contracts. Sellers agree that from the date of this Agreement through September 30, 2009, or such other date as is mutually agreed to by Buyer and Sellers (the "Designation Period"), Sellers will provide Buyer, at Buyer's expense, with the rights and benefits under the Contracts set forth on Schedule 13.10 (the "Designated Contracts"). Sellers and Buyer may update Schedule 13.10 until one (1) Business Day prior to the Closing Date. Upon finalization of Schedule 13.10, the Designated Contracts listed therein shall be automatically deemed removed from all Schedules related to Purchased Contracts and Excluded Contracts, and shall not be Purchased Contracts or Excluded Contracts as of the Closing Date. During the Designation Period, Sellers will not seek to reject any Designated Contracts. Buyer's exercise of such rights and benefits shall be subject to Buyer performing all of Sellers' obligations, if any, to third parties that arise under the Contracts during the Designation Period. Buyer shall also promptly pay the reasonable and actual incremental costs or administrative claims incurred by Sellers as a direct result of providing such rights and benefits to Buyer or directly due to the deferral of the decision to reject such

---

[10] The description of the APA Amendment provided herein is an overview of the significant terms of such agreement. To the extent that the description of the APA Amendment discussed in this Motion is inconsistent with the terms of the APA Amendment, the terms of the APA Amendment shall govern.

unexpired Contracts, a good faith estimate of which incremental costs is no more than $25,000 in excess of the Sellers' existing financing resources. Sellers shall, upon the written request of Buyer, promptly make a motion in the Bankruptcy Case to assume and assign to Buyer any Contract listed on Schedule 13.10 and any such Contract shall be deemed to be a Purchased Contract. The Cure Amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from any defaults under those Contracts set forth on Schedule 13.10 to be assumed and assigned to Buyer shall be paid by Buyer, and Sellers shall have no liability therefor. Upon receipt by Sellers of written notice from Buyer to reject a Designated Contract, Sellers shall, within three (3) Business Days thereof, make a motion in the Bankruptcy Case to reject such Designated Contract and shall use best efforts to cause such Designated Contract to be rejected promptly. Upon the approval of the Bankruptcy Court of the rejection of such Designated Contract, such Designated Contract shall be deemed an Excluded Contract for all purposes under this Agreement, and Buyer shall have no further obligation with respect to such incremental costs or administrative claims after the later of such date or the last day of the payment period in which such date occurs. All obligations arising thereafter in connection with such Excluded Contracts shall be considered Excluded Liabilities under this Agreement."

## Basis for Relief

19. The Debtors, in their business judgment, believe that entering into the APA Amendment is reasonable in light of the circumstances surrounding the Sale of the Assets, and given the economic benefit of closing on the Sale, is in the best interests of the Debtors' estates. As mentioned above, the Designated Contracts are critical to the Debtors' business operations and, in order to ensure a smooth continuity in business operations following the closing of the Sale to Buyer, it is critical that Buyer have access to the services and/or properties subject to the Designated Contracts.[11] At the same time, however, the Debtors are presently (or

---

[11] For example, the contracts with AT&T provide for the lease of essential equipment placed in each of the Debtors' retail locations. Absent continued access to the equipment leased from AT&T, the Debtors would likely suffer severe disruptions to their retail operations. Similarly, the lease agreement with M-K is the lease on the Ontario Facility. The Ontario Facility houses (and will continue to house following the closing of the Sale) all of the Debtors' management, technological support personnel and (Continued)

12

intend to commence) negotiating amendments with each of the Designated Parties and are unable to assume the Designated Contracts at this time (as the Buyer is unwilling to take an assignment of the Designated Contracts at this time). In its present form, the APA does not provide a mechanism for dealing with the Designated Contracts and it now contemplates that, upon closing, all contracts and leases will either be assumed and assigned to Buyer or retained by the Debtors with Buyer having no access to the benefits under those agreements. As such, the APA Amendment is necessary to provide a means for addressing the Designated Contracts in a manner that will give Buyer access to Debtors' rights under the Designated Contacts (at Buyer's own expense) for a limited period a time while the Debtors (or Buyer, as the case may be) complete their negotiations with the Designated Parties. Once the Designation Period expires, the Debtors will either then take action to assume and assign the Designated Contacts (as the same may be amended at that time) to Buyer or will reject them. The Debtors respectfully submit that they negotiated the APA Amendment based upon their sound business judgment and that its approval is in the best interests of their estates, thus meeting the requirements of sections 105 and 363 of the Bankruptcy Code.

20. Section 105(a) of the Bankruptcy Code "permits the court to issue any order that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, . . . other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). A court has the statutory authority to authorize a debtor to use property of the estate pursuant to section 363(b)(1) of the Bankruptcy Code when such use is an

---

others critical to the Debtors' operations. If the Debtors were to be forced to precipitously exit the Ontario Facility, they would again face potential irreparable harm.

