# EXHIBIT A

ASSET PURCHASE AGREEMENT

BY AND AMONG

HUB DISTRIBUTING, INC.,

HUB DESIGNS, INC., AND

ANCHOR BLUE RETAIL GROUP, INC.

AND

ABLECO FINANCE LLC (as Term Loan Agent
on behalf of the Term Loan Lenders
under the Loan Agreement and
not in its individual capacity)

Dated as of May 27, 2009

114265.9

# TABLE OF CONTENTS

Page

ARTICLE I      DEFINITIONS ......................................................................................... 1
    Section 1.1     Certain Definitions ......................................................................... 1
    Section 1.2     Other Definitional and Interpretive Matters ............................... 9

ARTICLE II      PURCHASE AND SALE OF ASSETS; ASSUMPTION
           OF LIABILITIES ............................................................................ 10
    Section 2.1     Purchase and Sale of Assets .......................................................... 10
    Section 2.2     Excluded Assets .............................................................................. 12
    Section 2.3     Assumption of Liabilities ............................................................... 13
    Section 2.4     Purchased Assets ............................................................................ 14
    Section 2.5     Further Conveyances and Assumptions ........................................ 14
    Section 2.6     Pre- and Post-Closing and Transitional Matters. ........................ 14

ARTICLE III      CONSIDERATION ......................................................................... 15
    Section 3.1     Purchase Price; Assumed Liabilities ............................................ 15

ARTICLE IV      CLOSING AND TERMINATION ................................................. 15
    Section 4.1     Closing Date .................................................................................... 15
    Section 4.2     Deliveries by Sellers ...................................................................... 15
    Section 4.3     Deliveries by Buyer ....................................................................... 16
    Section 4.4     Termination of Agreement ............................................................ 16
    Section 4.5     Procedure Upon Termination ........................................................ 17
    Section 4.6     Effect of Termination ..................................................................... 17

ARTICLE V      REPRESENTATIONS AND WARRANTIES OF SELLERS ............. 18
    Section 5.1     Authorization of Agreement ......................................................... 18
    Section 5.2     Title to Purchased Assets ............................................................. 18
    Section 5.3     Real Property ................................................................................. 18
    Section 5.4     Tangible Personal Property ........................................................... 18
    Section 5.5     Intellectual Property ...................................................................... 19
    Section 5.6     Financial Advisors ......................................................................... 19
    Section 5.7     Litigation ......................................................................................... 19
    Section 5.8     Compliance with Laws .................................................................. 19
    Section 5.9     Permits ............................................................................................ 19
    Section 5.10     Purchased Inventory ...................................................................... 19
    Section 5.11     Contracts ......................................................................................... 20
    Section 5.12     Taxes ............................................................................................... 20
    Section 5.13     Sellers' Representations and Warranties Generally ..................... 20

ARTICLE VI      REPRESENTATIONS AND WARRANTIES OF BUYER ............... 21
    Section 6.1     Organization and Good Standing .................................................. 21
    Section 6.2     Authorization of Agreement ......................................................... 21
    Section 6.3     Financial Advisors ......................................................................... 21

Section 6.4 Litigation ............................................................................................ 21
Section 6.5 Financial Capability ............................................................................ 21
Section 6.6 Condition of the Business .................................................................... 22

ARTICLE VII   BANKRUPTCY COURT APPROVAL ................................................. 22
Section 7.1 Approval of Expense Reimbursement and Overbid Protection ............... 22
Section 7.2 Competing Transaction ....................................................................... 22
Section 7.3 Bankruptcy Court Filings .................................................................... 23

ARTICLE VIII   COVENANTS ....................................................................................... 23
Section 8.1 Access to Information ......................................................................... 23
Section 8.2 Further Assurances ............................................................................. 23
Section 8.3 Confidentiality ................................................................................... 24
Section 8.4 Preservation of Records ...................................................................... 24
Section 8.5 Publicity ............................................................................................ 25
Section 8.6 Operation of Business ......................................................................... 25
Section 8.7 Section 363(b)(1)(A) .......................................................................... 27
Section 8.8 Adequate Assurances Regarding Purchased Contracts and Certain
            Real Property Leases ......................................................................... 27
Section 8.9 Material Adverse Effect ...................................................................... 27
Section 8.10 Prospective Employees ....................................................................... 27
Section 8.11 Name Change ..................................................................................... 27

ARTICLE IX   [RESERVED] ......................................................................................... 27

ARTICLE X   CONDITIONS TO CLOSING ................................................................. 28
Section 10.1 Conditions Precedent to Obligations of Buyer ..................................... 28
Section 10.2 Conditions Precedent to Obligations of Sellers .................................... 29
Section 10.3 Conditions Precedent to Obligations of Buyer and Sellers .................... 29
Section 10.4 Frustration of Closing Conditions ....................................................... 30

ARTICLE XI   NO SURVIVAL ...................................................................................... 30
Section 11.1 No Survival of Representations and Warranties .................................... 30

ARTICLE XII   TAX MATTERS ..................................................................................... 30
Section 12.1 Transfer Taxes ................................................................................... 30
Section 12.2 Prorations .......................................................................................... 30
Section 12.3 Purchase Price Allocation ................................................................... 30

ARTICLE XIII   MISCELLANEOUS .............................................................................. 31
Section 13.1 Expenses ........................................................................................... 31
Section 13.2 Submission to Jurisdiction; Consent to Service of Process ................... 31
Section 13.3 Waiver of Right to Trial by Jury ......................................................... 31
Section 13.4 Entire Agreement; Amendments and Waivers ...................................... 31

## TABLE OF CONTENTS
### (Continued)

Section 13.5  Governing Law ........................................................................... 32
Section 13.6  Notices ....................................................................................... 32
Section 13.7  Severability ................................................................................ 33
Section 13.8  Binding Effect; Assignment....................................................... 33
Section 13.9  Counterparts............................................................................... 33

# SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Contracts |
| Schedule 1.1(c) | Purchased Contracts |
| Schedule 1.1(d) | Purchased Intellectual Property |
| Schedule 1.1(g) | Disposed Locations |
| Schedule 2.1 | Additional Purchased Assets |
| Schedule 2.1(r) | Critical Trade Vendors |
| Schedule 2.2(m) | Additional Excluded Assets |
| Schedule 2.3(a) | Assumed Liabilities |
| Schedule 5.6 | Financial Advisors |
| Schedule 5.7 | Litigation |
| Schedule 5.8 | Compliance with Laws |
| Schedule 5.9 | Permits |
| Schedule 5.12 | Tax Audits |
| Schedule 8.6(i) | Affiliate Transactions |

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT, dated as of May 27, 2009 (this "Agreement"), is entered into by and among Hub Distributing, Inc., a Florida corporation (formerly known as Anchor Blue Enterprises, Inc.), Hub Designs, Inc., a Florida corporation (formerly known as Most Enterprises, Inc.), Anchor Blue Retail Group, Inc., a Delaware corporation (collectively, "Sellers") and Ableco Finance LLC, as Term Loan Agent on behalf of the Term Loan Lenders under the Loan Agreement and not in its individual capacity (together with its assignee or designee hereunder, "Buyer").

## WITNESSETH:

WHEREAS, on the date hereof (the "Petition Date"), Sellers intend to file voluntary petitions for reorganization relief (collectively, the "Bankruptcy Cases") pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as it may be amended from time to time as applicable to the Cases, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, Sellers presently conduct the Business;

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Purchased Assets and Assumed Liabilities as more specifically provided herein; and

WHEREAS, certain terms used in this Agreement are defined in Section 1.1.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Certain Definitions.  For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Ableco" means, together with its assignee or designee hereunder, Ableco Finance LLC, as Term Loan Agent on behalf of the Term Loan Lenders under the Loan Agreement and not in its individual capacity.

"Accounts Receivable" means all accounts, accounts receivable, contract rights to payment, notes, and notes receivable of Sellers related to the Business.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or

cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Alternative Proposal" has the meaning set forth in Section 7.2.

"Assumed Liabilities" shall have the meaning set forth in Section 2.3.

"Assumed Location" means each property subject to a Real Property Lease that is a Purchased Contract.

"Bankruptcy Cases" shall have the meaning set forth in the Recitals.

"Bankruptcy Code" shall have the meaning set forth in the Recitals.

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Bid Procedures Order" means an Order of the Bankruptcy Court, in substantially the form attached hereto as Exhibit A, approving the bid procedures with respect to the auction, the Expense Reimbursement and the Initial Minimum Overbid, and providing that if no qualified Competing Bid is received by the bid deadline established in accordance with the auction, Buyer's bid shall be determined to be the winning bid for the Purchased Assets.

"Business" means the business and operations of Sellers relating to the Anchor Blue retail store chain, but excluding such business and operations relating to the Disposed Locations.

"Business Day" means any day of the year on which national banking institutions in New York and California are open to the public for conducting business and are not required or authorized to close.

"Buyer" shall have the meaning set forth in the Recitals.

"Buyer Documents" shall have the meaning set forth in Section 6.2.

"Closing" shall have the meaning set forth in Section 4.1.

"Closing Date" shall have the meaning set forth in Section 4.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bid" shall have the meaning set forth in Section 7.2(a).

"Contract" means any contract, indenture, note, bond, lease, Real Property Lease, Personal Property Lease or other agreement (including, without limitation, employment and consulting agreements) to which any Seller is a party, relating to the Business, as set forth on Schedule 1.1(a).

"Critical Trade Vendors" shall have the meaning set forth in Section 2.1(r).

"Cure Amounts" means any and all amounts required, as a condition to assumption or assignment, to be paid to a non-debtor party to a Purchased Contract pursuant to Section 365(b) of the Bankruptcy Code.

"DIP Order" means any Order of the Bankruptcy Court relating to Debtor-in-Possession financing provided to Sellers and their Affiliates in connection with the Bankruptcy Case.

"Disposed Locations" means those stores relating to the Business set forth on Schedule 1.1(g) (as updated from time to time by Buyer in accordance with this Agreement) that are designated by Buyer, in its sole and absolute discretion, to be closed pursuant to a GOB Sale.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Business and the Purchased Assets in each case whether or not in electronic form.

"Employee Claims" means any claim, demand, action, cause of action, damage, loss, cost, Liability or expense, including legal costs, made or brought by any Employee, including, but not limited to, any Employment Claim made pursuant to any applicable Laws relating to employment standards, occupational health and safety, labor relations, workers compensation, pay equity, employment equity, the Americans with Disabilities Act, the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the Family and Medical Leave Act or the Fair Labor Standards Act or any other federal, state or local, statutory or decisional Law regarding employment discrimination.

"Employee Obligations" means all wages, bonuses, vacation pay, sick time, pension payments, overtime pay, change of control payments, severance pay and any other termination or severance obligations and any other compensation or obligation which may be due by statute, contract or Law relating to the employment of the Employees.

"Employees" means all individuals, as of the date hereof, whether or not actively at work as of the date hereof, who are employed by Sellers in connection with the Business, together with individuals who are hired in respect of the Business after the date hereof and prior to the Closing.

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Excluded Contracts" means all Contracts other than Purchased Contracts.

"Excluded Liabilities" shall have the meaning set forth in Section 2.3.

"Expense Reimbursement" shall have the meaning set forth in Section 7.1.

"Final Order" means an Order, judgment, or other decree of the Bankruptcy Court that has not been vacated, reversed, modified, amended, or stayed, and for which the time to further appeal or seek review or rehearing has expired with no appeal, review or rehearing having been filed or sought.

"Furniture and Equipment" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned or leased by Sellers in the conduct of the Business at the Assumed Locations, including all such artwork, desks, chairs, tables, computer and computer-related hardware (including, computers, file servers, facsimile servers, scanners, printers, and networks), copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles, cash registers, point-of-sale equipment, warehouse equipment, and miscellaneous office furnishings and supplies at the Assumed Locations.

"GAAP" means generally accepted accounting principles in the United States.

"GOB Sales" means the going-out-of-business sales at the Disposed Locations.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Indebtedness" of any Person means, without duplication, (i) the principal and interest of, and premium (if any) in respect of, (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of other Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Initial Minimum Overbid" means Five Hundred Thousand Dollars ($500,000).

"Intellectual Property" means all worldwide intellectual property rights used or useful by Sellers in connection with the Purchased Assets, including all (i) patents, patent applications and inventions, (ii) trademarks, service marks, trade names and trade dress, which expressly includes the goodwill and any common law rights associated with the foregoing, (iii) domain names, (iv) copyrights, including copyrights in computer software, (v) confidential and proprietary information, including trade secrets and know-how ("Trade Secrets"), (vi) licenses relating to any of the foregoing and (vi) registrations and applications for registration of the foregoing.

"**Inventory**" means all of Sellers' now owned or hereafter acquired inventory and goods, wherever located, relating to the Business which, among other things, (a) are leased by any Seller as lessor, (b) are held by such Seller for sale or lease or to be furnished under a Contract of service, (c) are furnished by any Seller under a Contract of service, or (d) consist of raw materials, work in process, finished goods or material used or consumed in connection with the Business.

"**Key Employee Incentive Plan**" means any key employee retention plan or management incentive plan of Sellers approved by the Bankruptcy Court.

"**Knowledge**" means, with respect to Sellers, as to a particular matter, the actual knowledge as of the date of inquiry or verification, and without independent verification or investigation, of Tom Sands (President, CEO and COO of Sellers) and Scott Rosner (Senior Vice President, Treasurer and CFO of Sellers).

"**Law**" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation or Order.

"**Legal Proceeding**" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"**Levi's Transaction**" means that transaction entered into in connection with that certain Asset Purchase Agreement, dated as of May 26, 2009 (as amended, supplemented or modified to date) (the "**Levi's Purchase Agreement**"), by and among Anchor Blue Retail Group, Inc., Hub Distributing, Inc. and Hub Designs, Inc., and Levi Strauss & Co.

"**Liability**" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"**Lien**" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, or transfer restriction under any shareholder or similar agreement or encumbrance; provided, however, that Assumed Liabilities as pertain to particular Purchased Assets shall not constitute Liens.

"**Loan Agreement**" means that certain Amended and Restated Loan and Security Agreement, dated as of March 7, 2005, by and among HUB Distributing, Inc., Hub Designs, Inc., Anchor Blue Purchasing Corp., Most Purchasing Corp., and Anchor Blue Retail Group, Inc. (as Guarantor), Wachovia Bank, National Association, as Administrative Agent, and Ableco (as Term Loan Agent) (as amended, supplemented or otherwise modified from time to time).

"**Material Adverse Effect**" means (i) a material adverse effect on the business, assets, results of operations or financial condition of Sellers, the Business or the Purchased Assets (except for the Bankruptcy Cases), or (ii) a material adverse effect on the ability of Sellers to consummate the transactions contemplated by this Agreement or perform their obligations under this Agreement, other than (a) the effect of any change resulting from any action taken by Buyer or its Affiliates with respect to the transactions contemplated hereby or with respect to Sellers, or

any effect resulting from the filing of the Bankruptcy Cases; (b) a generally applicable change in applicable Law or GAAP or interpretation thereof; (c) any public announcement of this Agreement; (d) any actions or inactions by Sellers in accordance with this Agreement; (e) changes in conditions generally affecting the industries in which Sellers conduct the Business that do not affect the Business, the Purchased Assets or the Assumed Liabilities in a disproportionate manner when compared to the effect of the same on other Persons engaged in such industries; or (f) general economic, political or financial market conditions.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business consistent with the past practice of the Business through the date hereof, subject to any duties and restrictions imposed on Sellers under the Bankruptcy Code.

"Overbid Protection" shall have the meaning set forth in Section 7.1.

"Parties" means Sellers and Buyer.

"Permits" means any approvals, authorizations, consents, licenses, permits or certifications of a Governmental Body.