13

exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith. In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); see also Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (a debtor's decision must be supported by "some articulated business justification"); Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b)); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Ernst Home Center, Inc., 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).

21.     Under section 363(b) of the Bankruptcy Code, a debtor has the burden to establish that it has a valid business purpose for using estate property outside the ordinary course of business. See Lionel Corp., 722 F.2d at 1070-71 (business judgment rule requires a finding that a good business reason exists to grant a debtor's application under 363(b)); see also In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989); In re Delaware Hudson Ty. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991). The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).

22.     Once the debtor has articulated such a valid business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief that the action was in the debtor's best interest. See In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). A party-in-interest seeking to challenge the debtor's valid business purpose must "produce some evidence supporting its objections." Montgomery Ward, 242 B.R. at 155.

RLF1-3423753-1

23. The Debtors submit that their decision to enter into the APA Amendment is based upon its sound business judgment and is in the best interests of the Debtors' estates, and thus more than meets the requirements of sections 105 and 363 of the Bankruptcy Code, for the following reasons:

    a. Approval of the APA Amendment will permit the Sale to close to Ableo in a timely and orderly fashion and will avoid potentially irreparable disruptions to the Debtors' business operations;

    b. the APA Amendment provides that Buyer will be responsible for all of the Debtors' obligations under the Designated Contracts during the Designation Period thereby insulating the Debtors from the risk of any liability on account of the Designated Contracts during that time;

    c. the APA Amendment will allow the Debtors, or Buyer as the case may be, the opportunity to complete negotiations with the Designated Parties with the ultimate goal of achieving the entry into amended agreements with those parties to the benefit of all parties involved including, without limitation, the benefit to the Debtors' estates of reducing and/or eliminating any potential rejection damages claims on account of any of the Designated Contracts that the Debtors might ultimately be in a position to assume and assign to Buyer following their amendment.

24. Absent approval of the APA Amendment, the closing of the Sale could be delayed. As noted, above, the Designated Contracts are both essential to the conduct of the Debtors' retail operations (and, by extension, will be critical to the operation of the retail business once the Sale to Buyer closes) but at the same time not in a form that Buyer is willing to accept an assignment of at this time.[12] By approving the APA Amendment, the Debtors (or Buyer, as the case may be) will be able to continue negotiating amendments to each of the Designated Contracts that, once amended, will likely leave the Debtors in a position of being

---

[12] For example, the lease agreement with M-K provides for the Debtors to occupy and pay lease payments on an excessive-sized space given the down-sizing of the go-forward Anchor Blue business. Similarly, the AT&T and Microsoft agreements, in their current form, obligate the Debtors to leasing or licensing far more equipment or technology than the go-forward Anchor Blue business needs given its reduced size compared to the size and scope of the Debtors' operations on and before the Petition Date.

able to assume and assign them to Buyer. If the Debtors (or Buyer, as the case may be) are unable to reach reasonable amendments to the Designated Contacts within the Designation Period, approval of the APA Amendment will provide Buyer with sufficient time to locate replacement providers with respect to the services provided under the Designated Contracts. At the same time, the APA Amendment provides for the continuation of all payments due under the Designated Contracts to the Designated Parties during the Designation Period thereby negating any potential prejudice to the Designated Parties.

25. Accordingly, for the reasons discussed above, the Debtors submit that their decision to enter into the APA Amendment is based upon their sound business judgment, is in the best interests of the Debtors' estates and their creditors, and that the Debtors have therefore satisfied the standards embodied by sections 105 and 363(b) of the Bankruptcy Code. Consequently, the Debtors respectfully submit that the APA Amendment should be approved.

### Notice

26. The Debtors shall provide notice of this Motion via overnight delivery to: (a) the U.S. Trustee, (b) counsel to the Creditors' Committee, (c) counsel to the agent for the Debtors' postpetition secured lenders, (d) counsel to the agents for the Debtors' prepetition secured lenders, (e) the Internal Revenue Service, (f) the Securities and Exchange Commission, (g) the United States Department of Justice, (h) counsel to the Debtors' controlling shareholder (i) each of the Designated Parties, and (j) all parties requesting notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. The Debtors respectfully submit that no further notice of this Motion is required.

### Prior Request

27. As set forth, above, this Court previously entered the Sale Order approving the APA. No previous motion for the specific relief sought herein with respect to approval of the APA Amendment has been made to this or any other court.

WHEREFORE, the Debtors respectfully request the entry of an order, substantially in the form attached hereto as <u>Exhibit D</u>, (i) approving the APA Amendment; and (ii) granting such other and further relief as is proper under the circumstances.

Dated: August 12, 2009
Wilmington, Delaware

Respectfully submitted,

/s/ [signature]

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Jason M. Madron (No. 4431)
Chun I. Jang (No. 4790)
Drew G. Sloan (No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Attorneys for the Debtors and Debtors-in-Possession*