"Permitted Exceptions" means (i) all defects, exceptions, restrictions, easements, rights of way, encumbrances and Liens reflected in policies of title insurance which have been made available to or are obtained by Buyer and that would not interfere with the use of the Purchased Assets or conduct of the Business in accordance with historical practice; (ii) statutory Liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings provided an appropriate reserve is established therefor; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations have not been violated; (v) title of a lessor under a capital or operating lease, (vi) the Assumed Liabilities as pertain to particular Purchased Assets, and (vii) such other imperfections in title which would not materially interfere with the use of the Purchased Assets.

"Person" means any individual, corporation, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Personal Property Leases" shall have the meaning set forth in Section 5.4.

"Petition Date" shall have the meaning set forth in the Recitals.

"Products" means any and all products developed, manufactured, procured, marketed or sold by Sellers, whether work in progress or in final form, in connection with the Business.

"Prospective Employees" shall have the meaning set forth in Section 8.10(a).

"Purchase Price" shall have the meaning set forth in Section 3.1.

"Purchased Assets" shall have the meaning set forth in Section 2.1.

"Purchased Contracts" means the Contracts set forth on Schedule 1.1(c), as such Schedule may be amended from time to time in accordance with this Agreement.

"Purchased Intellectual Property" means the Intellectual Property and related Software and Technology of the Sellers relating to the Business, all as set forth on Schedule 1.1(d).

"Purchased Inventory" means, as of the Closing, all Inventory located at, or in transit to, Assumed Locations.

"Real Property Leases" shall have the meaning set forth in Section 5.3.

"Sale and Bid Procedures Motion" means the motion or motions of Sellers filed with the Bankruptcy Court seeking approval and entry of the Bid Procedures Order, and, in the event that Buyer is the winning bidder at the auction or no Competing Bid is submitted, the Sale Order.

"Sale Order" shall be an Order of the Bankruptcy Court, in the form attached hereto as Exhibit B or as otherwise approved by Buyer in its sole and absolute discretion, approving this Agreement and all of the terms and conditions hereof, approving the sale and assignment to Buyer of all of the Purchased Assets (assuming that either Buyer is the winning bidder at the auction contemplated hereby or no Competing Bid is submitted for the Purchased Assets by the deadline for such bids set forth in the Bid Procedures Order), and approving and authorizing Sellers to consummate the transactions contemplated hereby. Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) the Purchased Assets sold to Buyer pursuant to this Agreement shall be transferred to Buyer free and clear of all Liens (other than Liens specifically assumed or created by Buyer and Permitted Exceptions), claims (other than Assumed Liabilities), encumbrances and interests (including Liens, claims, encumbrances and interests of any Governmental Body), such Liens, claims, encumbrances and interests to attach to the proceeds of sale of the Purchased Assets, (ii) the Purchased Contracts may be assumed by Sellers and assigned to Buyer under Section 365 of the Bankruptcy Code, (iii) Buyer has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code, (iv) this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions, (v) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 13.2 hereof, and (vi) this Agreement and the transactions contemplated hereby are not subject to rejection or avoidance by any chapter 7 or chapter 11 trustee of Sellers.

"Sellers" shall have the meaning set forth in the Recitals.

"Sellers Documents" shall have the meaning set forth in Section 5.1.

"Software" means, except to the extent generally available for purchase from third Persons, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize

and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons and (iv) all documentation including user manuals and other training documentation related to any of the foregoing, in each case, relating to the Business.

"Store Cash" means all cash and cash equivalents as of the Closing at each Assumed Location.

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, Inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business or in the design, development, reproduction, maintenance or modification of, any of the Products.

"Term Loan DIP" means that certain debtor-in-possession financing to be made available by the Term Loan Lenders to Sellers in an amount up to the aggregate proceeds (such proceeds to include the Deposit (as defined in the Levi's Purchase Agreement) and the Inventory Escrow Amount (as defined in the Levi's Purchase Agreement) (collectively, the "Escrowed Funds")) received by the Term Loan Lenders or deposited with the Escrow Agent (as defined in the Levi's Purchase Agreement) in respect of the Deposit (as defined in the Levi's Purchase Agreement) and the Inventory Escrow Amount (as defined in the Levi's Purchase Agreement) from the proceeds of the Levi's Transaction and the GOB Sales in excess of $52,500,000, subject to a budget and documentation acceptable to the Term Loan Lenders in their sole and absolute discretion.

"Term Loan Lenders" means those certain Term Loan Lenders under the Loan Agreement.

"Termination Date" shall have the meaning set forth in Section 4.4(a).

"Trade Secrets" shall have the meaning set forth in Section 1.1 (in the definition of Intellectual Property).

"Transfer Taxes" means sales, use, stamp, documentary stamp, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated by this Agreement.

"Transition Services Agreement" means that certain Transition Services Agreement to be entered into in connection with the Levi's Transaction.

"WARN" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar state Law related thereto.

Section 1.2     Other Definitional and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars. Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits/Schedules. The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall not be deemed to have been disclosed on any other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)     The Parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1     Purchase and Sale of Assets. On the terms and subject to the conditions set forth in this Agreement, at the Closing Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer the Purchased Assets. "Purchased Assets" shall mean all of Sellers' right, title and interest in, to and under the following assets of Sellers (but excluding Excluded Assets) as of the Closing related to the Business:

(a)     all accounts receivable of Sellers related to the Business other than any accounts receivable arising exclusively out of or exclusively in connection with any Excluded Contract or Excluded Asset;

(b)     Store Cash in an amount of not less than $500, nor more than $1,000, per Assumed Location;

(c)     all Purchased Inventory;

(d)     all deposits (including, with respect to Purchased Assets, customer deposits and security deposits for rent, electricity, telephone or otherwise) and other prepaid charges and expenses of Sellers as they relate to Purchased Assets; and excluding any deposits or prepaid charges and expenses paid exclusively in connection with or relating exclusively to any Excluded Assets;

(e)     subject to the provisions of Section 9.1, all rights of Sellers under each Real Property Lease set forth on Schedule 1.1(c), together with Sellers' interests in and to all improvements and fixtures under each such Real Property Lease, and other appurtenances thereto, and Sellers' rights in respect thereof;

(f)     all Furniture and Equipment;

(g)     all Purchased Intellectual Property;

(h)     all Purchased Contracts;

(i)     all Sellers' Documents that are used in, held for use in or intended to be used in, or that arise out of, the Business, including Documents relating to accounts receivable, Products, services, marketing, advertising, promotional materials, Purchased Intellectual Property and all files, customer lists, files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of the

premises referred to in clause (d) above; subject, in each case, to the rights of Levi Strauss & Co. under the Levi's Purchase Agreement and the rights of access under the Transition Services Agreement and excluding any Documents exclusively related to any Excluded Assets;

      (j)    all Permits used by Sellers in the Business, to the extent transferable;

      (k)    all supplies owned by Sellers and used in connection with the Business;

      (l)    to the extent transferable, all insurance policies or rights to proceeds thereof relating to the Purchased Assets (other than any directors and officers or fiduciary insurance policy, each of which shall be an Excluded Asset);

      (m)    all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees and agents of Sellers or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

      (n)    all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors if and to the extent that such rights are assignable by operation of Law and relating to Products sold, or services provided, to Sellers or to the extent affecting any Purchased Assets other than any warranties, representations and guarantees pertaining to any Excluded Assets;

      (o)    subject to the provisions of Section 363(b)(1)(A) of the Bankruptcy Code, all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property owned by Sellers;

      (p)    [reserved];

      (q)    the Transition Services Agreement and all assets of Sellers used or necessary to provide services in connection therewith;

      (r)    rights, claims or causes of action of Sellers, including any rights or claims as arise under Chapter 5 of the Bankruptcy Code, against the entities set forth on Schedule 2.1(r) (such schedule to be updated by Buyer in its sole and absolute discretion from time to time to include any entity that provides goods and services to or for the benefit of the Business, until one (1) Business Day prior to the Closing Date; provided, however, that no such update shall result in an adjustment of the Purchase Price) (the "Critical Trade Vendors"); and

      (s)    the assets set forth on Schedule 2.1.

Notwithstanding anything herein to the contrary, Buyer may, from time to time, amend the Purchased Assets so as to include additional assets in its sole and absolute discretion until two (2) Business Days prior to the date of the auction contemplated hereby (except that Buyer may not add as a Purchased Asset anything specifically listed in Section 2.2 below as an Excluded Asset, other than Excluded Contracts, and accounts receivable and proceeds relating thereto, and Intellectual Property rights); and provided, however, that no such addition shall result in any adjustment of the Purchase Price.

Section 2.2    Excluded Assets: Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets. "Excluded Assets" shall mean all assets, properties, interests and rights of Sellers other than the Purchased Assets, including without limitation each of the following assets:

(a)    all cash, cash equivalents, bank deposits or similar cash items of Sellers, other than Store Cash in an amount of not less than $500, nor more than $1,000, per Assumed Location;

(b)    all of Sellers' deposits or prepaid charges and expenses paid exclusively in connection with or relating exclusively to any Excluded Assets;

(c)    all Excluded Contracts;

(d)    any accounts receivable and proceeds arising exclusively out of or exclusively in connection with any Excluded Contract or Excluded Asset; and all of Sellers' rights under this Agreement and/or other documents and agreements executed in connection with the transactions provided for herein;

(e)    all obligations, Liabilities and Indebtedness, including any note Indebtedness, owed to or by any Seller to or by any Affiliate of any Seller;

(f)    any Intellectual Property rights of Sellers other than the Purchased Intellectual Property;

(g)    any (i) confidential personnel and medical records pertaining to any Employee; (ii) other books and records that Sellers are required by Law to retain or that Sellers determine are necessary or advisable to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Buyer shall have, to the extent allowed by applicable Law, the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets; (iii) minute books, stock or membership interest records and corporate seals; and (iv) documents relating to proposals to acquire the Business by Persons other than Buyer;

(h)    any claim, right or interest of Sellers in or to any refund, rebate, abatement or other recovery for Taxes of Sellers, except to the extent relating to Buyer's operation of the Business after the Closing, together with any interest due thereon or penalty rebate arising therefrom;

(i)    any rights, claims or causes of action of Sellers against third parties relating to assets, properties, Business or operations of Sellers arising out of events occurring on or prior to the Closing Date and causes of action under Chapter 5 of Title 11 of the United States Code, and proceeds deriving therefrom, other than rights, claims or causes of action of Sellers against Critical Trade Vendors;

(j)     all Inventory, Furniture and Equipment and other assets located and used at a Disposed Location including, without limitation, those that are sold in connection with a GOB Sale (and the proceeds thereof);

(k)     all funds deposited in Sellers' VEBA account (it being understood and agreed that Buyer shall neither assume such account nor any obligation to fund any liability covered thereby);

(l)     Sellers' rights under this Agreement;

(m)     the assets set forth on Schedule 2.2(m); and

(n)     all Tax credits and other Tax attributes of Sellers.

Notwithstanding anything herein to the contrary, Buyer may, from time to time, exclude additional assets from the Purchased Assets in its sole and absolute discretion until one (1) Business Day prior to the Closing Date; provided, however, that no such exclusion shall result in any adjustment of the Purchase Price.

Section 2.3     Assumption of Liabilities.  On and subject to the terms and conditions of this Agreement, Buyer shall assume and become responsible for all of the Assumed Liabilities at the Closing.  Buyer will not assume or have any responsibility for any other obligation or liability of Sellers not included within the definition of Assumed Liabilities, including, without limitation: (i) Taxes related to the Business or the Purchased Assets for all Tax periods (or portions thereof) ending on or prior to the Closing; (ii) any costs or expenses incurred in connection with, or related to, the administration of the Bankruptcy Cases, including, without limitation, any accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Bankruptcy Cases; (iii) liabilities to the extent relating to the Excluded Assets, including Liabilities relating to Excluded Contracts; (iv) Liabilities and obligations of Sellers under this Agreement; (v) all Liabilities and obligations arising under any Purchased Contract (and all liabilities for any breach, act or omission under any Purchased Contract) arising prior to the Closing; (vi) all obligations, Liabilities and Indebtedness, including any note Indebtedness, owed by any Seller to any Affiliate of any Seller; (vii) any Employee Obligations to any Employee arising out of such Employee's employment by Sellers prior to the Closing; (viii) any Employee Claim of any Employee arising out of such Employee's employment by Sellers prior to the Closing; (ix) any WARN Liabilities; (x) Cure Amounts; and (xi) all other Liabilities and obligations for which Buyer does not expressly assume any liability (collectively, the "Excluded Liabilities").  Buyer's assumption of the Assumed Liabilities shall in no way expand the rights or remedies of third parties against Buyer as compared to the rights and remedies which such parties would have had against Sellers had this Agreement not been consummated.  From and after the Closing Date, Buyer shall pay, perform and discharge, as and when due or as may otherwise be agreed between Buyer and the obligee, all of the Assumed Liabilities.  The "Assumed Liabilities" are specifically as follows:

(a)     all Liabilities of Sellers set forth on Schedule 2.3(a);

(b)     all Liabilities under the Purchased Contracts arising after the Closing;

1142668                                             13

(c)     all Liabilities arising from the sale of Products after the Closing pursuant to product warranties, product returns and rebates;

(d)     all Liabilities with respect to the Business or the Purchased Assets arising after the Closing;

(e)     all Liabilities, in the amounts listed on <u>Schedule 2.1(r)</u>, to the Critical Trade Vendors;

(f)     all Liabilities under Sellers' gift cards relating to the Purchased Assets;

(g)     all Liabilities associated with Employee accruals (other than vacation accruals or other amounts funded by the VEBA account) with respect to Employees, if any, hired by Buyer post-Closing at Assumed Locations; and

(h)     all Liabilities relating to amounts required to be paid by Buyer hereunder.

Section 2.4    <u>Purchased Assets</u>. At Closing, and pursuant to Section 363 and Section 365 of the Bankruptcy Code, Sellers shall sell or assume and assign to Buyer and Buyer shall buy or take an assignment from Sellers, as the case may be, the Purchased Assets and Assumed Liabilities.

Section 2.5    <u>Further Conveyances and Assumptions</u>. From time to time following the Closing, Sellers and Buyer shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and the Sellers Documents and to assure fully to Sellers and their respective Affiliates and their respective successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement and the Sellers Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

Section 2.6    <u>Pre- and Post-Closing and Transitional Matters</u>.

(a)     From and after Closing, Sellers shall retain full right and authority to use, enforce, pursue remedies and take actions with respect to any of the Excluded Assets.

(b)     Buyer will retain and make available to Sellers, for a period of three (3) years following the Closing Date, the Documents delivered by Sellers to Buyer, if reasonably needed by Sellers for liquidation, winding up, Tax reporting or other proper purposes; provided, that Sellers will use reasonable efforts to retain copies of Documents and the Parties otherwise will reasonably cooperate to minimize inconvenience to Buyer.

## CONSIDERATION

Section 3.1    Purchase Price; Assumed Liabilities. In consideration of the transfer of the Purchased Assets to Buyer and the other undertakings set forth herein, the purchase price (the "Purchase Price") for the Purchased Assets shall be Sixteen Million Seven Hundred Fifty Thousand Dollars ($16,750,000) to be satisfied in the form of a credit against the amount of Sellers' debt under the Loan Agreement and the Term Loan DIP pursuant to Section 363(k) of the Bankruptcy Code, plus the assumption of the Assumed Liabilities by Buyer at Closing. The Cure Amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts assumed at Closing, shall be paid by Buyer, and Sellers shall have no liability therefor.

## ARTICLE IV

## CLOSING AND TERMINATION

Section 4.1    Closing Date. Subject to the satisfaction of the conditions set forth in Section 10.1, Section 10.2 and Section 10.3 hereof (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place at the offices of Klee, Tuchin, Bogdanoff & Stern LLP (or at such other place as the Parties may designate in writing) as soon as practicable following the satisfaction or waiver of the conditions set forth in Article X (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) and no later than a date that is three (3) Business Days after the Sale Order becomes a Final Order, unless another time or date, or both, are agreed to in writing by the Parties hereto. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date," and the Closing shall be deemed effective at the close of business on the Closing Date.

Section 4.2    Deliveries by Sellers. At the Closing, Sellers shall deliver to Buyer:

(a)    a duly executed bill of sale and assignment;

(b)    duly executed assignments of the U.S. trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. trademark office, and general assignments of all other Purchased Intellectual Property;

(c)    the officer's certificate required to be delivered pursuant to Section 10.1(a) and Section 10.1(b);

(d)    a certified copy of the Sale Order; and

(e)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as may be necessary to convey the Purchased Assets to Buyer.

Section 4.3    Deliveries by Buyer.  At the Closing, Buyer shall deliver to Sellers all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Sellers, as may be necessary to convey the Purchased Assets to Buyer and for Buyer to assume the Assumed Liabilities.

Section 4.4    Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)    by mutual written consent of Sellers and Buyer;

(b)    by Sellers or Buyer, as applicable, if any of the conditions set forth in Section 10.3 shall have become incapable of fulfillment other than as a result of a breach by the Sellers or Buyer, as applicable, of any covenant or agreement contained in this Agreement, and such condition is not waived by the non-breaching party;

(c)    by Sellers or Buyer if there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the Parties hereto shall promptly appeal any adverse determination which is not nonappealable (and pursue such appeal with reasonable diligence);

(d)    by Buyer, if the Closing shall not have occurred on or before the close of business on the date which is five (5) Business Days after the Sale Order becomes a Final Order (the "Termination Date"); provided, however, that if the Closing shall not have occurred on or before the Termination Date and either (a) such failure to close is due to (1) a material breach of any representation, warranty, covenant or agreement contained in this Agreement by Buyer or (2) a breach by Buyer of the obligations set forth in Section 8.2 hereof, or (b) (1) Sellers have not materially breached any representation, warranties, covenants or agreements contained in this Agreement and (2) Sellers have not breached the obligations set forth in Section 8.2 hereof, then Buyer may not terminate this Agreement pursuant to this Section 4.4(d);

(e)    by Buyer, if any of the conditions to the obligations of Buyer set forth in Section 10.1 shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer;

(f)    by Buyer, if there shall be a material breach by Sellers of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 10.1 or Section 10.3 and which breach cannot be cured or has not been cured by the earlier of (i) 10 (ten) Business Days after the giving of written notice by Buyer to Sellers of such breach and (ii) the Termination Date;

(g)    by Buyer in the event the Bankruptcy Court has not entered the Bid Procedures Order on or before fifteen (15) Business Days following the Petition Date and the Sale Order ten (10) Business Days after the hearing at which the Bankruptcy Court orally approves the Sale Order;

(h)    by Buyer, if the Closing has not occurred by September 30, 2009;

(i)     by Sellers, if any condition to the obligations of Sellers set forth in Section 10.2 shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

(j)     by Sellers, if there shall be a material breach by Buyer of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 10.2 or Section 10.3 and which breach cannot be cured or has not been cured by the earlier of (i) 10 (ten) Business Days after the giving of written notice by Sellers to Buyer of such breach and (ii) the Termination Date;

(k)     by Sellers, if the Closing shall not have occurred on or before the Termination Date; provided, however, that if the Closing shall not have occurred on or before the Termination Date and either (a) such failure to close is due to (1) a material breach of any representation, warranty, covenant or agreement contained in this Agreement by Sellers or (2) a breach by Sellers of the obligations set forth in Section 8.2 hereof, or (b) (1) Buyer has not materially breached any representation, warranties, covenants or agreements contained in this Agreement and (2) Buyer has not breached the obligations set forth in Section 8.2 hereof, then Sellers may not terminate this Agreement pursuant to this Section 4.4(k); or

(l)     with no further action by either Party, if the Bankruptcy Court shall enter an Order approving a Competing Bid and the transaction contemplated by such Competing Bid is thereafter consummated.

Section 4.5     Procedure Upon Termination.  In the event of termination and abandonment by Buyer or Sellers, or both such Parties, pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Buyer or Sellers.  If this Agreement is terminated as provided herein each Party shall redeliver all documents, work papers and other material of any other Party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the Party furnishing the same.  If this Agreement is terminated pursuant to Sections 4.4(a), (b), (c), (d), (e), (f), (g), (h) (as to Section 4.4(h), only if Buyer is not in breach of any representation, warranty, covenant or agreement contained in this Agreement), or (l), Sellers shall pay the Expense Reimbursement to Buyer, and the Parties shall have no further obligations to one another except for any obligations that, by their terms, survive the termination of this Agreement, as described in Section 4.6(a).

Section 4.6     Effect of Termination.

(a)     In the event that this Agreement is validly terminated in accordance with Section 4.4, this Agreement shall terminate and each of the Parties shall be relieved of its respective duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Buyer or Sellers; provided, however, that the obligations of the Parties set forth in Section 4.5, Section 8.3, Section 8.5 and Article XIII hereof shall survive any such termination and shall be enforceable hereunder.

(b)   Remedies.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby jointly and severally represent and warrant to Buyer that:

Section 5.1    Authorization of Agreement.  Subject to the entry of the Sale Order: (a) each Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and each Seller has all requisite power, authority and legal capacity to execute and deliver each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by any Seller in connection with the consummation of the transactions contemplated by this Agreement (the "Sellers Documents"), to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby; and (b) this Agreement has been, and each of the Sellers Documents will be at or prior to the Closing, duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other Parties hereto and thereto and the entry of the Sale Order) this Agreement constitutes, and each of the Sellers Documents when so executed and delivered will constitute, legal, valid and binding obligations of each Seller, enforceable against each Seller in accordance with their respective terms.

Section 5.2    Title to Purchased Assets.  Sellers have good title to the Purchased Assets and, at the Closing, the Buyer, pursuant to the Sale Order, shall acquire good title in, to and under (subject to the Purchased Contracts (other than Purchased Contracts assumed or assigned post-Closing) being assumed and assigned in accordance with Section 2.1) all of the Purchased Assets, in each case free and clear of all Liens, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.  The Purchased Assets include all of the properties and assets required to operate, in all material respects, the Business in the Ordinary Course of Business.  For the sake of clarity, the right to use any assets included in the Purchased Assets in which Sellers have leasehold or non-ownership rights to use shall be assigned to Buyer only through the assumption and assignment of the Purchased Contracts in accordance with and subject to this Agreement.

Section 5.3    Real Property.  Schedule 1.1(a) sets forth a complete list of all real property and interests in real property leased by Sellers (individually, a "Real Property Lease" and collectively, the "Real Property Leases") as lessee or lessor in connection with the Business and which are part of the Purchased Assets.  Sellers have a valid and enforceable leasehold interest under each Real Property Lease under which it is a lessee.

Section 5.4    Tangible Personal Property.  Schedule 1.1(a) sets forth all leases of personal property ("Personal Property Leases") relating to personal property used by Sellers or to which any Seller is a party or by which the properties or assets of any Seller are bound, in each case relating to the Business.  Each Seller has a valid and enforceable leasehold interest under each Personal Property Lease under which it is a lessee.

Section 5.5    Intellectual Property.  Schedule 1.1(a) sets forth an accurate and complete list of all Intellectual Property.  To Sellers' Knowledge, Sellers own all right, title and interest to, or are licensees with respect to, the Purchased Intellectual Property, and can convey such property free and clear of Liens pursuant to the Sale Order.  To the Knowledge of Sellers, (i) no Person is engaging in any activity that infringes any Purchased Intellectual Property and (ii) no claim has been asserted to any Seller that the use of any Purchased Intellectual Property or the operation of the Business infringes or violates the Intellectual Property of any third party.  The Purchased Intellectual Property and the rights under the Purchased Contracts include the rights to use all Intellectual Property required to operate the Business as currently conducted.

Section 5.6    Financial Advisors.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers in connection with the transactions contemplated by this Agreement, and no Person is entitled to any fee or commission or like payment from Buyer or Sellers in respect thereof, in each case other than as set forth on Schedule 5.6.

Section 5.7    Litigation.  Except as set forth on Schedule 5.7 and other than in connection with the Bankruptcy Cases, there is no suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to the best of Sellers' Knowledge, threatened against or relating to any Seller or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, might adversely affect the ability of any Seller to enter into this Agreement or to consummate the transactions contemplated hereby and Sellers are not aware of any existing ground on which any such action, suit or proceeding may be commenced with any reasonable likelihood of success.

Section 5.8    Compliance with Laws.  Except as set forth on Schedule 5.8, Sellers have conducted and are presently conducting the Business in material compliance with all applicable Laws.

Section 5.9    Permits.  Schedule 5.9 sets forth all material Permits used by Sellers in the Business.  Sellers are in compliance with the material terms of all such Permits, and all such Permits are valid and in full force and effect, and no proceeding is pending or, to the Knowledge of Sellers, threatened, the object of which is to revoke, limit or otherwise affect any such Permit.

Section 5.10    Purchased Inventory.  With respect to the Purchased Inventory, Sellers hereby jointly and severally represent and warrant as follows:

(a)    No Purchased Inventory for the Purchased Inventory is materially damaged in any significant way, including, but not limited, to damage caused by water, except for any such damage which would not have a Material Adverse Effect on the Purchased Inventory taken as a whole;

(b)    To Sellers' Knowledge, the Purchased Inventory has not been part of a current or past product recall;

(c)    The Purchased Inventory is in material compliance with United States federal guidelines for such products as of the date hereof, except for such compliance failure

which would not have a Material Adverse Effect on the Purchased Inventory taken as a whole; and

(d)    The Purchased Inventory is in working condition except for such failure to be in working condition which would not have a Material Adverse Effect on the Purchased Inventory taken as a whole.

Section 5.11    Contracts. The Purchased Contracts include all Contracts material to the ownership and/or operation of the Business. Sellers have not, and, to the best of Sellers' Knowledge, no other party to any Purchased Contract has, commenced any action against any of the parties to any Purchased Contract or given or received any written notice of any default or violation under any Purchased Contract that has not been withdrawn or dismissed except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Amounts. Each Purchased Contract is, or will be upon the Closing, valid, binding and in full force and effect in accordance with its terms.

Section 5.12    Taxes. Except as such payment or any enforcement action is stayed as a result of the Bankruptcy Case:

(a)    Since January 1, 2006, all income Tax Returns required to have been filed by Sellers have been duly filed;

(b)    No federal or state income Tax Return audits are pending with respect to any Seller, except for those set forth on Schedule 5.12;

(c)    No Seller has received written notice from any Governmental Body of future federal or state income Tax Return audits;

(d)    There are no material liens with respect to Taxes upon any of the Purchased Assets, other than Liens for Taxes not yet due and payable; and

(e)    No Seller has (i) waived any statute of limitations in respect of any Tax Returns that have not been filed as of the date hereof or (ii) agreed to any extension of time with respect to the assessment of Taxes for which such Taxes have not been paid as of the date hereof.

Section 5.13    Sellers' Representations and Warranties Generally. Sellers' representations and warranties herein (including as made or qualified in the Schedules hereto) are made by Sellers in their respective corporate capacity, without personal liability to Sellers' directors, officers, members or counsel, or Sellers' signatory, other than with respect to fraudulent or criminal activity with respect to the transactions contemplated hereby.

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers that:

Section 6.1    Organization and Good Standing.  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Delaware.

Section 6.2    Authorization of Agreement.  In its capacity as Term Loan Agent under the Loan Agreement, Buyer has full limited liability company power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Buyer in connection with the consummation of the transactions contemplated hereby and thereby (the "Buyer Documents"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Buyer of this Agreement and each Buyer Document have been duly authorized by all necessary action on behalf of Buyer.  This Agreement has been, and each Buyer Document will be at or prior to the Closing, duly executed and delivered by Buyer in its capacity as Term Loan Agent under the Loan Agreement, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Buyer Document when so executed and delivered will constitute, legal, valid and binding obligations of Buyer, enforceable against Buyer in its capacity as Term Loan Agent under the Loan Agreement, in accordance with their respective terms.

Section 6.3    Financial Advisors.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Buyer in connection with the transactions contemplated by this Agreement and no person is entitled to any fee or commission or like payment in respect thereof.

Section 6.4    Litigation.  There is no suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to the best of Buyer's knowledge, threatened against or relating to Buyer or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, might adversely affect the ability of Buyer to enter into this Agreement or to consummate the transactions contemplated hereby and Buyer is not aware of any existing ground on which any such action, suit or proceeding may be commenced with any reasonable likelihood of success.

Section 6.5    Financial Capability.  Buyer (i) has, as of the date hereof, and will have as of the Closing, sufficient funds available to assume the Assumed Liabilities and pay any expenses incurred by Buyer in connection with the transactions contemplated by this Agreement; (ii) has, as of the date hereof, and will have at Closing, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and (iii) has not, as of the date hereof, and will not have as of the Closing, incurred any obligation, commitment, restriction or Liability of any kind which would impair or adversely affect such resources and capabilities.

Section 6.6    Condition of the Business.  Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Sellers are not making any representation or warranty whatsoever, express or implied, beyond those expressly given by Sellers in Article V hereof (as modified by the Schedules hereto), and Buyer acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred on a "WHERE IS" and, as to condition, "AS IS" basis.

## ARTICLE VII

## BANKRUPTCY COURT APPROVAL

Section 7.1    Approval of Expense Reimbursement and Overbid Protection.  Subject to the entry of the Bid Procedures Order, in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Sellers, Sellers shall pay to Buyer promptly upon the effective date of termination of this Agreement in accordance with the provisions of Section 4.5 Buyer's reasonable expenses (including, without limitation, consultants' and attorneys' fees) incurred in connection with the transactions contemplated by this Agreement, provided that the amount of such expense reimbursement does not exceed Five Hundred Thousand Dollars ($500,000) (the "Expense Reimbursement").  In addition, the Bid Procedures Order shall provide for an initial overbid protection in the amount of Five Hundred Thousand Dollars ($500,000) over and above the aggregate of the Purchase Price and the Expense Reimbursement, and minimum bid increments thereafter of One Hundred Thousand Dollars ($100,000) (the "Overbid Protection"), and Buyer shall have the ability to credit bid at the auction the amount of the Expense Reimbursement.

Section 7.2    Competing Transaction.

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids (each a "Competing Bid").  From the date hereof (and any prior time) and until the completion of the auction contemplated hereby or as otherwise directed by the Bankruptcy Court, Sellers are permitted to cause their representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates, agents and representatives) in connection with any sale or other disposition of the Purchased Assets.  In addition, Sellers shall be permitted to respond to any inquiries or offers to purchase all or any part of the Purchased Assets (each, an "Alternative Proposal"), provided that such Person enters into a non-disclosure agreement in favor of Sellers and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Business and the assets of Sellers to prospective buyers.  Within twenty-four (24) hours of receipt thereof, Sellers shall provide to Buyer a copy of any such Alternative Proposal and any written response of Sellers thereto and regularly update Buyer as to the status of any negotiations in connection therewith.

(b)    Following completion of the auction contemplated hereby, Sellers are not permitted to cause their representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its

Affiliates, agents and representatives) in connection with any sale or other disposition of the Purchased Assets. In addition, unless otherwise directed by the Bankruptcy Court, Sellers shall not after completion of the auction contemplated herein respond to any Alternative Proposal or perform any other acts related thereto, including supplying information relating to the Business and the assets of Sellers to prospective buyers of the Purchased Assets.

Section 7.3    Bankruptcy Court Filings.  Sellers shall file the sale and bid procedures motion with respect to the Levi's Transaction with the Bankruptcy Court within five (5) Business Days of the Petition Date, and shall use commercially reasonable efforts (A) to file the Sale and Bid Procedures Motion with the Bankruptcy Court on the same day Sellers file the sale and bid procedures motion with respect to the Levi's Transaction, provided, that in no event shall the Sale and Bid Procedures Motion be filed before or more than five (5) Business Days after the filing of the sale and bid procedures motion with respect to the Levi's Transaction, and (B) to seek entry of the Bid Procedures Order and the Sale Order.  Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining the Bid Procedures Order and the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Buyer is a "good faith" Buyer under Section 363(m) of the Bankruptcy Code.  In the event the entry of the Bid Procedures Order and the Sale Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

## ARTICLE VIII

## COVENANTS

Section 8.1    Access to Information.  Sellers agree that, prior to the Closing Date, Buyer shall be entitled, through its officers, employees and representatives (including its legal advisors and accountants), to make such investigation of the properties, businesses and operations of the Business and such examination of the books, records and financial condition of the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law.  Sellers shall cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Buyer and Buyer's representatives in connection with such investigation and examination, and Buyer and its representatives shall cooperate with Sellers and their respective representatives and shall use their reasonable efforts to minimize any disruption to the Business.

Section 8.2    Further Assurances.  Each of Sellers and Buyer shall use commercially reasonable efforts to (a) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement on or prior to the Termination Date and (b) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

Section 8.3    Confidentiality.

(a)    Buyer acknowledges that the confidential information provided to it in connection with this Agreement, including under Section 8.1, and the consummation of the transactions contemplated hereby, is subject to the terms and conditions of that certain confidentiality provision set forth in Section 13.9 of the Loan Agreement.

(b)    Following the completion of the auction contemplated hereby, Sellers agree to maintain, and shall cause their respective Affiliates to maintain, unless disclosure is required by applicable Law, the confidentiality of any confidential information regarding the Business which is in Sellers' or any of their respective Affiliate's possession or of which Sellers or any of their respective Affiliates are aware. Sellers hereby further agree, unless disclosure is required by applicable Law, to take all appropriate steps, consistent with Sellers' past practice, and to cause each of their respective Affiliates to take all appropriate steps, consistent with Sellers' past practice, to safeguard such confidential information and to protect it against disclosure, misuse, espionage, loss and theft. In furtherance and not in limitation of the foregoing, Sellers shall not, and shall cause their respective Affiliates not to, unless required by applicable Law, disclose to any Person (a) any confidential information regarding the Business, provided, that confidential information shall not include information that becomes generally available to the public other than as a result of the breach of this Section 8.3(b) or information not otherwise known by the Sellers that becomes available to any Seller from a Person other than Buyer, or (b) any of the discussions or negotiations conducted with Buyer in connection with this Agreement, provided, that Sellers shall be entitled to disclose (i) any information required to be disclosed by Sellers to the Bankruptcy Court, the United States Trustee, parties in interest in the Bankruptcy Cases, other Persons bidding on assets of Sellers, (ii) any information required to be disclosed by Sellers in connection with the Levi's Transaction or the Transition Services Agreement, (iii) any information required to be disclosed by Sellers pursuant to any applicable Law (including, without limitation, the Bankruptcy Code), Legal Proceeding or Governmental Authority, or (iv) any information to Sellers' counsel; provided, that, in each case, such disclosure shall be limited to the information that is so required to be disclosed and the Person(s) to whom such disclosure is required. Notwithstanding anything in this Section 8.3 to the contrary, unless disclosure is required by applicable Law, the confidentiality of any Trade Secrets of the Business or Buyer shall be maintained for so long as such Trade Secrets continue to be entitled to protection as Trade Secrets of the Business and Buyer, respectively.

Section 8.4    Preservation of Records. Sellers (or any subsequently appointed bankruptcy estate representative, including, but not limited to, a trustee, a creditor trustee or a plan administrator) and Buyer agree that each of them shall preserve and keep the books and records held by it or their respective Affiliates relating to the pre-Closing Business for a period of three (3) months from the Closing Date and shall make such books and records available to the other parties (and permit such other party to make extracts and copies of such books and records at its own expense) as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or Tax audits against or governmental investigations of Sellers or Buyer or any of their Affiliates or in order to enable Sellers or Buyer to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In the event Sellers, on the one hand, or Buyer, on the other hand, wish to destroy such records during such three (3) month

period, such Party shall first give twenty (20) days' prior written notice to the other and such other Party shall have the right at its option and expense, upon prior written notice given to such Party within that twenty (20) day period, to take possession of the records within thirty (30) days after the date of such notice.

Section 8.5    Publicity. Neither Sellers, on the one hand, nor Buyer, on the other hand, shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Buyer or Sellers, disclosure is otherwise required by applicable Law or with respect to filings to be made with the Bankruptcy Court in connection with this Agreement. Notwithstanding the foregoing, the Parties may publicly disclose the existence of this Agreement.

Section 8.6    Operation of Business. Until the Closing, Sellers shall use commercially reasonable efforts, except as otherwise required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court and except in connection with the GOB Sales, to operate the Business in the Ordinary Course of Business (among other things, Sellers will not incur unreasonable liabilities, including, without limitation, inappropriate increases in Inventory or factoring of accounts receivable). Sellers shall use commercially reasonable efforts to (A) preserve intact its business organization, (B) maintain the Business and the Purchased Assets (normal wear and tear excepted), (C) keep available the services of their respective officers and Employees, (D) maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, customers and others having business relationships with Sellers in connection with the operation of the Business (other than payment of pre-petition claims), (E) pay all of their respective post-petition obligations in the Ordinary Course of Business, and (F) continue to operate the Business in all material respects in compliance with all Laws applicable to the Business and Sellers. Without limiting the generality of the foregoing, and except (i) as otherwise expressly provided in or contemplated by this Agreement or the Transition Services Agreement, or (ii) required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, on or prior to the Closing Date, Sellers may not, without the prior written consent of Buyer, take any of the following actions with respect to the Business:

(a)    other than with respect to any Key Employee Incentive Plan, modify in any manner the compensation of any of the Employees, or accelerate the payment of any such compensation (other than in the Ordinary Course of Business or such that the liability associated with such modification is excluded from the Assumed Liabilities);

(b)    engage any new Employee other than in the Ordinary Course of Business;

(c)    remove or permit to be removed from any building, facility, or real property any Purchased Asset or any Inventory (other than de minimis amounts in the Ordinary Course of Business or in connection with the GOB Sales);

(d)     sell, lease or otherwise dispose of, mortgage, hypothecate or otherwise encumber any Purchased Asset (other than in the Ordinary Course of Business and other than any Liens provided for in the DIP Order);

(e)     amend, terminate or renew any Purchased Contract, once identified as such by Buyer in writing to Sellers;

(f)     fail to pay any required filing, processing or other fee, or fail to use commercially reasonable efforts to maintain the validity of Sellers' rights in, to or under any Purchased Intellectual Property;

(g)     fail to use commercially reasonable efforts to maintain all Permits of Sellers, including those used in the operation of the Business;

(h)     make any unusual or extraordinary efforts to collect any outstanding accounts receivable or intercompany obligation, liability or Indebtedness, give any discounts or concessions for early payment of such accounts receivable or intercompany obligation, liability or Indebtedness, other than the usual discounts given by the Business in the Ordinary Course of Business and make any sales of, or, other than Liens provided for in the DIP Order, convey any interest in, any accounts receivable or intercompany obligation, liability or Indebtedness to any third party;

(i)     other than transactions pursuant to agreements or arrangements in effect on the Petition Date as set forth on Schedule 8.6(i), and other than with respect to the Key Employee Incentive Plan, engage in any transaction with any Affiliate, subsidiary, shareholder, officer or director of any Seller (other than in the Ordinary Course of Business), incur or assume any long term or short term debt with or on behalf of any such Person or guarantee, endorse or otherwise be liable or responsible (whether directly, indirectly, contingently or otherwise) for the obligations of any such Person;

(j)     other than with respect to the Key Employee Incentive Plan, increase the salaries or other compensation payable to any of Sellers' directors, officers or Employees;

(k)     make any change in their method of accounting, except in accordance with GAAP;

(l)     other than with respect to a Competing Bid, enter into any Contract that would survive the Closing;

(m)     return Inventory with an aggregate value of more than $25,000 to any single vendor;

(n)     fail to maintain any insurance policy in effect on the date hereof or amend any such policy; and

(o)     agree, whether in writing or otherwise, to do any of the foregoing.

Section 8.7    Section 363(b)(1)(A).  Buyer shall honor and observe any and all policies of Sellers in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

Section 8.8    Adequate Assurances Regarding Purchased Contracts and Certain Real Property Leases.  With respect to each Purchased Contract and Real Property Lease set forth on Schedule 1.1(c), Buyer shall provide adequate assurance of the future performance of such Purchased Contract and Real Property Lease by Buyer as required by Sections 365(b)(1)(C) and/or 365(f)(2)(B) of the Bankruptcy Code, as applicable.

Section 8.9    Material Adverse Effect.  Sellers shall promptly inform Buyer in writing of the occurrence of any event that has had, or is reasonably expected to have, a Material Adverse Effect.

Section 8.10    Prospective Employees.

(a)    Sellers shall reasonably assist Buyer to engage, in Buyer's sole and absolute discretion, the services of Sellers' (i) store associates and other store staff, (ii) district managers, and (iii) regional managers, in each case currently engaged in staffing the Business ("Prospective Employees"), on terms and conditions satisfactory to Buyer and such Prospective Employees.  Sellers shall not, and shall not attempt to, engage or transfer the services of any of the Prospective Employees to any other business (including, without limitation, related to the Levi's Transaction) operated by Sellers or their successors; provided, however, that in the event Buyer engages and then later terminates the services of any Prospective Employee, Sellers may later re-engage the services of such individuals.  Buyer shall identify the names of the Prospective Employees whose services it wishes to engage at least five (5) days prior to the Closing Date.

(b)    Buyer shall, in consultation with Sellers, be provided access to, and be allowed to communicate with, the Prospective Employees.  Sellers shall, subject to restrictions imposed by the Bankruptcy Code, as such may be modified by order of the Bankruptcy Court, be responsible for payment of all compensation due to Prospective Employees with respect to the period prior to the Closing Date, including, but not limited to any unpaid wages, salary, unused vacation or sick leave earned and accrued (to the extent not paid), health benefits, severance, WARN Act liability, or change of control obligations.

Section 8.11    Name Change.  Any of the Sellers shall take all steps necessary to effect a change in its corporate name to remove the words "Anchor Blue" from such name within a reasonable time after such Seller's receipt of a written request therefor sent by Buyer within ten (10) days before and thirty (30) days after the Closing.

ARTICLE IX

[RESERVED]

## CONDITIONS TO CLOSING

Section 10.1  Conditions Precedent to Obligations of Buyer.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer in whole or in part to the extent permitted by applicable Law):

(a)  The representations and warranties of Sellers set forth in this Agreement qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects, on and as of such earlier date); and Buyer shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect in his or her corporate (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate);

(b)  Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, and Buyer shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect in his or her corporate (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate);

(c)  Sellers shall have delivered, or caused to be delivered, to Buyer all of the items set forth in Section 4.2;

(d)  Buyer shall have received all Permits necessary or useful for the conduct of the Business (which Buyer shall use commercially reasonable efforts to timely obtain);

(e)  From the date hereof through the Closing Date, (i) there shall have been no Material Adverse Effect and (ii) each Seller shall have delivered to Buyer a certificate (executed in corporate or limited liability company capacity, without liability to such Seller's signatory), dated as of the Closing Date, to such effect;

(f)  The Purchased Contracts shall be sold or assumed and assigned to Buyer, as the case may be, by Order of the Bankruptcy Court satisfactory to Buyer in its sole and absolute discretion, except for any Purchased Contracts to be assumed and assigned after the Closing;

(g)  the Levi's Transaction shall have closed;

(h)  the GOB Sales shall have commenced;

(i)    the aggregate proceeds (including the Escrowed Funds) received by the Term Loan Lenders from the Levi's Transaction and the GOB Sales shall have been at least $52,500,000; and

(j)    the period to challenge or contest the validity, amount, perfection, or priority of the claims of the Term Loan Lenders and the Revolving Loan Lenders (as defined in the Loan Agreement) under the Loan Agreement shall have expired with no such challenge or contest having been asserted, or any such challenge or contest having been resolved to the satisfaction of the Buyer in its sole and absolute discretion.

Section 10.2   Conditions Precedent to Obligations of Sellers.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)    The representations and warranties of Buyer set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materially shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date); and Sellers shall have received a certificate signed by an authorized officer of Buyer, dated the Closing Date, to the foregoing effect in his or her corporate (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate);

(b)    Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date; and Sellers shall have received a certificate signed by an authorized officer of Buyer, dated the Closing Date, to the foregoing effect in his or her corporate (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate); and

(c)    To the extent that Ableco Finance LLC (as Term Loan Agent on behalf of the Term Loan Lenders under the Loan Agreement and not in its individual capacity) determines, in its sole and absolute discretion, to assign its rights, interests and obligations hereunder to one or more of its Affiliates or designees, such Affiliate or designee shall deliver to Sellers certificates similar in form and substance to the certificates required to be delivered pursuant to Section 10.2(a) and Section 10.2(b) hereof, certifying to such matters with respect to itself.

Section 10.3 .  Conditions Precedent to Obligations of Buyer and Sellers.  The respective obligations of Buyer and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer and Sellers in whole or in part to the extent permitted by applicable Law):

(a) there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

(b) the Bid Procedures Order and the Sale Order shall have become Final Orders (unless this condition shall have been waived in writing by Buyer).

Section 10.4  Frustration of Closing Conditions.  Neither Sellers nor Buyer may rely on the failure of any condition set forth in Section 10.1, Section 10.2 or Section 10.3, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

## ARTICLE XI

## NO SURVIVAL

Section 11.1  No Survival of Representations and Warranties.  The Parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the Parties shall have any liability to each other after the Closing for any breach thereof. The Parties hereto agree that the covenants contained in this Agreement to be performed after the Closing shall survive the Closing hereunder, and each Party hereto shall be liable to the other after the Closing for any breach thereof.

## ARTICLE XII

## TAX MATTERS

Section 12.1  Transfer Taxes.  Sellers shall be responsible for all Transfer Taxes.

Section 12.2  Prorations.  All real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between Sellers and Buyer as of 12:01 a.m. (New York time) on the day following the Closing Date. If the exact amount of any real or personal property Taxes is not known on the Closing Date, the apportionment shall be based upon a reasonable amount, without subsequent adjustment.

Section 12.3  Purchase Price Allocation.  Within sixty (60) days after the Closing Date, Buyer and Sellers will agree to a certificate of allocation detailing the allocation of the Purchase Price among the Purchased Assets. If required by applicable Law, Buyer and Sellers will each file an Internal Revenue Service Form 8594 "Asset Acquisition Statement under Section 1060" at the times and in the manner as required by Treasury Regulation 1060-1 consistent with the certificate of allocation. The certificate of allocation will be conclusive and binding on the Parties for all purposes, including reporting and disclosure requirements under the Code and any foreign, state, or local Tax authority.

## ARTICLE XIII

### MISCELLANEOUS

**Section 13.1   Expenses.** Except for the Expense Reimbursement that may be owed by Sellers to Buyer pursuant to Section 4.5, if any, each of Sellers and Buyer shall bear their own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

**Section 13.2   Submission to Jurisdiction; Consent to Service of Process.**

(a)   Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 13.7 hereof; provided, however, that if the Bankruptcy Cases have closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware and any appellate court thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)   Each of the Parties hereto hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 13.7.

**Section 13.3   Waiver of Right to Trial by Jury.** Each Party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

**Section 13.4   Entire Agreement; Amendments and Waivers.** This Agreement (including the Schedules and Exhibits hereto) represents the entire understanding and agreement between the Parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought or, if such amendment, supplement, modification or waiver can be so construed, by both Parties. No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a

31

further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

Section 13.5  <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and performed in the State of Delaware.

Section 13.6  <u>Notices</u>.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or electronic mail (and no notice of failure of delivery was received within a reasonable time after such message was sent) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses, facsimile numbers and e-mail addresses (or to such other address, facsimile number or e-mail address as a Party may have specified by notice given to the other Party pursuant to this provision):

If to Sellers, to:

>       Anchor Blue
>       2501 East Guasti Road
>       Ontario, CA  91761
>       Attention:  Tom Sands
>       Facsimile:  909-605-5414
>       E-mail:  tomsands@anchorblue.com

With a copy (which shall not constitute notice) to:

>       Richards, Layton & Finger, P.A.
>       One Rodney Square
>       920 North King Street
>       Wilmington, Delaware  19801
>       Attention:  Mark D. Collins
>       Facsimile:  302-498-7531
>       E-mail:  Collins@rlf.com

If to Buyer, to:

>       Ableco Finance LLC
>       299 Park Avenue, 22nd Floor
>       New York, New York 10171
>       Attn:  Daniel Wolf
>       Facsimile:  212-891-1541
>       E-mail:  dWolf@cerberuscapital.com

With a copy (which shall not constitute notice) to:

> Klee, Tuchin, Bogdanoff & Stern LLP
> 1999 Avenue of the Stars, 39th Floor
> Los Angeles, California 90067
> Attn: Michael L. Tuchin
> Facsimile: (310) 407-9090
> E-mail: MTuchin@ktbslaw.com

Each Party entitled to notice may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving all other Parties notices in the manner herein set forth.

Section 13.7    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 13.8    Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for Sellers' estates or any trustee appointed in a chapter 7 case if the Bankruptcy Cases are converted from chapter 11. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Sellers, on the one hand, or Buyer, on the other hand, (by operation of law or otherwise) without the prior written consent of the other Parties hereto and any attempted assignment without the required consents shall be void; provided, however, that Buyer may assign any or all of its rights, interests, and obligations hereunder to one or more of its Affiliates or designees.  No assignment of any obligations hereunder shall relieve the Parties hereto of any such obligations.  Upon any such permitted assignment, the references in this Agreement to Buyer shall also apply to any such assignee or designee unless the context otherwise requires.

Section 13.9    Counterparts.  This Agreement may be executed in one or more counterparts (including by facsimile or electronic mail), each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLERS:**

HUB DISTRIBUTING, INC.

By: _____
Name: _____Thomas T. Sands_____
Title: _____CEO_____

HUB DESIGNS, INC.

By: _____
Name: _____Thomas J Sands_____
Title: _____CEO_____

ANCHOR BLUE RETAIL GROUP, INC.

By: _____
Name: _____Thomas J. Sands_____
Title: _____CEU_____

**BUYER:**

ABLECO FINANCE LLC (as Term Loan Agent on behalf of the Term Loan Lenders under the Loan Agreement and not in its individual capacity)

By: _____

Name: Daniel E. Wolf

Title: President

# SCHEDULE 1.1(a)

## Contracts of Sellers and Intellectual Property

### General Business Contracts:

Sellers have contracts with the following suppliers, service providers and vendors:

### IT Maintenance Contracts

Non-ABRG Entity and/or Service Description

Lawson Hosting (Velocity) /
PivotLink Monthly Subscription
(SeeTab Software, Inc.)*

### PC Hardware/Software Maitenance -9603

(AJB) FDMS Settlement Software
(AJB) Pathfinder Polling Software   Annual RTS Software
Maitenance

(AJB) Bin Manager Software
(Apect Loss Prevention) -SDK for DSM


(Aspect Loss Prevention)

(BSI) Tax Factory
(Chesapeake) 2008 Source Code Escrow Fees.
(Chesapeake) IDM Annual Support/Maint.
(Chesapeake System Solution) Total Reconciliation Solution (T-Recs) Cash Management

(E*Trade Financial) Equity Edge Software Maintenance

(Foresight) EDISIM

(Gerber Technology) WebPDM

(Inovis) - Transform Service  Item# 826603M
(Inovis) Bizlink Maintenance and Support

(JDA) Arthur Merchandise Planning

(JDA) Network Optimization by E3 CS
(JDA) Store Replenishment GS, Warehouse Replenishment GS,
Warehouse Replenishment by E3
(Kronos) Workforce Timekeeper

(Lawson) Financial and HR, MS Addins & System Foundation

My Eclipse - Annual Maitenance Fee

(Oracle) Back Office, Central Office, Returns Mgmt.
(Oracle) Database
(Oracle) Database - additional licenses
(Oracle) Oracle Retail -Point of Sale
(Oracle) Oracle Retail - Base RMS

(Quest) Toad Licenses and Annual Maintenance

(UC4 Software) AppWorxs Maintenance and Support
(UC4 Software) AIX Agent Software Lic. Support

Iron Moutain - FlexSAFE Beneficiary
Depository Fees (Source Code) from JDA

**PC Hardware/Software Maitenance -9604**
(Agile360) -What's Up Gold Maint
Agilysys) - POS Middleware
Part Number: E01F5LL ,E01F7LL, E02T4LL E02TWLL
Agilysys or IBM
Susue Linux SW Subscription 10/2008 - 10/31/09
Client Lic. 10/2008 - 10/31/09
Websphere End: 10/31/09   See Agilysys Invoice# D41430701309

(Anixis) - Password Policy Enforcer/Reset License
Business Partner Solutions - Webwasher replaced Websense Maint

(Cal Protection)
Annual fire suppression maintanence and certification

(Cisco) 6509 Switch maintanence

(Citrix) Citrix Maint

(Computer Protection Technology): Preventative Maintenance
Liebert UPS System & Generator  and Diesel Generator

(Direct Source):  Wavelink Avalance Maintenance Renewal

(Elynx-SwifView) - SwiftView Annual Support

(GFI)  Email Archiving - Email Archive 1000 Users


Go Daddy.com - SSL for Email Server

(IBM CORP) - Tivoli Storage Manager Extended Edition 10 Processor Value

(Insight) - Symantec AV Corportate Maint (Stores Separate)

(Insight) Symantec Ghost Solution Suite -Essential Support

(Insight) - Symantec AV Store Maint (Stores Separate)

(Instant Info) -Right Fax Maint


(Network Solutions) - Domain Names
(Neustar) - Ultra DNS  (Monthly Service)
(Proxy Networks) -  Proxy Maintenance & Support -30 Masters and 300 Hosts
(Stat Seeker) - Annual Support Maitenance  ($5170.00  Term: 7/1/09 - 6/30/10)   Statseeker NPM Software
(Van Dyke) - SecureCRT (Cisco Router Logon Tool)

(Virtual Graffiti) -  IronPort AntiSpam 3 Year Contract

(Sowsoft) - Network Password Management

(Shareit) - Software to push configurations to router and switches.

**PC Hardware/Software Maitenance -9605**
Front Range Solutions (HEAT)

**POS Contracts**
IBM

**Capital**
Microsoft - Business and Services Agreement, dated March 26, 2008, made by Hub Distributing, Inc. and Microsoft Licensing, GP, and related enrollments and agreements
Cisco Capital:  Master Installment Payment Agreement, dated as of July 11, 2008, between Cisco Systems Capital Corporation and Hub Distributing, Inc.

**Other IT Contracts**

| Non-ABRG Entity | Date Signed | Department |
| --- | --- | --- |
| AirDefense | 3/22/2008 | IT |
| AT&T Capital | 3/31/2008 | |

| | | |
|---|---|---|
| Services, Inc. | Lease for store routers, phones and VOIP equipment - Schedule #4 | |
| AT&T Capital Services, Inc. | Lease for store routers, phones and VOIP equipment - Schedule #6 (Lessor listed as Ameritech Capital Corporation (d/b/a SBC Capital Services, Inc.) | |
| AT&T Capital Services, Inc. | Lease for store routers, phones and VOIP equipment - Schedule #8 | |
| EPICOR-CRS | 3/28/2008 | IT |
| First Data | 10/6/2008 | IT |
| Skill Net | | IT |
| TekServe POS | | IT |
| Key Financial | Oracle Central Office, Back Office and Returns Mgmt | |
| Key Financial | Oracle RMS Suite License | |
| Cognos (IBM) | Cognos Business Inteligence Licenses in use and licensed by Hub Distributing or ABRG | |
| Cognos (IBM) | Cognos BI support and maintenance | |

| Vendor | Type | Description |
|---|---|---|
| Teogas, Inc. (d/b/a ASG or ThinkASG) | Hardware Maintenance | IBM hardware maintenance - Data Center. Term: 12/05/09 - 12/4/10 |
| Teogas, Inc. (d/b/a ASG or ThinkASG) | Hardware Maintenance | IBM hardware maintenance - Data Center SNS for V13 |
| Teogas, Inc. (d/b/a ASG or ThinkASG) | Utility Maintenance | Tivoli Storage Manager Maintenance. Term: 3/25/09 - 3/24/10 |
| Teogas, Inc. (d/b/a ASG or ThinkASG) | Utility Maintenance | Tivoli Storage Manager Maintenance. Term: 3/1/09 - 2/28/10 |
| Teogas, Inc. (d/b/a ASG or ThinkASG) | Utility Maintenance | Red Hat License Term: 3/31/09 - 3/30/10 |

## Operations Related Contracts (NonIT)

| Non-ABRG Entity | Date Signed or Contract Date, as applicable or Description | Department or Description |
|---|---|---|
| ADP | 10/16/2008 | |
| Advanced Wireless Communication | 6/5/2008 | Facilities |
| Alpha Maintenance, Inc. | 6/26/2008 | Facilities |
| American Express | | HR |
| AppleOne | 12/27/2005 | HR |
| Ares Corp. Opportunities Fund | 7/22/2005 | Finance |
| Automotive Rentals, Inc. ("ARI") | The Fleet Management Services Agreement, dated as of August 21, 1991, between ARI and Hub Distributing, Inc., as amended | |
| BDO Seidman, LLP | 12/22/2008 | |
| Cadence Enterprise | 7/15/2004 | |
| Cooper & Dunham LLP | 7/9/2008 | Legal |
| Canon Business Solutions | 1/2/2009 | Real Estate |
| Certegy/ Welcome Check Warranty | 8/8/2008 | Finance |

RLF1-3398527-11

Cresa Partners

| | | |
|---|---|---|
| Custom Resource Solutions, Inc. | 6/29/2007 | HR |
| Data Entry Services | | Marketing |
| DMX Music | 5/10/2006 | RE/Store Design |
| ExecuServ | 5/10/2008 | HR |
| Experian-Cheetahmail | 7/8/2008 | Marketing |
| E*Trade | 12/6/2005 | Finance |
| Focal Point/Communications | | HR |
| Fusion Sign & Design | | Real Estate/MKTG |
| Great American | | |
| Headhigh | | Marketing |
| Hub Designs Intercompany | | Executive |
| Hybrid Merchandising | 8/8/____ | Merchandising |
| Industrial Building Services | | Store Ops |
| Innerworkings | | Marketing |
| JPMorgan Chase | | |

| | | |
|---|---|---|
| KIIS FM (Clear Channel LA) | | Marketing |
| Life Ins. Company of N. America | | HR |
| LP Software | Initial term from 7/23/2008 to 7/23/2009 | Store Ops |
| Mercer Health & Benefits, LLC | | HR |
| Monster, Inc. | | HR |
| Pitney Bowes | | Real Estate |
| RGIS Inventory Specialists RemX IT Staffing | | HR |
| Schwarz Paper Company (d/b/a Schwarz Retail Services) ("Schwarz") | The Service Agreement, dated as of January 21, 2005, between Schwarz and Hub Distributing, Inc. | |
| ServInt | 1/19/2009 | Marketing |
| Singapore Airlines, Corporate Net Fare Agreement, dated March 3, 2009. | 5/19/2009 | HR |
| ShopperTrak | 4/12/2006, amended on 2/13/2008 | Store Ops |
| Superline | 12/5/2007 | |

| Talx | 9/28/2006 | HR |
| Tantara | | Real Estate |
| UPS Supply Chain Solutions, Inc. ("UPS") | Master Services Agreement, dated April 16, 2008, between UPS and Hub Distributing, Inc. | |
| VSP | | April 1, 2008 |
| Wachovia | | Finance |
| Western Exterminator | | Facilities |
| WIS International | 6/17/2008 | Finance |

**Insurance Related Contracts**:

Sellers have the following insurance policies and insurance related agreements:

| Policy Provider | Policy Number | Policy Type |
|---|---|---|
| Travelers Property & Casualty of America | TC2JUB-303D475-8 08 | Workers Compensation/Employers Liability |
| Travelers Property & Casualty of America | TRJUB-8223A61-5-08 | Workers Compensation/Employers Liability |
| Travelers Property & Casualty of America | TC2J-GLSA-8223A596-08 | General Liability |
| Travelers Property & Casualty of America | TJ-CAP-8223A603-08 | Automobile Liability |
| ACE Property and Casualty Insuance Co. | M00530141 | Umbrella Liability |
| Indemnity Insurance Company of North America | 491343-65 | Marine Cargo |
| Lexington Insurance Co. | 4271212 | Property |
| C.N.A. | RMP2071086320 | Property |
| Arch Specialty | PRP0010945-03 | Property |
| Zurich American Insurance Co. | BM 9307251-06 | Boiler &Machinery |

| | | |
|---|---|---|
| AIG-National Union Fire Ins. Co. | 7040320 | D&O/EPL |
| Zurich American Insurance Co. | DOC967627801 | D&O/EPL |
| AIG-National Union Fire Ins. Co. | TBD | Crime and Excess Crime |
| AIG-National Union Fire Ins. Co. | 6900305 | Fiduciary Benefit Plan, Fiduciary Liability Insurance |
| AIG - National Union Fire Insurance, Policy | 0009115936 | Business Travel Accident |
| Anthem Blue Cross | 1789CC | |
| Kaiser (Hawaii) [Kaiser Foundation Health Plan, Inc.] | 15167 | |
| MetLife | 113656 | Dental |
| Cigna Life & Disability | VDT960217 | STD |
| | LKT961587 | LTD |
| | FLX962095 | Basic Life |
| | FLX962096 | Supplemental Life |
| | OK963697 | Basic AD&D |
| | OK963698 | Supplemental AD&D |
| Health Advocate | 3330-00 | |
| IGOE (Cobra Administrators) | Unknown | |
| Tranamerica (401k) | YK51316 | |
| Travelers (Workers Comp) | TC2JGL8223A596-06 | General Liability |
| | TC2J UB 303D475806 | Workers Compensation |
| Exec-U-Care | 10120-00 | |

**Other Contracts:**

| Non-ABRG Entity | Date Signed | Department |
|---|---|---|
| ACCOcare | 7/19/2006 | Facilities |
| ACS - Master Hosting and Professional Services Agreement | 1/27/2009 | |
| Asterop, Inc. | 2/8/2008 | |
| Barreda Moller | 7/11/2008 | Sourcing |
| Business Partner Solutions, Inc. | 6/23/2008 | |
| Canon Business Solutions | 8/17/2007 | Real Estate |
| Choice Point | 4/1/2008 | |
| CIT Technology Financing | Master Installment Payment Agreement | |

Schedule 1.1(a)

| | | |
|---|---|---|
| Services, Inc. | (Microsoft Enterprise Agreement Financing), dated March 24, 2008, between CIT Technology Financing Services, Inc. and Hub Distributing, Inc. | |
| Comfort Suites | | |
| Commercial Fire, Inc. | 5/1/2007 | Facilities |
| Corbin (Space Craft) | 12/16/2005 | |
| Egencia | | HR |
| Expedia | 4/12/2007 | HR |
| Fields, Barbara | 10/1/2008 | Merchandising |
| First Fireworks | 9/26/2005 | Marketing |
| Gaia Tech Inc. | | IT |
| Global Source Merchandising | | |
| Global Trim | | Sourcing |
| GMAC Commercial Financial | | Finance |
| Harris Bridge Loan (2006) | | |
| Heidrick & Struggles | | Executive |
| Kuehne & Nigel License Agmt | | |
| Lee & Associates | | |
| Logic | | IT |
| MSDN Benefits | | IT |
| Peak Models & Talent | | MDSE/MKTG |
| Playnet Work | | Real Estate |
| Resources Global Structure Networks Agreement | | |
| TFG California | | |
| US Security Assoc. | | Store Ops |
| Valuation Resource Corp. | | |
| Vaya | | |
| WGSN | | HR |
| Wheretogetit | | Marketing |
| Windstream | | IT |

**Credit Card Agreements:**

1. Agreement for American Express® Card Acceptance, dated as of July 1, 2003, between American Express Travel Related Services Company, Inc. and American Retail Group, as amended and supplemented through the Closing Date.

2. Merchant Services Bankcard Agremeent, dated March 1, , 2005, among Hub Distributing, Inc., JP Morgan Chase Bank and Chase Merchant Services L.L.C.

3. Merchant Services Agreement, effective April 1, 2005, between Discover Financial Services, Inc. and Merchant (as defined therein).

4. Merchant Services Agreement, dated January 27, 1986, between Discover Card Services, Inc. and Hub Distributing, Inc.

**Employment/ Independent Contractor Agreements:**

Sellers are party to the following employment and independent contractor agreements.

1. The Independent Contractor Services Agreement, dated as of February 9, 2009, between Hub Distributing, Inc. and Caroline Lettieri.

2. The Independent Contractor Services Agreement, dated as of May 10, 2006, between Caroline Lettieri and Hub Distributing, Inc.

3. The letter agreement, dated June 24, 2004, made by Katherine A. Nichols ("Nichols") and accepted by Hub Distributing, Inc., as supplemented by the related letter agreement made by Hub Distributing, Inc. and accepted by Nichols.

4. The letter agreement, dated July 9, 2008, made by Cooper & Dunham LLP and accepted by Hub Distributing, Inc.

5. The Contract, dated as of April 23, 2009, between Anchor Blue Retail Group, Inc. and MWW Group.

6. The letter agreement, dated December 22, 2008, made by BDO Seidman, LLP and accepted by Anchor Blue Retail Group, Inc.

7. The letter agreement, dated October 23, 2007, made by PricewaterhouseCoopers LLP ("PWC") and accepted by Hub Designs, Inc.

8. The letter agreement, dated January 14, 2008, made by PWC and accepted by Anchor Blue Retail Group, Inc.

9. The letter agreement, dated March 7, 2008, made by PWC and accepted by Anchor Blue Retail Group, Inc.

10. The Tenant Improvement Work Authorization, dated March 3, 2009, between Anchor Blue Retail Group, Inc. and HKS Architects, Inc.

**Legal Services Providers not listed above:**

Sellers have retained the below law firms to provide legal services.

| Law Firm | Practice Area |
| --- | --- |
| Epstein, Becker & Green | Immigration |

| | |
|---|---|
| Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt | Logistics/Importing |
| Jackson Lewis LLP | Litigation/Immigration |
| Morgan, Lewis Bockius | Benefits/Employee Relations |
| Opus Law | Real Estate |
| ReedSmith | Real Estate |
| von Maltitz, Derenberg, Kunin, Janssen & Giordano | Trademark |
| Law Offices of William Tedeschi | General |

## **Real Property Leases:**

Sellers have real property leases relating the Business for the locations set forth below.

| Store # | CENTER NAME | ADDRESS | CITY | STATE | LANDLORD |
|---|---|---|---|---|---|
| 11 | Bakersfield/Valley Plaza Mall | 2701 Ming Avenue | Bakersfield | CA | GEN GROWTH |
| 12 | Visalia/Visalia Mall | 2055 S. Mooney Avenue | Visalia | CA | GEN GROWTH |
| 13 | Bakersfield/East Hills Mall | 3000 Mall View Rd., Ste. 1023 | Bakersfield | CA | BAKERSFIELD REALTY CTR |
| 15 | Modesto/Vintage Faire Mall | 3401 Dale Road, #420 | Modesto | CA | MACERICH |
| 16 | Salinas/Northridge Mall | 410 Northridge Center | Salinas | CA | MACERICH |
| 17 | Fresno/Manchester North SC | 3502-111 N. Blackstone Avenue | Fresno | CA | CARLSON COMPANY |
| 18 | Yuma/Yuma Palms Regional Shopping Center | 1329 South Yuma Palms Pkwy, F2 | Yuma | AZ | WESTCOR |
| 21 | San Jose/Oakridge Mall | 925 Blossom Hill RD, Ste 1043 | San Jose | CA | WESTFIELD |
| 22 | Panorama City/Panorama Mall | 8425 Van Nuys Blvd., #38 | Panorama City | CA | MACERICH |
| 25 | Clovis/Sierra Vista Mall | 1050 Shaw Ave., Sp. #A-19 | Clovis | CA | SV LANDVALUE 27 |
| 28 | Mesa/Fiesta Mall | 1445 W. Southern #2006 | Mesa | AZ | MACERICH |
| 29 | Las Vegas/The Boulevard Mall | 3528 Maryland Pkwy, Ste 118 | Las Vegas | NV | GEN GROWTH |

| 30 | Burbank/Media City Center | 201 East Magnolia Blvd., Sp 233 | Burbank | CA | CROWN REALTY & DEVELOPMENT |
|----|---------------------------|----------------------------------|-----------------|-----|-------------------------------|
| 32 | Lakewood/Lakewood Center | 40 lakewood Center Mall | Lakewood | CA | MACERICH |
| 33 | Downey/Stonewood Center Mall | 250 Stonewood Street | Downey | CA | MACERICH |
| 34 | Norwalk/Norwalk Town Square (AB Outlet) | 11711 Rosecrans Avenue | Norwalk | CA | NEWMARK MERRILL |
| 35 | Redding/Mt Shasta Mall | 900 Dana Dr., Ste A41 | Redding | CA | CORDANO COMPANY |
| 36 | City of Industry/Puente Hills Mall | 1600 South Azusa Ave., Ste 557 | City of Industry | CA | GLIMCHER |
| 38 | Cerrritos/Los Cerritos Center | 465 Los Cerritos Center | Cerritos | CA | MACERICH |
| 39 | Buena Park/Buena Park Downtown | 8346 On The Mall | Buena Park | CA | DDR |
| 40 | Brea/Brea Mall | 2067B Brea Mall | Brea | CA | SIMON |
| 41 | Westminster/Westminster Mall | 2027 Westminster Mall | Westminster | CA | SIMON |
| 42 | Pico Rivera Towne Center (AB Outlet) | 8828 Washington Blvd. | Rico Rivera | CA | Vestar California XXVI, L.L.C. |
| 44 | Santa Maria/Santa Maria TC | 263 Town Center East | Santa Maria | CA | INSIGNIA/ESG, INC. |
| 45 | Laguna Hills/Laguna Hills Mall (AB Outlet) | 24155 Laguna Hills Mall, #1730 | Laguna Hills | CA | SIMON |
| 46 | Fort Collins/Foothills Mall | 215 E Foothills Pkwy., Sp E7 | Fort Collins | CO | GEN GROWTH |
| 48 | Mesquite/Town East Mall | 2138 Town East Center | Mesquite | TX | GEN GROWTH |
| 52 | Albuquerque/Cottonwood Mall | 10000 Coors Bypass NW Sp. E-215 | Albuquerque | NM | SIMON |
| 53 | San Ysidro/The Shops at Las Americas | 4211 Camino De La Plaza Sp H152 | San Diego | CA | CHELSEA |
| 54 | Carlsbad/Plaza South | 2525 El Camino Real #209 | Carlsbad | CA | WESTFIELD |
| 55 | Chula Vista/Chula Vista Center | 555 Broadway Sp 116 | Chula Vista | CA | GEN GROWTH |
| 57 | Oxnard/Esplanade SC | 201 W. Esplanade Drive | Oxnard | CA | WATT MGMT. |
| 58 | San Diego/Mission Valley Mall | 1640 Camino del Rio, Sp.#206 | San Diego | CA | WESTFIELD |
| 59 | Escondido/Escondido Village SC | 1351 E. Valley Park Way | Escondido | CA | JAMES CRONE & ASSOC. |
| 64 | Van Nuys (AB Outlet) | 6371 Van Nuys Blvd. | Van Nuys | CA | 6371-77 VNB LLC |
| 65 | Santa Anita Fashion Park | 400 S. Baldwin Avenue, Suite AB | Arcadia | CA | WESTFIELD |
| 66 | Glendale/Glendale Galleria | 2180 Glendale Galleria | Glendale | CA | GEN GROWTH |

RLF1-3398527-11

| 67 | Street of Brentwood | 2565 Sand Creek Road | Brentwood | CA | CONTINENTAL REAL ESTATE COMPANY |
|---|---|---|---|---|---|
| 69 | Colorado Springs/Chapel Hills Mall | 1710 Briargate Blvd. Sp 481 | Colorado Springs | CO | GEN GROWTH |
| 71 | Riverside/Galleria at Tyler | 1269 Galleria At Tyler SP #E108 | Riverside | CA | GEN GROWTH |
| 72 | Indio/Indio Fashion Plaza | 82-227 Highway 111 | Indio | CA | AG INDIO |
| 73 | West Covina/Westfield West Covina | 166 Plaza Drive | West Covina | CA | WESTFIELD |
| 74 | Westminster/West minster Mall | 5523 West 88th Ave., Space 7 | Westminster | CO | M.D. MANAGEMENT |
| 76 | Las Vegas/Meadows Mall | 4300 Meadows Lane, Ste. 228 | Las Vegas | NV | GEN GROWTH |
| 77 | Lakewood/Colorad o Mills | 14500 W. Colfax Ave. | Lakewood | CO | MILLS CORPORATION |
| 78 | Aurora/Aurora Mall | 14200 E Alameda Av. Sp 1017 | Aurora | CO | M.S. MANAGEMENT ASSOCIATES |
| 79 | Prescott/Prescott Gateway | 3298 Gateway Blvd, Sp 1184 | Prescott | AZ | MACERICH |
| 88 | Tempe/Arizona Mills | 5000 Arizona Mills Circle, Ste. 609 | Tempe | AZ | MILLS CORPORATION |
| 89 | Ontario/Ontario Mills | One Mills Circle, Sp 303 | Ontario | CA | MILLS CORPORATION |
| 90 | Milpitas/Great Mall Of The Bay Area | 406 Great Mall Dr. | Milpitas | CA | MILLS CORPORATION |
| 91 | Orange/The Block At Orange | 20 City Blvd. West, Sp #906 | Orange | CA | MILLS CORPORATION |
| 93 | Montclair/Montcla ir Plaza | 5154 Montclair Plaza Ln | Montclair | CA | GEN GROWTH |
| 94 | Redwood City/Mervny'S Plaza | 312 Walnut Street | Redwood City | CA | HERB FRIEDMAN |
| 101 | Sun Valley/Canyon Plaza SC | 8405 Laurel Canyon Blvd. | Sun Valley | CA | GMS THREE, LLC |
| 104 | Ventura/Pacific View Mall | 3301 E. Main St., Ste 2260 | Ventura | CA | MACERICH |
| 109 | Rancho Cucamonga/Victor ia Gardens | 12518 N. Main Street | Rancho Cucamonga | CA | FOREST CITY |
| 110 | Chico/Chico Mall | 1950 E. 20th St. | Chico | CA | GEN GROWTH |
| 112 | Newark/Newpark Mall | 2047 Newpark Mall | Newark | CA | GEN GROWTH |
| 114 | Chino/Chino Spectrum TC | 3841 Grand Ave., Ste. 3B | Chino | CA | VESTAR |
| 116 | Chino/Chino TC (AB Outlet) | 12125 Central Avenue | Chino | CA | FAMECO |
| 119 | Phoenix/Metro Center | 9617 N. Metro Pkwy., #2094 | Phoenix | AZ | MACERICH |

Schedule 1.1(a)
14 of 31

| 123 | San Bernardino/Inland Center Mall | 242 Inland Center Drive | San Bernardino | CA | MACERICH |
|---|---|---|---|---|---|
| 125 | Corona/Crossings at Corona | 3383 Grand Oake, Space 104 | Corona | CA | CASTLE & COOKE |
| 127 | El Centro/Imperial Valley Mall | 3451 Dogwood Ave., Sp 1474 | El Centro | CA | CBL |
| 128 | Flagstaff/Flagstaff Mall | 4650 North Highway 89, SP G025 | Flagstaff | AZ | MACERICH |
| 129 | Torrance/Del Amo FC | 21880 Hawthorne Blvd | Torrance | CA | SIMON |
| 131 | Phoenix/Desert Sky Mall (AB Outlet) | 7611 W. Thomas Rd., Ste. F20 | Phoenix | AZ | MACERICH |
| 132 | Phoenix/Desert Ridge Marketplace | 21001 North Tatum Bl vd., Suite 46-1500 | Phoenix | AZ | VESTAR |
| 133 | Northridge/Northri dge FC | 9301 Tampa Ave, SP 91 | Northridge | CA | GEN GROWTH |
| 134 | Roseville/Westfiel d Galleria At Roseville | 1151 Galleria Blvd., Suite 211 | Roseville | CA | WESTFIELD |
| 135 | Fairfield/Westfield Solano | 1350 Travis Blvd., Ste. 1479-A | Fairfield | CA | WESTFIELD |
| 137 | Merced Mall | 250 Merced Mall | Merced | CA | CODDING ENTERPRISES |
| 140 | Santa Rosa/Coddingtown regional Mall | 356 Coddingtown Center | Santa Rosa | CA | SIMON |
| 141 | Las Cruces/Mesilla Valley Mall (AB Outlet) | 1536 Mesilla Valley Mall | Las Cruces | NM | JONES LANG |
| 142 | Fontana/Palm Court at Empire Center (AB Outlet) | 17144 Slover Av. | Fontana | CA | MILAN PROPERTIES, LLC |
| 145 | Citrus Heights/Sunrise Mall | 6054 Sunrise Mall | Citrus Heights | CA | STEADFAST CO. |
| 147 | San Bruno/Shops at Tranforan | 1150 El Camino Real, Ste 295 | San Bruno | CA | GEN GROWTH |
| 150 | San Jose/Eastridge Mall | 2200 Eastridge Loop, Ste 2050 | San Jose | CA | GEN GROWTH |
| 153 | National City/Westfield Plaza Bonita | 3030 Plaza Bonita Road, Sp. 1206 | National City | CA | WESTFIELD |
| 155 | Tacoma/Tacoma Mall | 4502 South Steele Street #476-A | Tacoma | WA | SIMON |
| 157 | Simi Valley/Simi Valley TC | 1555 Simi Town Center Way, Ste 645 | Simi Valley | CA | FOREST CITY |
| 158 | Tucson/Tucson Mall | 4500 N. Oracle Sp 289 | Tucson | AZ | GEN GROWTH |
| 161 | Santa Rosa/Santa Rosa Plaza | 2005 Santa Rosa Plaza | Santa Rosa | CA | SIMON |
| 163 | Santa Barbara/State | 820 State Street | Santa Barbara | CA | DAVID BEERMAN |

|     | Street District | | | | |
|-----|------------------|-------------------------------|------------|-----|-------------------------------|
| 165 | Spokane/North Town Mall | 4750 N. Division, Sp 1246 | Spokane | WA | GEN GROWTH |
| 169 | Silverdale/Kitsap Mall | 10315 Silverdale Way NW Sp F2 | Silverdale | WA | MACERICH |
| 173 | Medford/Rogue Valley Mall | 1600 North Riverside Av Ste 1045 | Medford | OR | GEN GROWTH |
| 174 | Lynnwood/Alderw ood Mall | 3000 184th St. S W, #372 | Lynnwood | WA | GEN GROWTH |
| 178 | Bellingham/Bellis Fair | 350 Bellis Fair Mall | Bellingham | WA | GEN GROWTH |
| 184 | Kennewick/Colum bia Center | 353 Columbia Center Blvd. | Kennewick | WA | M.S. MANAGEMENT ASSOCIATES |
| 185 | Vancouver/Westfi eld Vancouver Mall | 8700 NE Vancouver Mall Dr., #157 | Vancover | WA | WESTFIELD |
| 186 | Salem/Lancaster Mall | 831 Lancaster DR., NE #147 | Salem | OR | C. E. JOHN CO. |
| 190 | Farmington/Anima s Valley Mall | 4601 East Main St., Ste. 740 | Farmington | NM | GEN GROWTH |
| 192 | Sacramento/The Village@Sacrame nto Gateway | 3620 North Freeway Blvd., Ste 105 | Sacramento | CA | OPUS WEST |
| 195 | Gallup/Rio West Mall | 1300 West I-40 Frontage, Ste. 314 | Gallup | NM | GEN GROWTH |
| 196 | Sacramento/Arden Fair Mall | 1689 Arden Way, Ste. 2095 | Sacramento | CA | MACERICH |
| 197 | Tucson/Park Place Mall | 5870 East Broadway | Tucson | AZ | GEN GROWTH |
| 198 | El Cajon/Parkway Plaza | 335 Parkway Plaza | El Cajon | CA | WESTFIELD |
| 202 | Lewisville/Vista Ridge Mall | 2401 South Stemmons Freeway, Sp 2186 | Lewisville | TX | GEN GROWTH |
| 203 | Fort Worth/Hulen Mall | 4800 S. Hullen, Suite 1092 | Ft. Worth | TX | GEN GROWTH |
| 204 | Cedar Park/Lakeline Mall | 11200 Lakeline Mall Dr, SP N07 | Cedar Park | TX | SIMON |
| 205 | Plano/Colin Creek Mall | 811 N. Central Expressway, Sp 1495 | Plano | TX | GEN GROWTH |
| 206 | Arlington/The Parks At Arlington | 3811 South Cooper St, SP 1180 | Arlington | TX | GEN GROWTH |
| 207 | Austin/Highland Mall | 6001 Airport Blvd., Ste 1390 | Austin | TX | GEN GROWTH |
| 208 | Humble/Deerbroo k Mall | 20131 Highway 59 North, SP 2038 | Humble | TX | GEN GROWTH |
| 223 | Phoenix/Paradise Valley Mall | 4568 East Cactus Road, SP C050 | Phoenix | AZ | MACERICH |
| 225 | Valencia/Westfield Valencia TC | 24201 Valencia Blvd, Ste 1265 | Valencia | CA | WESTFIELD |
| 229 | Laredo/Mall del Norte | 5300 San Dario Avenue, STE 118 | Laredo | TX | CBL |
| 231 | Albuquerque/Mont gomery Plaza | 5001 Montgomery Blvd. #A30 | Albuquerque | NM | GOODMAN REALTY |

| 234 | Roswell/Roswell Mall (AB Outlet) | 4501 North Main | Roswell | NM | ASHLEY KARNS BAKER |
|---|---|---|---|---|---|
| 235 | Huntington Park/Pacific Entertainment Center (AB Outlet) | 5952 Pacific Blvd. | Huntington Park | CA | PACIFIC PROP MGMT. |
| 237 | Sierra Vista/Mall at Sierra Vista | 2200 El Mercado Loop, Sp 1226 | Sierra Vista | AZ | GEN GROWTH |
| 240 | Ft. Myers/Edison Mall | 4125 Cleveland Ave, #1615 | Fort Myers | FL | SIMON |
| 243 | Orlando/Prime Outlets Mall 2 (AB Outlet) | 4973 International Drive SP#3F.19 | Orlando | FL | PRIME RETAIL |
| 245 | St. Petersburg/Tyrone Square | 6901 22nd Avenue North, #854B | St. Petersburg | FL | SIMON |
| 246 | Melbourne/Melbourne Square | 1700 West New Haven Ave. #285A | Melbourne | FL | SIMON |
| 247 | Jensen Beach/Treasure Coast Square | 3174 NW Federal Highway, #3434A | Jensen Beach | FL | SIMON |
| 248 | Sanford/Seminole TC | 167 Towne Center Circle | Sanford | FL | SIMON |
| 249 | Boynton Beach/Boynton Beach Mall | 801 N. Congress Ave. #355B | Boynton Beach | FL | SIMON |
| 251 | Coral Springs/Coral Square | 9469 W. Atlantic Blvd, #9347A | Coral Springs | FL | SIMON |
| 252 | Reno/Meadowood Mall | 5220 Meadowood Mall Circle | Reno | NV | SIMON |
| 253 | Altamonte Springs/Altamonte Mall | 451 East Altamonte Dr, SP 1111 | Altamonte Springs | FL | GEN GROWTH |
| 254 | Ocoee/West Oaks Mall | 9401 West Colonial Dr, SP 630 | Ocoee | FL | GEN GROWTH |
| 255 | Lakeland/Lakeland Square | 3800 U.S. Highway 98 North, SP 610 | Lakeland | FL | GEN GROWTH |
| 256 | Naples/Coastland Center | 2018 Tamiami Trail N. | Naples | FL | GEN GROWTH |
| 257 | Stockton/Weberstown Mall | 4950 Pacific Ave #221 | Stockton | CA | GLIMCHER |
| 258 | Monterey/Del Monte Center | 1415 Del Monte Center | Monterey | CA | AMERICAN ASSETS |
| 259 | Hayward/Southland Mall | 384 Southland Mall | Hayward | CA | GEN GROWTH |
| 261 | Tallahassee/Governor's Square | 1500 Apalachee Parkway, SP 2145 | Tallahassee | FL | GEN GROWTH |
| 262 | Savannah/Oglethorpe Mall | 7804 Abercorn Extension, SP 33 | Savannah | GA | GEN GROWTH |
| 263 | Turlock/Turlock TC | 677 North Golden State Blvd | Turlock | CA | TURLOCK TC |
| 265 | Redondo Beach/Galleria at | 1815 Hawthorne Blvd., #102 | Redondo Beach | CA | FOREST CITY |

| | | | | | |
|---|---|---|---|---|---|
| | South Bay | | | | |
| 266 | Clearwater/Westfield Countryside | 27001 US Highway 19 North, SP 1048 | Clearwater | FL | WESTFIELD |
| 267 | Orlando/Florida Mall | 8001 S. Orange Blossom Trail, SP 1226 | Orlando | FL | SIMON |
| 268 | Tampa/University Mall | 2200 E. Fowler Ave., SP 501 | Tampa | FL | SOMERA |
| 270 | Brandon/Westfield Brandon | 459 Brandon Town Center, SP 420 | Brandon | FL | WESTFIELD |
| 271 | Sarasota/Sarasota Square | 8201 S. Tamiami Trail, SP 13 | Sarasota | FL | WESTFIELD |
| 273 | Santa Fe/Santa Fe Place | 4250 Cerrillos Rd., Sp 1386 | Santa Fe | NM | JONES LANG |
| 282 | Boise/Boise Towne Square | 350 North Milwaukee, Sp. 2002 | Boise | ID | GEN GROWTH |
| 285 | Montebello/Montebello TC | 2139 Montebello Town Center | Montebello | CA | MACERICH |
| 292 | Albuquerque/Coronado Center | 6600 Menaul Blvd NE. Suite 65 | Albuquerque | NM | GEN GROWTH |
| 294 | Pleasanton/Stoneridge Mall | 1448 Stoneridge Mall | Pleasanton | CA | SIMON |
| 295 | Richmond/Hilltop Mall | 2327 Hilltop Mall Road, Sp B227 | Richmond | CA | SIMON |
| 300 | Concord/Sun Valley | 305 Sun Valley Mall | Concord | CA | TAUBMAN COMPANY |
| 301 | Fresno/Fashion Faire | 697 East Shaw Ave. | Fresno | CA | MACERICH |
| 310 | Escondido/Westfield North County | 200 E Via Rancho Pkwy #461 | Escondido | CA | WESTFIELD |
| 319 | Woodland/County Fair Mall | 1264 E. Gibson, Sp. #F609 | Woodland | CA | TRIPLE NET PROPERTIES |
| 321 | Victorville/The Mall @ Victor Valley | 14440 Bear Valley Road, Sp. 621 | Victorville | CA | MACERICH |
| 333 | Tracy/West Valley Mall | 3200 S.Naglee Rd. Sp 460 | Tracy | CA | GEN GROWTH |
| 340 | Henderson/Galleria @ Sunset | 1300 W. Sunset, Sp 2209 | Henderson | NV | FOREST CITY |
| 345 | Las Vegas/Town Square | 6623 Las Vegas Blvd South, Bldg F, SP A-139 | Las Vegas | NV | TURNBERRY ASSOCIATES |
| 346 | Orem/University Mall | 575 E. University Pkwy, Suite E72 | Orem | UT | WOODBURY CORP |
| 350 | St. George/Red Cliffs Mall | 1770 East Red Cliff Dr., Suite 1194 | St. George | UT | GEN GROWTH |
| 351 | Provo/Provo TC | 1200 Towne Centre Blvd., #2036 | Provo | UT | GEN GROWTH |
| 352 | Salt Lake City/Fashion Place Mall | 6191 South State St. Ste 1200 | Murray | UT | GEN GROWTH |
| 353 | Sandy/South TC | 10450 So State Street, Suite 2238 | Sandy | UT | MACERICH |
| 354 | Ogden/Newgate Mall | 3651 Wall Ave. Ste 1094 | Ogden | UT | GEN GROWTH |

Schedule 1.1(a)
18 of 31

| 356 | Layton/Layton Hills Mall | 2062 Layton Hills Mall | Layton | UT | CBL |
|---|---|---|---|---|---|
| 364 | Eureka/Bayshore Mall | 3300 Broadway, Sp. 417 | Eureka | CA | GEN GROWTH |
| 367 | Porterville/Portervi lle TC | 940 W. Henderson | Potterville | CA | W PORTERVILLE, LLC |
| 369 | Bullhead City/Mohave Crossroads | 3699 HWY 95, Space #660 | Bullhead City | AZ | Weingarten/Investments, Inc. |
| 370 | Temecula/Promen ade In Temecula | 40820 Winchester, Sp 1210 | Temecula | CA | FOREST CITY |
| 373 | Tempe/Tempe Marketplace | 2000 E. Rio salado Pkwy, STE 1117 | Tempe | AZ | VESTAR |
| 375 | Orange/Mall of Orange | 1500 East Village Way, Ste 2239 | Orange | CA | JONES LANG |
| 377 | Portland/Clackama s TC | 1200 SE 82nd, Ste 2185 | Portland | OR | GEN GROWTH |
| 379 | Antioch/Summers ville TC | 2550 Somersville Road, Sp 85 | Antioch | CA | MACERICH |
| 381 | Yuba City/The Mall At Yuba City | 1201A Colusa Ave. | Yuba City | CA | STEADFAST CO. |
| 382 | Hanford/Hanford Mall | 1675 West Lacey Blvd., SP B-5 | Hanford | CA | JONES LANG |
| 384 | Gilbert/San Tan Village | 2270 E. Willams Field Rd, SP 748 | Gilbert | AZ | MACERICH |
| 385 | Mesa/Superstition Springs Center | 6555 E Southern Ave. #2208 | Mesa | AZ | MACERICH |
| 386 | Palmdale/Antelope Valley Mall | 1233 W Ave. P, Sp. 840 | Palmdale | CA | FOREST CITY |
| 387 | El Paso/Cielo Vista Mall | 8401 Gateway Blvd. West, Sp.I-01& I-02 | El Paso | TX | SIMON |
| 389 | Moreno Valley/Moreno Valley Mall | 22500 Towngate Circle, Sp 1171 | Moreno Valley | CA | GEN GROWTH |
| 392 | Santa Ana/Westfield Main Place | 2800 N. Main St., STE 828 | Santa Ana | CA | WESTFIELD |
| 393 | Anaheim/Anaheim Plaza (AB Outlet) | 586 N. Euclid St. | Anaheim | CA | PAN PACIFIC |
| 397 | Daly City/Serramonte SC | 8-D Serra Monte Center | Daly City | CA | CAPITAL & COUNTIES |
| 398 | Glendale/Arrowhe ad TC | 7700 West Arrowhead Town Center #1226 | Glendale | AZ | MACERICH |
| 399 | Hemet/Hemet Valley Mall | 2200 West Florida Av., Ste. 260 | Hemet | CA | MCS HEMET |
| HQ | | 2501 Guasti Road | Ontario | CA | M-K Associates Ltd. |

## Investor Related Agreements:

1. Amended and Restated Registration Agreement, dated as of July 22, 2005, among Hub Holding Corp., a Delaware corporation ("Hub Holding"), Ares Corporate Opportunities

Fund, L.P. ("Ares"), Sun Hub, LLC, a Delaware limited liability company ("Sun"), and the Other Investors (as defined therein).

2. Amended and Restated Stockholders' Agreement, dated as of July 22, 2005, among Ares, Sun, the Minority Stockholders (as defined therein) and Hub Holding.

3. Series A. Preferred Stock Purchase Agreement, dated as of July 22, 2005, among Hub Holding and the Investors (as defined therein).

**Loan Agreements:**

1. Amended and Restated Loan and Security Agreement, dated as of March 7, 2005, by and among Hub Distributing, Inc., dated as of March 7, 2005, by and among HUB Distributing, Inc., Hub Designs, Inc., Anchor Blue Purchasing Corp., Most Purchasing Corp., and Anchor Blue Retail Group, Inc. (as Guarantor), Wachovia Bank, National Association, as Administrative Agent, and Ableco (as Term Loan Agent) (as amended, supplemented or otherwise modified).

**Miscellaneous:**

1. The Transition Services Agreement, dated as of July 13, 2009, by and between Anchor Blue Retail Group, Inc., a Delaware corporation, and Levi Strauss & Co., a Delaware corporation, as amended by Amendment No. 1 thereto, dated as of July 18, 2009.

RLF1-3398527-11

**Intellectual Property**

| Mark | Jurisdiction | Serial No./ Filing Date | Reg. No./ Reg. Date | Class/Goods and Services | Status | Current Owner | Comments |
|------|-------------|------------------------|--------------------|--------------------------|--------|---------------|----------|
| A.BLUE | U.S. | 76/382018 3/14/2002 | 3209443 2/13/2007 | 3, PERFUME | Registered  6-year Affidavit of Use due 2/13/2013  Renewal Due Date 2/13/2017 | Hub Distributing, Inc. | |
| ANCHOR BLUE | U.S. | 75/298813 5/27/1997 | 2142905 3/10/1998 | 35, RETAIL STORE SERVICES SPECIALIZING IN CLOTHING AND ACCESSORIES, INCLUDING HAIR ORNAMENTS, HANDBAGS AND LEATHER GOODS, COSTUME JEWELRY, COLOGNE | Registered  Next renewal due 3/10/2018 | Hub Distributing, Inc. | Unreleased security interest: Anchor Blue Enterprises, Inc. to Congress Financial Corporation (Florida), dated 12/16/2003 (3131/0339) |
| ANCHOR BLUE | U.S. | 75/078622 3/26/1996 | 2038917 2/18/1997 | 3, COLOGNE | Registered  Next renewal due 2/18/2017 | Hub Distributing, Inc. | Unreleased security interest: Anchor Blue Enterprises, Inc. to Congress Financial Corporation (Florida), dated 12/16/2003 (3131/0339) |
| ANCHOR BLUE | U.S. | 73/820411 8/21/1989 | 1589034 3/27/1990 | 25, MEN'S SPORTSWEAR, NAMELY PANTS, SHORTS, SHIRTS, JACKETS, FOOTWEAR AND YOUNG WOMEN'S AND LADIES SPORTSWEAR, NAMELY BLOUSES, DRESSES, PANTS, JACKETS, SWEATERS, SHORTS, SKIRTS, AND FOOTWEAR | Registered  Next renewal due 3/27/2010 | Hub Distributing, Inc. | Unreleased security interest: Anchor Blue Enterprises, Inc. to Congress Financial Corporation (Florida), dated 12/16/2003 (3131/0339) |
| ANCHOR BLUE | U.S. | 73/424740 5/6/1983 | 1292992 9/4/1984 | 25, LADIES' PANTS | Registered  Next renewal due 9/4/2014 | Hub Distributing, Inc. | Unreleased security interest: Anchor Blue Enterprises, Inc. to Congress Financial Corporation (Florida), dated 12/16/2003 (3131/0339) |
| ANCHORBLUE | U.S. | 77/402624 2/21/2008 | 3501735 9/16/2008 | 3, FRAGRANCES FOR PERSONAL USE  14, JEWELRY  18, HANDBAGS, TOTE BAGS AND BACKPACKS  25, SHIRTS, T-SHIRTS, SWEATERS, TOPS, JACKETS, PANTS, SHORTS, SOCKS, UNDERWEAR, LINGERIE, SWIMWEAR, BELTS, HEADWEAR AND FOOTWEAR  35, RETAIL STORE SERVICES SPECIALIZING IN CLOTHING, HEADWEAR, FOOTWEAR, AND ACCESSORIES INCLUDING HANDBAGS, TOTE BAGS AND BACKPACKS, SUNGLASSES, HAIR ORNAMENTS, JEWELRY AND FRAGRANCES | Registered  6-year Affidavit of Use due 9/18/2014  Renewal Due Date 9/16/2018 | Hub Distributing, Inc. | |

Schedule 1.1(a)
21 of 31

| Mark | Jurisdiction | Serial No./ Filing Date | Reg. No./ Reg. Date | Class/Goods and Services | Status | Current Owner | Comments |
|---|---|---|---|---|---|---|---|
| BEYOND BAGGY | U.S. | 75/194362 11/7/1996 | 2126999 1/6/1998 | 25, PANTS AND SHORTS | Registered<br>Next renewal due 1/6/2018 | Hub Distributing, Inc. | Unreleased security interest: Anchor Blue Enterprises, Inc. to Congress Financial Corporation (Florida), dated 12/16/2003 (3131/0339) |
| BIKINI EYE CANDY | U.S. | 78/429028 6/2/2004 | 3086433 4/25/2006 | 3, COLOGNE, BODY SPRAYS | Registered<br>6-year Affidavit of Use due 4/25/2012<br>Renewal due date 4/25/2016 | Hub Distributing, Inc. | |
| BIKINI SUMMER | U.S. | 78/429033 6/2/2004 | 3086434 4/25/2006 | 3, COLOGNE; BODY SPRAYS | Registered<br>6-year Affidavit of Use due 4/25/2012<br>Renewal due date 4/25/2016 | Hub Distributing, Inc. | |
| DESIGN  | U.S. | 77/144024 3/29/2007 | 3452096 6/24/2008 | 3, FRAGRANCES FOR PERSONAL USE, COSMETICS AND NON-MEDICATED TOILETRIES<br>14, JEWELRY<br>18, BACKPACKS, TOTEBAGS AND HANDBAGS<br>25, SHIRTS, T-SHIRTS, SWEATERS, TOPS, JACKETS, PANTS, BELTS, SHORTS, UNDERWEAR, SWIMWEAR, LINGERIE, HEADWEAR AND FOOTWEAR<br>35, RETAIL STORE SERVICES SPECIALIZING IN CLOTHING, FOOTWEAR AND ACCESSORIES, NAMELY, HANDBAGS, BACKPACKS AND TOTE BAGS, HAIR ORNAMENTS, SUNGLASSES, JEWELRY, FRAGRANCES AND COSMETICS | Registered<br>6-year Affidavit of Use due 6/24/2014<br>Renewal due date 6/24/2018 | Hub Distributing, Inc. | |
| GET YOUR CLOTHES ON | U.S. | 76/666789 9/29/2006 | 3270819 7/31/2007 | 35, RETAIL STORE SERVICES FEATURING CLOTHING AND ACCESSORIES | Registered<br>6-year Affidavit of Use due 7/31/2013<br>Renewal due date 7/31/2017 | Hub Distributing, Inc. | |

Schedule 1.1(a)
22 of 31

RLFI-3398527-11

| Mark | Jurisdiction | Serial No./ Filing Date | Reg. No./ Reg. Date | Class/Goods and Services | Status | Current Owner | Comments |
|---|---|---|---|---|---|---|---|
| HEIDIWOOD | U.S. | 77/329638 11/14/2007 | 3522204 10/21/2008 | 14, JEWELRY 18, HANDBAGS 25, SHIRTS, T-SHIRTS, TOPS, JACKETS, PANTS, SHORTS, SKIRTS AND DRESSES 35, RETAIL STORE SERVICES SPECIALIZING IN CLOTHING, HANDBAGS, FRAGRANCES FOR PERSONAL USE AND JEWELRY | Registered 6-year Affidavit of Use due 10/21/2014 Renewal due date 10/21/2018 | Hub Distributing, Inc. | |
| LIVE, LOVE AND BE FREE | U.S. | 77/187424 5/22/2007 | 3437344 5/27/2008 | 25, CLOTHING, NAMELY, SHIRTS, T-SHIRTS, TOPS, JACKETS, PANTS, SHORTS | Registered 6-year Affidavit of Use due 5/27/2014 Renewal due date 5/27/2018 | Hub Distributing, Inc. | |
| MILLER'S OUTPOST | U.S. | 73/143127 9/30/1977 | 1096347 7/11/1978 | 42, RETAIL CLOTHING STORE SERVICES | Registered Declaration of use due date 7/11/2018 Next renewal due 7/11/2018 | Hub Distributing, Inc. | Unreleased security interest: Anchor Blue Enterprises, Inc. to Congress Financial Corporation (Florida), dated 12/16/2003 (3131/0339) |
| MILLERS OUTPOST DESIGN  | U.S. | 73/793351 4/14/1989 | 1589478 3/27/1990 | 42, RETAIL CLOTHING STORE SERVICES | Registered Declaration of use due date 3/27/2010 Next renewal due 3/27/2010 | Hub Distributing, Inc. | Unreleased security interest: Anchor Blue Enterprises, Inc. to Congress Financial Corporation (Florida), dated 12/16/2003 (3131/0339) |
| TAKEN | U.S. | 77/366730 1/8/2008 | 3599743 3/31/2009 | 3, FRAGRANCES FOR PERSONAL USE | Registered Declaration of use due 3/31/2015 Renewal due date 3/31/2019 | Hub Distributing, Inc. | |

| Mark | Jurisdiction | Serial No./ Filing Date | Reg. No./ Reg. Date | Class/Goods and Services | Status | Current Owner | Comments |
|---|---|---|---|---|---|---|---|
| UNCHAINED | U.S. | 77/381783 1/28/2008 | 3609902 4/21/2009 | 3, FRAGRANCES FOR PERSONAL USE | Registered Declaration of Use Due 4/21/2015 Renewal due date 4/21/2019 | Hub Distributing, Inc. | |
| PICK OUR POCKETS | U.S. | 77/381783/ 7/25/2009 | | | Pending registration | Hub Distributing, Inc. | |
| WIRED | U.S. | 78/609120 4/14/2005 | 3126096 8/8/2006 | 3, COLOGNE | Registered 6-year Affidavit of Use due 8/8/2012 Renewal due date 8/8/2016 | Hub Distributing, Inc. | |
| ANCHOR BLUE | State of Wisconsin | | 7/5/2000 | 35, RETAIL STORES SPECIALIZING IN APPAREL AND FASHION ACCESSORIES | Registered Renewal due 7/5/2010 | Hub Distributing, Inc. | |
| ANCHOR BLUE | Canada | 0833741 1/15/1997 | TMA531528 8/21/2000 | 25, MENS SPORTSWEAR, NAMELY PANTS, SHORTS, SHIRTS, JACKETS, FOOTWEAR, NAMELY, SHOES, ATHLETIC SHOES, BOOTS AND SANDALS AND YOUNG WOMEN'S AND LADIES SPORTSWEAR, NAMELY BLOUSES, DRESSES, PANTS, JACKETS, SWEATERS, SHORTS, SKIRTS, AND FOOTWEAR, NAMELY, SHOES, ATHLETIC SHOES, BOOTS AND SANDALS | Registered Renewal due 8/21/2015 | Hub Distributing, Inc. | |
| ANCHOR BLUE | Mexico | 251584 1/9/1996 | 541708 2/3/1997 | 25, TROUSERS, TROUSERS SHORTS, SHIRTS, CHAMARRAS, FOOTWEAR FOR MEN AND OVERALLS, CLOTHING, TROUSERS, CHAMARRAS, SWEATERS, TROUSERS SHORTS, SHIRTS AND FOOTWEAR FOR DRAUGHTS AND YOUNG WOMEN | Registered Renewal due 1/9/2016 | Hub Distributing, Inc. | |
| ANCHORBLUE | Peru | | 144,199 10/15/2008 | 25, CLOTHING | Expiration Date 10/18/2018 | Hub Distributing, Inc. | |
| ANCHORBLUE | Singapore | | T0800516B 1/15/2008 | 25, CLOTHING, FOOTWEAR AND HEADWARE | Expiration Date 1/15/2008 | Hub Distributing, Inc. | |
| ANCHOR BLUE | Taiwan | 083050390 7/30/1994 | 693679 10/16/95 | 25, LADIES PANTS, MEN'S PANTS, SHORTS, SHIRTS, JACKETS, FOOTWEAR, YOUNG WOMEN'S AND LADIES BLOUSES, DRESSES, PANTS, JACKETS, SWEATERS, SHORTS, SKIRTS AND FOOTWEAR | Expiration Date 10/16/2015 | Hub Distributing, Inc. | |

| Mark | Jurisdiction | Serial No./ Filing Date | Reg. No./ Reg. Date | Class/Goods and Services | Status | Current Owner | Comments |
|------|-------------|------------------------|--------------------|-------------------------|--------|--------------|----------|
| ANCHORBLUE | Indonesia | D2008 017603 5/14/2008 | | 25, CLOTHING, FOOTWEAR AND HEADWEAR | Application Pending | Hub Distributing, Inc. | |
| ANCHORBLUE | Malaysia | 2008/01604 1/25/2008 | | 25, CLOTHING, FOOTWEAR AND HEADWEAR | Application Pending | Hub Distributing, Inc. | |

Schedule 1.1(a)
25 of 31

RLFI-3398527-11

# U.S. COPYRIGHT REGISTRATIONS

| Title | Registration No. | Publication Date/ Year of Creation | Registration Date | Current Owner | Comments |
|-------|------------------|-------------------------------------|-------------------|---------------|----------|
| The Millers Outpost Game | VA74366 | 12/20/1980 | 5/1/1981 | Hub Distributing, Inc. d/b/a Millers Outpost | |
| Merry Christmas Star | PAu292186 | 1979 | 5/4/1981 | Miller's Outpost/Hub Distributing, Inc. | |

Schedule 1.1(a)
26 of 31

RLFI-3398527-11

**PATENTS**

None

RLF1-3398527-11

# DOMAIN NAMES

| Domain Name | Expiration Date | Registrant | Registrar |
|---|---|---|---|
| ANCHORBLUE.COM | 11/21/2014 | Hub Distributing, Inc.<br>P.O. Box 5996<br>Ontario, California 91761 | Network Solutions |
| HUBDIST.COM | 4/27/2014 | Hub Distributing, Inc.<br>P.O. Box 5996<br>Ontario, California 91761 | Network Solutions |
| HUBDISTRIBUTING.COM | 11/21/2014 | Hub Distributing, Inc.<br>P.O. Box 5996<br>Ontario, California 91761 | Network Solutions |
| MILLERSOUTPOST.COM | 11/21/2014 | Hub Distributing, Inc.<br>P.O. Box 5996<br>Ontario, California 91761 | Network Solutions |
| ABRGOWA.COM | 4/10/2010 | Anchor Blue Retail Group | Network Solutions |
| ABRGREMOTE.COM | 12/19/2010 | Anchor Blue Retail Group | Network Solutions |
| ANCHORBLUEUNIVERSITY.COM | 1/12/2014 | Anchor Blue Retail Group | GoDaddy.com |
| ABRG.TV | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| ANCHORSBLUE.COM | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| ANCHORSBLUE.ORG | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| ANCHORSBLUE.NET | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| ANCHORSBLUE.TV | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| HUBDISTRIBUTING.ORG | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| HUBDISTRIBUTING..NET | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| HUBDISTRIBUTING.TV | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| MILEROUTPOST.COM | 12/11/2010 | Domains by Proxy | GoDaddy.com |

Schedule 1.1(a)
28 of 31

| Domain Name | Expiration Date | Registrant | Registrar |
|---|---|---|---|
| MILEROUTPOST.ORG | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| MILEROUTPOST.NET | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| MILEROUTPOST.TV | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| MILLEROUTPOST.ORG | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| MILLEROUTPOST.TV | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| MILLEROUTPOSTS.COM | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| MILLEROUTPOSTS.NET | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| MILLEROUTPOSTS.ORG | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| MILLEROUTPOSTS.TV | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| MILLERSOUTPOST.ORG | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| MILLERSOUTPOSTS.TV | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| ANCHORBLUE.TV | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| MILLERSOUTPOSTS.COM | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| MILLERSOUTPOSTS.ORG | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| MILLERSOUTPOSTS.NET | 12/11/2010 | Domains by Proxy | GoDaddy.com |
| ABRGSPECIALEVENTS.ORG | 12/7/2010 | Domains by Proxy | GoDaddy.com |
| ABRGSPECIALEVENTS.NET | 12/7/2010 | Domains by Proxy | GoDaddy.com |
| ABRGSPECIALEVENTS.TV | 12/7/2010 | Domains by Proxy | GoDaddy.com |
| ABRGSPECIALEVENTS.COM | 12/6/2010 | Domains by Proxy | GoDaddy.com |

**THIRD-PARTY / PRIVATE REGISTRATIONS**

Schedule 1.1(a)
29 of 31

| Domain Name | Expiration Date | Registrant | Registrar |
|---|---|---|---|
| HEIDIWOOD.COM | 4/25/2001 | Domains By Proxy | GoDaddy.com |
| ANCHORBLUE.NET | 6/16/2009 | Whois Privacy Protection Service, Inc. Bellevue, WA | |
| HUBDESIGNS.COM | 7/22/2010 | Domains By Proxy, Inc. Scottsdale, AZ | GoDaddy.com |
| MILLERSOUTPOST.TV | 12/11/2010 | Domains By Proxy, Inc. Scottsdale, AZ | GoDaddy.com |
| MOSTENTERPRISES.COM | 7/17/2010 | Internet Reit, Inc. 1177 West Loop South, S-1300 Houston, TX 77027 | Tucows |

## NON-REGISTERED INTELLECTUAL PROPERTY

• Graphic designs, artwork, slogans and verbiage used or created for use in connection with the Business together with all goodwill associated with each of the foregoing

• Silhouette and fabric design patterns, and any designs for apparel, marketing materials or store layouts

• Specifications, make details, and measurements related to apparel

• Logos and trims used for branding of the Business and related products together with all goodwill associated with each of the foregoing

• Product development calendar that establishes a timeline for the product development cycle

• Invention disclosures and know-how related to the Business

• Trademarks, service marks, trade names, trade dress, corporate names used or created for use in connection with the operation of the Business together with all goodwill associated with each of the foregoing

• Trade Secrets used or created for use in connection with the operation of the Business

Schedule 1.1(a)
30 of 31

- Copyrights and Software used or created for use in connection with the operation of the Business

- The right to sue, counterclaim, and recover for past, present, and future infringement or other violations of the Purchased Intellectual Property

- Intellectual Property acquired under the Asset Purchase Agreement made as of February 20, 2008, by and between Communication Concepts International, Inc., and Kathryn J. Volin ("Volin"), and Hub Distributing, Inc.

- Other Intellectual Property used or created for use in connection with the operation of the Business or licenses to the foregoing

RLF1-3398527-11