THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL TO THE BANKRUPTCY COURT BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| HUB HOLDING CORP., et al.,[1] | Case No. 09-11770 (PJW) |
| Debtors. | Jointly Administered |

## DISCLOSURE STATEMENT FOR FIRST AMENDED JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (Bar No. 2981)
Jason M. Madron (Bar No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

Counsel for the Debtors and Debtors in Possession

**PACHULSKI STANG ZIEHL & JONES LLP**
Bradford J. Sandler (Bar No. 4142)
919 North Market Street, Suite 1700
Wilmington, Delaware 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Counsel for the Official Committee of Unsecured Creditors

Dated: January 6, 2011
        Wilmington, Delaware

---

[1] The Debtors in these cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Hub Holding Corp. (4718), Hub Distributing, Inc. (0682), Hub Designs, Inc. (6076), Ontario Purchasing Corp. (6120) and MOST Purchasing Corp. (6052). The Debtors' corporate mailing address is 1304 SW 160th Avenue, Box 145, Sunrise, FL 33326.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. ON FEBRUARY 11, 2011 (PACIFIC STANDARD TIME), UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE. TO BE COUNTED, THE VOTING AGENT MUST <u>ACTUALLY RECEIVE</u> YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.

THE DEBTORS AND THE CREDITORS' COMMITTEE PROVIDE NO ASSURANCE THAT THE DISCLOSURE STATEMENT (AND THE EXHIBIT HERETO) THAT IS ULTIMATELY APPROVED IN THE CHAPTER 11 CASES (A) WILL CONTAIN ANY OF THE TERMS IN THIS CURRENT DOCUMENT OR (B) WILL NOT CONTAIN DIFFERENT, ADDITIONAL OR MATERIAL TERMS THAT DO NOT APPEAR IN THIS CURRENT DOCUMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS ATTACHED HERETO IS <u>HIGHLY SPECULATIVE</u>, AND PERSONS SHOULD NOT RELY ON SUCH DOCUMENTS IN MAKING INVESTMENT DECISIONS WITH RESPECT TO (A) THE DEBTORS OR (B) ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THE CHAPTER 11 CASES.

THE DEBTORS AND THE CREDITORS' COMMITTEE ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN. YOU SHOULD NOT RELY UPON OR USE THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS AND THE CREDITORS' COMMITTEE URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE DEBTORS' AND THE CREDITORS' COMMITTEE'S POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE LIQUIDATING TRUSTEE MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS. THE PLAN RESERVES FOR THE LIQUIDATING TRUSTEE THE RIGHT TO BRING CAUSES OF ACTION (DEFINED IN THE PLAN) AGAINST ANY ENTITY OR PARTY IN INTEREST EXCEPT THOSE SPECIFICALLY RELEASED.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS AND THE CREDITORS' COMMITTEE DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, NO ENTITY HAS AUDITED THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DEBTORS AND THE CREDITORS' COMMITTEE FILED THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS AND THE CREDITORS' COMMITTEE HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER

2

THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS AND THE CREDITORS' COMMITTEE HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.

RLF1 3761176v. 1

## I.    INTRODUCTION

This is the disclosure statement (the "Disclosure Statement") of Hub Holding Corp. (f/k/a Anchor Blue Retail Group, Inc.), Hub Distributing, Inc., Hub Designs, Inc., Ontario Purchasing Corp. (f/k/a Anchor Blue Purchasing Corp.) and MOST Purchasing Corp (collectively, "Hub" or the "Debtors"), the debtors and debtors in possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases") pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), filed in connection with the Debtors' Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, dated November 24, 2010 (the "Plan"), a copy of which is attached to this Disclosure Statement as Exhibit A.

### A.    Definitions and Exhibits

#### 1.    Definitions

Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

#### 2.    Exhibits

All exhibits to this Disclosure Statement are incorporated as if fully set forth herein and are a part of this Disclosure Statement.

### B.    Notice to Creditors

#### 1.    Purpose of Disclosure Statement

The purpose of this Disclosure Statement is to set forth information that (i) summarizes the Plan and alternatives to the Plan, (ii) advises holders of Claims and Equity Interests of their rights under the Plan, (iii) assists holders of Claims entitled to vote in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

By order dated _____, 2011 the Court approved this Disclosure Statement, finding that it contains "adequate information" as that term is used in section 1125(a)(1) of the Bankruptcy Code. However, the Court has not passed on the merits of the Plan. Creditors should carefully read the Disclosure Statement, in its entirety, before voting on the Plan.

**IT IS THE OPINION OF THE DEBTORS AND THE CREDITORS' COMMITTEE THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND CREDITORS. THEREFORE, THE DEBTORS AND THE CREDITORS' COMMITTEE RECOMMEND THAT CREDITORS VOTE TO APPROVE THE PLAN.**

PLEASE READ THE DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY. A COPY OF THE PLAN IS ATTACHED AS EXHIBIT A. THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN FOR THE CONVENIENCE OF CREDITORS AND EQUITY INTEREST HOLDERS, BUT THE PLAN ITSELF QUALIFIES ALL SUCH SUMMARIES. ACCORDINGLY, IF THERE EXISTS ANY INCONSISTENCY BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

### C. Disclosure Statement Enclosures

Accompanying the Disclosure Statement are the following enclosures:

#### 1. Disclosure Statement Approval Order

A copy of the order of the Court, dated _____, 2011, approving the Disclosure Statement and, among other things, establishing procedures for voting on the Plan and scheduling the hearing to consider, and the deadline for objecting to, confirmation of the Plan (the "Disclosure Statement Order").

#### 2. Notice of Confirmation Hearing

A copy of the notice of the deadline for submitting ballots to accept or reject the Plan and, among other things, the date, time and place of the Confirmation Hearing and the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice").

#### 3. Ballots

One or more ballots (and return envelopes) for voting to accept or reject the Plan, unless you are not entitled to vote to accept or reject the Plan and are deemed to reject the Plan, and therefore, are not entitled to vote. See Article III below for an explanation of which parties in interest are entitled to vote.

### D. Inquiries

If you have any questions about the packet of materials that you have received, please contact Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, (302) 651-7700, Attn: Jason M. Madron, Esq., during normal business hours.

## II. OVERVIEW OF DEBTORS' OPERATIONS AND CHAPTER 11 CASES

### A. Debtors' Prepetition Business Operations

#### 1. Business

A predecessor to Anchor Blue Retail Group, Inc. ("ABRG"), Hub Distributing, Inc. ("HUB"), was founded in 1972 as a retailer of casual men's apparel under the name "Millers Surplus" (later renamed "Millers Outpost"). Millers Outpost was a specialty retailer of casual apparel with a male-oriented image, principally selling Levi's® branded clothing. Throughout the 1970s, Millers Outpost grew to become one of the world's largest retailers of Levi's® products. In 1980, American Retail Group (formerly known as Amcena Corporation) purchased HUB, the parent of the Millers Outpost business. The following year, Millers Outpost developed its own proprietary brand of private label denim under the Anchor Blue name. By 1989, there were more than 300 Millers Outpost stores, with locations in Arizona, Arkansas, California, Louisiana, Nevada, New Mexico, Texas and Utah.

In 1990, ABRG's predecessor opened the first Levi's® Outlet by MOST store, and, over the next several years, the Levi's® Outlet by MOST business grew to become a leading outlet center retailer offering a variety of men's, women's and children's apparel and accessories at value prices. As of the Petition Date, Hub Distributing, Inc. and Hub Designs, Inc. held the exclusive third-party U.S. license for Levi's® and Dockers® outlet stores in the United States and Puerto Rico, and sold a variety of

overrun and irregular Levi's® and Dockers® branded clothing, as well as private label merchandise. The license agreement authorized the Levi's® and Dockers® division of ABRG ("LDO") to use certain Levi Strauss & Co. trademarks in connection with the operation of its Levi's® Outlet by MOST, Levi's® Outlet by Designs, Dockers® Outlet by MOST and Dockers® Outlet by Designs stores. While not provided for in the license agreement, LDO purchased and resold an assortment of first-quality merchandise under the Levi's® and Dockers® label. As of the Petition Date, LDO operated 74 outlet stores in 31 states and Puerto Rico.

In 1996, the first Anchor Blue store was opened. Beginning in 2001, a process began whereby the Millers Outpost stores were converted to the Anchor Blue banner. As of the Petition Date, there were five (5) stores with the Millers Outpost banner, all of which operated as clearance or outlet stores. As of the Petition Date, Anchor Blue was a mall-based retailer of contemporary fashion basics and accessories for the high growth teen and young adult markets. ABRG operated 178 Anchor Blue stores in 12 states.

In 2003, ABRG's business was acquired by Sun Capital Partners, Inc. ("Sun Capital"). In November 2004, ABRG acquired the Designs business from Casual Male Retail Group and became the exclusive Levi's® and Dockers® licensee for outlets in the United States and Puerto Rico. Thereafter, in March 2005, ABRG and Sun Capital completed a leveraged recapitalization and sold a minority equity stake to Ares Management LLC in July 2005.

As of the Petition Date, the Debtors were a leading specialty apparel retailer, offering compelling value on high-quality, branded casual apparel and accessories through their two retail formats, the Anchor Blue stores and the Levi's® and Dockers® outlets. The Debtors leased their 425,000 square foot corporate headquarters and distribution facility in Ontario, California (the "Ontario Facility"). All of the Debtors' corporate management functions (for both the Anchor Blue and Levi's® and Dockers® outlet businesses) were conducted at the Ontario Facility. As of May 23, 2009, the Debtors had 2,814 employees, 808 of which are full-time employees and 2,006 of which work on a part-time basis. All 251 of the retail stores were subject to leases with aggregate annual rent in excess of $55.6 million.

## 2.    Capital Structure

As of the Petition Date, ABRG had 1,979,677 voting common shares outstanding, 100,253 non-voting common shares outstanding, 37,408 series A preferred shares outstanding, 639,388 series A-1 preferred shares outstanding and 76 series A restricted preferred shares outstanding. ABRG owns 100% of the equity of Hub Distributing, Inc. ("Hub Distributing"), Hub Designs, Inc. ("Hub Designs"), Anchor Blue Purchasing Corp. ("AB Purchasing") and Most Purchasing Corp. ("Most Purchasing").

The Debtors are parties to that certain *Amended and Restated Loan and Security Agreement*, dated as of March 7, 2005, among Hub Distributing, Hub Designs, AB Purchasing and Most Purchasing Corp., as borrowers (collectively, the "Borrowers"), ABRG, formerly known as Hub Holding Corp., as guarantor, Wachovia Bank, National Association, in its capacity as agent ("Wachovia") for itself and the other financial institutions from time to time party thereto, as revolving loan lenders (collectively, the "Revolving Loan Lenders"), Ableco Finance LLC ("Ableco"), as term loan agent, the lenders named therein, as term loan lenders (collectively, along with the Revolving Loan Lenders, the "Prepetition Lenders"), and the other parties thereto under which the Prepetition Lenders provided loans of up to $120 million to the Borrowers (as amended, the "Prepetition Loan Facility"). The Prepetition Loan Facility consists of a $85 million term loan and a $35 million revolving loan.

Amounts outstanding under the Prepetition Loan Facility are secured by a continuing security interest in, among other things, all of the Debtors' intellectual property, inventory, equipment, deposit accounts, personal property and fixtures, accounts receivable, general intangibles, chattel paper, instruments and letter of credit rights. As of the Petition Date, an aggregate amount of $90.5 million was outstanding under the Prepetition Loan Facility — approximately $76 million owed on account of the term loan and $14.5 million on account of the Debtors' prepetition revolving credit facility.

### 3. Events Leading to the Debtors' Chapter 11 Filing

Due primarily to the underperformance of the Anchor Blue segment, the Debtors sustained pre-tax operating losses for the three (3) years prior to the Petition Date. The decline in the housing market and the tightening of the credit markets led to a decline in consumer discretionary spending and to a tightening of credit terms by the Debtors' suppliers. This dramatic slowdown in consumer spending became even more acute during 2008 and the first several months of 2009, thereby exacerbating the Debtors' financial condition and leaving the Debtors operating under tight liquidity constraints.

Given the foregoing factors, the Debtors determined that chapter 11 afforded them the best possible tool to preserve and realize upon the value of their businesses through a prompt going-concern sale of the Debtors' Anchor Blue and LDO businesses, closing a limited number of uneconomic and underperforming retail stores in the Anchor Blue business, and the pursuit of the prompt sale and disposition of their remaining operations. In consultation with their professionals and after careful examination by the Debtors' Board of Directors, the Debtors determined that chapter 11, combined with an expeditious sale of the substantial segment of their Levi's® and Dockers® outlet and Anchor Blue operations through a going-concern auction process, was the best and most efficient way to maximize a return for the Debtors, their estates and all parties-in-interest.

## B. The Chapter 11 Cases

### 1. Commencement of Chapter 11 Cases

On May 27, 2009 (the "Petition Date"), each of the Debtors filed a petition for relief under chapter 11 of the Bankruptcy Code. The Debtors retained the law firm of Richards, Layton & Finger, P.A. as their counsel. Additionally, the Debtors retained Duff & Phelps Securities, LLC ("Duff & Phelps") as their financial advisor.

### 2. Appointment of the Committee

On June 5, 2009, the Creditors' Committee was appointed by the Office of the United States Trustee pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases. The Creditors' Committee is comprised of Superline, Inc., J.T. Intimates, Inc., The Macerich Company, Simon Property Group Inc. and General Growth Properties. The Creditors' Committee is represented by the law firm of Pachulski Stang Ziehl & Jones LLP.

### 3. Events During the Pendency of the Chapter 11 Cases

#### a. First Day Motions

On May 27, 2009, the Debtors filed certain applications and motions (collectively, the "First Day Motions") with the Bankruptcy Court, including (i) a motion for an order directing the joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b); (ii) an application for an

order approving the retention of Kurtzman Carson Consultants LLC as claims and noticing agent pursuant to section 156(c) of the Judicial Code and Rule 2002-1(f) of the Local Rules; (iii) a motion for an order (a) authorizing the continued use of the Debtors' centralized cash management system, (b) authorizing the maintenance of the Debtors' existing bank accounts and business forms, and (c) extending the Debtors' time to comply with section 345 of the Bankruptcy Code; (iv) a motion for an order authorizing the Debtors to pay prepetition wages, compensation and employee benefits pursuant to sections 105(a) and 363(b) of the Bankruptcy Code; and (v) a motion for an order authorizing the Debtors to provide adequate assurance of future payment to utility companies pursuant to section 366(b) of the Bankruptcy Code. On May 28, 2009, the Bankruptcy Court entered orders approving each of the First Day Motions.

b.    The DIP Financing Motion

In order for the Debtors to maintain their operations through the closing of a going-concern sale, it was necessary for the Debtors to obtain post-petition financing through the closing of such going-concern sale. The Debtors therefore filed a motion seeking the approval of post-petition financing (the "DIP Motion"). On May 28, 2009, the Bankruptcy Court held a hearing with regard to the DIP Motion. After hearing from the parties, the Bankruptcy Court entered an interim order (the "Interim Financing Order") authorizing the Debtors to, among other things, (i) obtain post-petition financing, (ii) grant security interests to the Debtors' lenders, (iii) use cash collateral and (iv) set a final hearing on the DIP Motion for June 17, 2009 (which hearing was adjourned by the Debtors to June 30, 2009). On June 30, 2009, the Court entered a final order on the DIP Motion (the "Final Order") granting the Debtors final authority to obtain post-petition loans.

c.    The Asset Sales

Since the Petition Date, the Debtors have successfully consummated the sales of their Levi's® and Dockers® outlet division and Anchor Blue division to going-concern purchasers. Additionally, in conjunction with the sale of their operating divisions, the Debtors have also (either on their own or with the assistance of a court-approved liquidation firm) conducted store closing sales at approximately sixty (60) of their retail locations that were in operation as of the Petition Date.

Specifically, on June 30, 2009, the Court entered its *Order (A) Approving Asset Purchase Agreement Between the Debtors and the Successful Bidder; (B) Authorizing the Sale of the Purchased Assets of the Debtors Free and Clear of All Liens, Claims, Encumbrances, and Interests; and (C) Authorizing the* Assumption *and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith* [Docket No. 273] (the "MOST Sale Order"). Pursuant to the MOST Sale Order, the Court approved the sale of the Debtors' Levi's® and Dockers® outlet division to Levi's Only Stores, Inc. ("Levi's"). The sale transaction to Levi's closed on July 13, 2009.

Thereafter, on July 30, 2009, the Court entered its *Order (1) Approving Asset Purchase Agreement Between Debtors and Buyer, (2) Approving Sale of Substantially All Anchor Blue Assets and Assumption of Certain Liabilities Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (3)* Approving *Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases, and (4) Determining Amounts Necessary to Cure Such Executory Contracts and Unexpired Leases* [Docket No. 497] (the "Anchor Blue Sale Order").[2] Pursuant to the Anchor Blue Sale Order, the

---

[2] Among other things, the Anchor Blue Sale Order approved that certain *Asset Purchase Agreement By and Among HUB Distributing, Inc., HUB Designs, Inc., and Anchor Blue Retail Group, Inc., and Ableco Finance LLC*, dated as of May 27, 2009, by and between three of the Debtors, Hub Distributing, Inc., a Florida corporation (formerly known as Anchor Blue Enterprises, Inc.), Hub Designs, Inc., a Florida corporation (formerly known as Most Enterprises, Inc.), Anchor Blue Retail Group, Inc., a Delaware corporation, and Ableco Finance LLC, as Term

Court approved the sale of the Debtors' Anchor Blue division to Buyer. The sale transaction to Buyer closed on August 14, 2009.[3]

Finally, with respect to the store closing process, the Debtors, either through a liquidation firm pursuant to the Bankruptcy Court's *Order (A) Approving Agency Agreement, (B) Authorizing Debtors to Conduct Store Closing Sales and (C) Granting Certain Related Relief*, dated June 18, 2009 [Docket No. 182] or on their own, have completed store closing sales at a number of their stores. Additionally, pursuant to the Bankruptcy Court's *Order Authorizing Debtors to Amend List of Closing Stores*, dated June 24, 2009 [Docket No. 228], the Debtors commenced, through a liquidation firm, a limited number of additional store closing sales in late June 2009. In sum, all of the Debtors' retail locations as of the Petition Date not otherwise sold to Levi's or Buyer have been closed pursuant to a store closing sale as of the date of this Disclosure Statement. Consequently, in light of the consummation of the two going-concern sale transactions and the conclusion of the store closing sales, the Debtors no longer have any ongoing retail business operations.

### d. Miscellaneous Applications, Motions and Filings

#### (i) Retention of Professionals

In connection with the Chapter 11 Cases, the Debtors retained the following professionals: (i) Richards, Layton & Finger, P.A., pursuant to section 327(a) of the Bankruptcy Code, as bankruptcy counsel; (ii) Duff & Phelps Securities, LLC, pursuant to section 327(a) of the Bankruptcy Code, as financial advisors; (iii) CRG Partners Group LLC, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, as special financial advisors; and (iv) PricewaterhouseCoopers LLP, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, as tax and accounting advisors. The Creditors' Committee retained the following professionals in the Chapter 11 Cases: (i) Benesch, Friedlander, Coplan & Aronoff LLP, pursuant to section 327(a) of the Bankruptcy Code, as bankruptcy counsel;[4] and (ii) Deloitte Financial Advisory Services LLP, pursuant to section 327(a) of the Bankruptcy Code, as financial advisors.

Additionally, on June 17, 2009, pursuant to section 327(a) of the Bankruptcy Code, the Bankruptcy Court entered an order authorizing the Debtors to retain certain professionals used in the ordinary course of business, pursuant to sections 327 and 328 of the Bankruptcy Code, subject to a per professional cap of $35,000.00 per month on average over a rolling three-month period.

---

Loan Agent on behalf of the Term Loan Lenders under the Loan Agreement and not in its individual capacity (together with its assignee or designee thereunder, "Buyer").

[3] On August 19, 2009, the Court entered its *Order Approving That Certain "Amendment No. 2 to Asset Purchase Agreement" in Connection With (I) That Certain Asset Purchase Agreement By and Among Hub Distributing, Inc., Hub Designs, Inc., and Anchor Blue Retail Group, Inc., and Ableco Finance, LLC Dated as of May 27, 2009, and (II) this Court's "Order (1) Approving Asset Purchase Agreement Between Debtors and Buyer, (2) Approving Sale of Substantially All Anchor Blue Assets and Assumption of Certain Liabilities Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (3) Approving Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases, and (4) Determining Amounts Necessary to Cure Such Executory Contracts and Unexpired Leases" Dated July 30, 2009 [Docket No. 497]* [Docket No. 594] (the "APA Amendment Order") approving that certain *Amendment No. 2 to Asset Purchase Agreement*, dated August 12, 2009 (the "APA Amendment"), to the Asset Purchase Agreement. Pursuant to the APA Amendment Order, the Court approved the APA Amendment pursuant to which the Debtors continue to be the counter-party to certain enumerated contracts and leases (collectively, the "Designated Agreements") for a specified period of time.

[4] The Creditors' Committee also retained Pachulski Stang Ziehl & Jones LLP, pursuant to section 327(a) of the Bankruptcy Code, which replaced Benesch, Friedlander, Coplan & Aronoff LLP as counsel to the Creditors' Committee.

(ii)      Schedules and Statements

On June 24, 2009, the Debtors filed their respective schedules of assets and liabilities (as may be amended from time to time, the "Schedules") and statements of financial affairs (as may be amended from time to time, the "Statements").

(iii)      Extension of Exclusive Periods

The Debtors have sought and obtained from the Bankruptcy Court a number of orders, (i) extending the period during which the Debtors have the exclusive right to file a chapter 11 plan (the "Exclusive Filing Period") and (ii) extending the period during which the Debtors have the exclusive right to solicit acceptances thereof (the "Exclusive Solicitation Period"). On October 28, 2010, the Bankruptcy Court entered an order extending the Exclusive Filing Period through and including November 27, 2010 and the Exclusive Solicitation Period through and including January 27, 2011.

(iv)      Claims Bar Dates

On June 17, 2009, the Bankruptcy Court entered an order (the "503(b)(9) Bar Date Order") setting July 27, 2009 at 4:00 p.m. (Pacific Daylight Time) as the date by which administrative expense claims asserted under section 503(b)(9) of the Bankruptcy Code must be filed. On March 30, 2010, the Bankruptcy Court entered an order (the "General Bar Date Order") establishing the following bar dates in the Chapter 11 Cases: (i) all Entities (as defined in section 101(15) of the Bankruptcy Code) holding Claims against the Debtors (whether secured, unsecured priority or unsecured nonpriority, but not including claims under section 503(b)(9) of the Bankruptcy Code) that arose prior to the Petition Date, are required to have filed proofs of claim with Kurtzman Carson Consultants LLC, the Debtors' claims and noticing agent, on or before June 4, 2010 at 5:00 p.m. (Pacific Daylight Time) (the "General Bar Date"); (ii) all Governmental Units (as defined in Section 101(22) of the Bankruptcy Code) holding claims (whether secured, unsecured priority or unsecured non-priority, but not including claims under section 503(b)(9) of the Bankruptcy Code) that arose prior to the Petition Date are required to have filed proofs of claim on or before June 4, 2010 at 5:00 p.m. (Pacific Daylight Time) (the "Governmental Bar Date"); (iii) all Entities holding Claims arising from the Debtors' rejection of an executory contract or unexpired lease, in accordance with section 365 of the Bankruptcy Code are required to have filed a proof of claim on or before the later of (x) the General Bar Date and (y) thirty (30) days after the date of the order authorizing the Debtors' rejection of the applicable contract or lease; and (iv) in the event that the Debtors amend their Schedules to reduce the undisputed, noncontingent and liquidated amount or to change the nature or classification of a Claim against a Debtor or to list a claim as contingent, unliquidated or disputed, the affected claimant is required to filed a proof of claim or amend any previously filed proof of claim in respect of the amended scheduled claim on or before the later of: (x) the General Bar Date and (y) twenty (20) days after the date that notice of the applicable amendment to the Schedules is served on the claimant.

## III.    OVERVIEW OF THE PLAN

### A.    General

This section of the Disclosure Statement summarizes the Plan, which is set forth in its entirety as Exhibit A hereto. This summary is qualified in its entirety by reference to the Plan. YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

7

In general, a chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the plan. Under the Bankruptcy Code, "claims" and "equity interests" are classified rather than "creditors" and "shareholders" because such entities may hold claims and equity interests in more than one class. Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (a) leaves unaltered the legal, equitable and contractual rights of each holder of a claim in such class or (b) provides, among other things, for the cure of existing defaults and reinstatement of the maturity of claims in such class. Class 2 (Ableco Claims) and Class 5 (General Unsecured Claims) are impaired under the Plan. Only holders of Class 2 and Class 5 claims are entitled to accept or reject the Plan. Ballots are being furnished to all holders of Class 2 and Class 5 Claims to submit their vote to accept or reject the Plan.

A chapter 11 plan may also specify that certain classes of claims or equity interests are to have their claims or equity interests remain unaltered by the plan. Such classes are referred to as "not impaired," and because of the favorable treatment accorded to such classes, they are conclusively deemed to have accepted the plan and therefore need not be solicited to vote to accept or reject the plan. The holder of Class 1 Wachovia Secured Lender Claim, Class 3 Other Secured Claims and Class 4 Priority Non-Tax Claims under the Plan are not impaired and are conclusively deemed to have accepted the Plan. Holders of such Claims are, therefore, not entitled to vote to accept or reject the Plan. Therefore, based on the foregoing, no ballots are enclosed for holders of such claims.

## B. Assets for Distribution Under the Plan

As soon as is reasonably practicable after the Effective Date (to the extent such amounts have not already been remitted), the Liquidating Trustee shall remit to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Wachovia Secured Lender Claims and Allowed Priority Non-Tax Claims an amount in Cash equal to the Allowed amount of such Claims, or such lesser amounts as agreed to by such holders. Additionally, the Plan provides that the Hub Liquidating Trust shall make payment to the holders of Allowed Claims in connection with Accrued Professional Compensation as and when such Claims become due and payable by Final Order of the Bankruptcy Court authorizing and approving the payment of such Claims in accordance with Article II of the Plan.

## C. Summary Table of Classification and Treatment of Claims and Equity Interests under the Plan

Claims and Equity Interests are divided into six (6) classes under the Plan, and the proposed treatment of Claims and Equity Interests in each Class is described in the Plan and in the chart set forth below. Such classification takes into account the different nature and priority of the Claims and Equity Interests. The Plan contains one class each for Wachovia Secured Lender Claims (Class 1), Ableco Claims (Class 2), Other Secured Claims (Class 3), Priority Non-Tax Claims (Class 4), General Unsecured Claims (Class 5), and Equity Interests (Class 6). Classes 1, 3 and 4 are not impaired under the Plan and Classes 2, 5, and 6 are impaired under the Plan. The meaning of "impairment," and the consequences thereof in connection with voting on the Plan, are set forth in section III.A above.

The estimated percentage recovery to holders of General Unsecured Claims is dependent on, among other things, the amount remaining after payment of all Allowed Administrative Claims, Claims in connection with Accrued Professional Compensation, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims, the net recoveries of the Debtors, the Creditors' Committee and/or the Liquidating Trustee on account of the Avoidance Actions, and the total amount of General Unsecured Claims that become Allowed Claims. There can be no assurance that the estimated claims amounts are correct, and actual claim amounts may be significantly different from the estimates. The following table

8

is qualified in its entirety by reference to the Plan, a copy of which is annexed hereto as Exhibit A. In no case will any creditor receive more than 100% of its Allowed Claim.

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under Plan |
|---|---|---|---|
| N/A | Accrued Professional Compensation | $300,000[5] | - Recovery: 100%<br><br>- Not Impaired<br><br>- Subject to the procedures set forth in Article II. A. of the Plan, all Accrued Professional Compensation shall be paid from the Professional Expense Escrow Account in the first instance and only from the HUB Liquidating Trust to the extent that the Cash in the Professional Expense Escrow Account is insufficient to pay all Allowed Accrued Professional Compensation. |
| N/A | Administrative Expense Claims | $215,000 | - Recovery: 100%<br><br>- Not Impaired<br><br>- Each holder of an Allowed Administrative Claim shall be paid the full unpaid amount of such Allowed Administrative Claim in Cash: (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (3) at such time and upon such terms as may be agreed upon by such holder and the Debtors; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court. |

---

[5] The Debtors estimate that there will be approximately $300,000 of Accrued Professional Compensation owed to the Professionals as of the Effective Date and, consistent with the terms of the Plan, all Accrued Professional Compensation shall be paid from the Professional Expense Escrow Account in the first instance and only from the HUB Liquidating Trust to the extent that the Cash in the Professional Expense Escrow Account is insufficient to pay all Allowed Accrued Professional Compensation.

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under Plan |
|---|---|---|---|
| N/A | Priority Tax Claims | $345,000 | - Recovery: 100%<br><br>- Not Impaired<br><br>- Each holder of an Allowed Priority Tax Claim shall be paid the full unpaid amount of such Allowed Priority Tax Claim in Cash, on the latest of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law. |
| Class 1 | Wachovia Secured Lender Claim | $19,537,000[6] | - Recovery: 100% (Paid in full during pendency of Chapter 11 Cases)<br><br>- Not Impaired<br><br>- To the extent it has not already been paid prior to the Effective Date, Wachovia shall receive those amounts that it is entitled to receive under the terms of the Global Settlement on account of the Wachovia Secured Lender Claim. |
| Class 2 | Ableco Claims | $8,650,710.90 | - Recovery: Estimated to be 2-4%<br><br>- Impaired<br><br>- To the extent it has not already been paid prior to the Effective Date, Ableco shall receive those amounts that it is entitled to receive under the terms of the Global Settlement, including, without limitation, its Pro Rata share of the Liquidating Trust Fund on account of the Ableco Unsecured Claim. |

---

[6] It is the position of the Debtors and the Creditors' Committee that the Wachovia Secured Lender Claim was paid in full during the pendency of the Chapter 11 Cases. As such, it is not contemplated that Wachovia will receive any further distributions on account of its Class 1 Wachovia Secured Lender Claim pursuant to the Plan.

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under Plan |
|---|---|---|---|
| Class 3 | Other Secured Claims | $150,000 | - Recovery: 100% <br><br> - Not Impaired <br><br> - On or as soon as practicable after the Effective Date, the Debtors or the Liquidating Trustee shall pay each holder of an Allowed Other Secured Claim, at the Debtors' or the Liquidating Trustee's sole and exclusive election, in full and final satisfaction of such Allowed Other Secured Claim, except to the extent any holder of an Allowed Other Secured Claim agrees to a different treatment, either: (1) The collateral securing such Allowed Other Secured Claim, or (2) Cash in an amount equal to the value of such collateral. |
| Class 4 | Priority Non-Tax Claims | $75,000 | - Recovery: 100% <br><br> - Not Impaired <br><br> - Unless otherwise mutually agreed upon by the holder of an Allowed Priority Non-Tax Claim and the Debtors or the Liquidating Trustee, as applicable, on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, the Debtors or the Liquidating Trustee, as applicable, shall pay to each holder of an Allowed Priority Non-Tax Claim, in Cash, the full amount of such Allowed Priority Non-Tax Claim, in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed Priority Non-Tax Claim. |

RLF1 3761176v. 1

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under Plan |
|---|---|---|---|
| Class 5 | General Unsecured Claims | $34,500,000 | - Recovery: Estimated to be 2-4%<br><br>- Impaired<br><br>- On or as soon as practicable after the Initial Distribution Date, the Liquidating Trustee shall pay each holder of an Allowed General Unsecured Claim, in full and final satisfaction of such Allowed General Unsecured Claim, its Pro Rata share of the Liquidating Trust Fund. |
| Class 6 | Equity Interests | N/A | - Recovery: None<br><br>- Impaired<br><br>- Holders of Equity Interests shall neither receive nor retain any property under the Plan. On the Effective Date, the Equity Interests shall be deemed cancelled. |

**D.    Provisions Governing Distributions Under the Plan**

**1.    Initial Distribution Date**

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the HUB Liquidating Trust shall make, or shall make adequate reserves for, the Distributions required to be made under the Plan.

**2.    Establishment of Disputed Reserves**

On the Initial Distribution Date, and after making all Distributions required to be made on such date under the Plan, the Liquidating Trustee shall establish a separate Disputed Reserve for Disputed Claims, each of which Disputed Reserves shall be administered by the Liquidating Trustee. The Liquidating Trustee shall reserve in Cash or other property, for Distribution on account of each Disputed Claim, the full asserted amount (or such lesser amount as may be estimated by the Bankruptcy Court in accordance with Article VI.B of the Plan) with respect to each Disputed Claim.

**3.    Maintenance of Disputed Reserves**

To the extent that the property placed in a Disputed Reserve consists of Cash, that Cash shall be deposited in an interest-bearing account. The HUB Liquidating Trust shall hold property in the Disputed Reserves in trust for the benefit of the holders of Claims ultimately determined to be Allowed. Each Disputed Reserve shall be closed and extinguished by the HUB Liquidating Trust when all Distributions and other dispositions of Cash or other property required to be made hereunder will have been made in accordance with the terms of the Plan. Upon closure of a Disputed Reserve, all Cash (including any Cash Investment Yield) or other property held in that Disputed Reserve shall revest in and

become the property of the HUB Liquidating Trust. All funds or other property that vest or revest in the HUB Liquidating Trust pursuant to Article V of the Plan shall be (a) used to pay the fees and expenses of the HUB Liquidating Trust as and to the extent set forth in the Liquidating Trust Agreement, and (b) thereafter distributed on a Pro Rata basis to holders of Allowed Claims.

### 4. Quarterly Distributions

Any Distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the HUB Liquidating Trust in a Disputed Reserve pursuant to Article V.B of the Plan and Distributed (in full in the case of Administrative Expense Claims, Priority Tax Claims or Priority Non-Tax Claims; and up to its Ratable Proportion with respect to the Claims in Classes 2 and 5) on the first Quarterly Distribution Date after such Claim is Allowed. No interest shall accrue or be paid on the unpaid amount of any Distribution paid on a Quarterly Distribution Date in accordance with Article V.C. of the Plan.

### 5. Record Date for Distributions

Except as otherwise provided in a Final Order of the Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date. The HUB Liquidating Trust shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. In making any Distribution with respect to any Claim, the HUB Liquidating Trust shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of Claim Filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon such other evidence or record of transfer or assignment that is known to the HUB Liquidating Trust as of the Record Date.

### 6. Undeliverable Distributions

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made by the HUB Liquidating Trust at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim Filed by such holder or (b) the last known address of such holder if no proof of Claim is Filed or if the Debtors have been notified in writing of a change of address. If any Distribution is returned as undeliverable, the HUB Liquidating Trust may, in its discretion, make such efforts to determine the current address of the holder of the Claim with respect to which the Distribution was made as the HUB Liquidating Trust deems appropriate, but no Distribution to any holder shall be made unless and until the HUB Liquidating Trust has determined the then-current address of the holder, at which time the Distribution to such holder shall be made to the holder without interest. Amounts in respect of any undeliverable Distributions made by the HUB Liquidating Trust shall be returned to, and held in trust by, the HUB Liquidating Trust until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code, as set forth in Article V.E.3 of the Plan. The HUB Liquidating Trust shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; *provided, however*, that its discretion may not be exercised in a manner inconsistent with any express requirements of the Plan or the Liquidating Trust Agreement.

RLF1 3761176v. 1

### 7.    Minimum Distributions

Notwithstanding anything herein to the contrary, if a Distribution to be made to a holder of an Allowed Claim on the Initial Distribution Date or any subsequent date for Distributions (other than the final Distribution Date) would be $50 or less in the aggregate, no such Distribution will be made to that holder unless a request therefor is made in writing to the Liquidating Trustee no later than twenty (20) days after the Effective Date.

### 8.    Unclaimed Property

Except with respect to property not Distributed because it is being held in a Disputed Reserve, Distributions that are not claimed by the expiration of one year from the Effective Date shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest or revest in the HUB Liquidating Trust, and the Claims with respect to which those Distributions are made shall be automatically cancelled. After the expiration of that one-year period, the claim of any Entity to those Distributions shall be discharged and forever barred. Nothing contained in the Plan shall require the HUB Liquidating Trust to attempt to locate any holder of an Allowed Claim. All funds or other property that vests or revests in the HUB Liquidating Trust pursuant to Article V of the Plan shall be distributed by the Liquidating Trustee to the other holders of Allowed Claims in accordance with the provisions of the Plan or the Liquidating Trust Agreement.

### 9.    Transactions on Business Days

If the Effective Date or any other date on which a transaction is to occur under the Plan shall occur on a day that is not a Business Day, the transactions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day.

### 10.    Surrender of Cancelled Instruments and Securities

Except as set forth in Article V.G of the Plan, as a condition precedent to receiving any Distribution hereunder on account of an Allowed Claim evidenced by instruments, securities or other documentation cancelled pursuant to Article IV.K of the Plan, the holder of such Claim shall tender such instrument, security or other documentation evidencing such Claim to the HUB Liquidating Trust (except as set forth in Article V.G of the Plan). Any Distributions pursuant to the Plan on account of any Claim evidenced by such instruments, securities or other documentation shall, pending such surrender, be treated as an undeliverable Distribution in accordance with Article V.E of the Plan; *provided, however*, all notes, instruments and other securities issued under the Debtors' prepetition secured credit facility shall be deemed terminated and cancelled upon the Effective Date to the extent not already surrendered and cancelled as part of the closing of the sales of the Debtors' assets. If any holder of an Allowed Claim evidenced by instruments, securities or other documentation cancelled pursuant to Article IV.K of the Plan, fails to surrender such instrument, security or other documentation or comply with the provisions of Article V.F.1 of the Plan within one year after the Effective Date, its Claim for a Distribution under the Plan on account of such instrument, security, or other documentation shall be discharged, and such holder shall be forever barred from asserting such Claim against the HUB Liquidating Trust or its property. In such case, any property held on account of such Claim shall be disposed of pursuant to the provisions set forth in Article V.E.3 of the Plan.

### 11.    Lost, Stolen, Mutilated or Destroyed Instrument or Security

Any holder of an Allowed Claim evidenced by instruments, securities or other documentation cancelled pursuant to Article IV.K of the Plan that has been lost, stolen, mutilated or

destroyed shall, in lieu of surrendering such instrument, security or documentation: (a) deliver to the HUB Liquidating Trust (i) an affidavit of loss reasonably satisfactory to the Liquidating Trustee setting forth the unavailability of such instrument, security, or other documentation and (ii) such additional security or indemnity as may reasonably be requested by the Liquidating Trustee to hold the HUB Liquidating Trust harmless from any damages, liabilities, or costs incurred in treating such Entity as a holder of an Allowed Claim and (b) satisfy any other requirement under any other relevant document. Upon compliance with V.G of the Plan by a holder of an Allowed Claim evidenced by such instrument, security or other documentation, such holder shall, for all purposes under the Plan, be deemed to have surrendered such instrument, security or other documentation.

### 12. Manner of Cash Payments Under the Plan or the Liquidating Trust Agreement

Cash payments made pursuant to the Plan or the Liquidating Trust Agreement shall be in United States dollars by checks drawn on a domestic bank selected by the HUB Liquidating Trust or by wire transfer from a domestic bank, at the option of the HUB Liquidating Trust.

### 13. Time Bar to Cash Payments by Check

Checks issued by the HUB Liquidating Trust on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to Article V.I of the Plan shall be made directly to the Liquidating Trustee by the holder of the Allowed Claim to whom the check was originally issued. Any Claim in respect of such voided check shall be made in writing on or before the later of ninety (90) days following the Effective Date or ninety (90) days following the date on which the Claim at issue became an Allowed Claim. After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall revest in and become the property of the HUB Liquidating Trust as unclaimed property in accordance with section 347(b) of the Bankruptcy Code and be distributed as provided in Article V.E.3 of the Plan.

### 14. Compliance with Tax Requirements

In connection with making Distributions under the Plan, to the extent applicable, the Liquidating Trustee shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The Liquidating Trustee may withhold the entire Distribution due to any holder of an Allowed Claim until such time as such holder provides the necessary information to comply with any withholding requirements of any governmental unit. Any property so withheld will then be paid by the Liquidating Trustee to the appropriate authority. If the holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six months from the date of first notification to the holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such holder's Distribution shall be treated as an undeliverable Distribution in accordance with Article V.E.1 of the Plan.

### 15. No Payments of Fractional Dollars

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

15

### 16. Interest on Claims

Except as specifically provided for in the Plan or the Confirmation Order, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim. Except as expressly provided herein or in a Final Order of the Court, no prepetition Claim shall be Allowed to the extent that it is for postpetition interest or other similar charges.

### 17. Setoff and Recoupment

The HUB Liquidating Trust may, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that any of the Debtors, the Estates or the HUB Liquidating Trust may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors, the Estates or the HUB Liquidating Trust of any right of setoff or recoupment that any of them may have against the holder of any Claim.

### E. Means for Implementation and Execution of the Plan

#### 1. Appointment of a Liquidating Trustee and a Liquidating Trust Committee

On or prior to the Confirmation Date, the Debtors and the Creditors' Committee shall agree upon and appoint a Liquidating Trustee. Additionally, on or prior to the Confirmation Date, the Debtors and the Creditors' Committee shall agree upon and appoint a three (3) member Liquidating Trust Committee. The Liquidating Trustee shall serve at the direction of the Liquidating Trust Committee, *provided, however*, the Liquidating Trust Committee may not direct the Liquidating Trustee or the members of the Liquidating Trust Committee to act inconsistently with their duties under the Liquidating Trust Agreement and the Plan. The Liquidating Trust Committee may terminate the Liquidating Trustee at any time in accordance with the provisions of the Liquidating Trust Agreement.

#### 2. Formation of the HUB Liquidating Trust

On the Effective Date, the HUB Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of (a) administering the Liquidating Trust Fund, (b) resolving all Disputed Claims, (c) pursuing the Causes of Action, and (d) making all Distributions to the Beneficiaries provided for under the Plan. The HUB Liquidating Trust is intended to qualify as a liquidating trust pursuant to United States Treasury Regulation Article 301.7701-4(d).

#### 3. Funding of the HUB Liquidating Trust

On the Effective Date, the Liquidating Trust Fund shall vest automatically in the HUB Liquidating Trust. The Plan shall be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief. The transfer of the Liquidating Trust Fund to the HUB Liquidating Trust shall be made for the benefit and on behalf of the Beneficiaries. The assets comprising the Liquidating Trust Fund will be treated for tax purposes as being transferred by the Debtors to the Beneficiaries pursuant to the Plan in exchange for their Allowed Claims and then by the Beneficiaries to the HUB Liquidating Trust in exchange for the beneficial interests in the HUB Liquidating Trust. The Beneficiaries shall be treated as the grantors and owners of the HUB Liquidating Trust. Upon the transfer of the Liquidating Trust Fund, the HUB Liquidating Trust shall succeed to all of the Debtors' rights, title and interest in the Liquidating Trust Fund, and the Debtors will have no further interest in or with respect

to the Liquidating Trust Fund. As soon as possible after the Effective Date, but in no event later than sixty (60) days thereafter, (i) the Liquidating Trust Committee shall inform the HUB Liquidating Trust in writing of the fair market value of the Liquidating Trust Fund as of the Effective Date, based on its good faith determination, and (ii) the Liquidating Trustee shall establish appropriate means to apprise the Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the HUB Liquidating Trust, the Beneficiaries and the Liquidating Trust Committee) for all federal income tax purposes.

### 4. Rights and Powers of the Liquidating Trustee

The Liquidating Trustee shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules (including, without limitation, the right to (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidating Trust Agreement; (2) liquidate any assets remaining in the Estates as of the Effective Date; (3) prosecute, settle, abandon or compromise any Causes of Action; (4) make Distributions contemplated hereby, (5) establish and administer any necessary reserves for Disputed Claims that may be required; (6) object to the Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; and (7) employ and compensate professionals and other agents, *provided, however*, that any such compensation shall be made only out of the Liquidating Trust Fund), to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes.

### 5. Fees and Expenses of the HUB Liquidating Trust

Except as otherwise ordered by the Bankruptcy Court, the Liquidating Trust Expenses on or after the Effective Date shall be paid in accordance with the HUB Liquidating Trust Agreement without further order of the Bankruptcy Court.

### 6. Semi-Annual Reports to Be Filed by the HUB Liquidating Trust

The HUB Liquidating Trust shall File semi-annual reports regarding the liquidation or other administration of property comprising the Liquidating Trust Fund, the Distributions made by it and other matters required to be included in such report in accordance with the Liquidating Trust Agreement. In addition, the HUB Liquidating Trust will file tax returns as a grantor trust pursuant to United States Treasury Regulation Article 1.671-4(a).

### 7. Directors/Officers/Equity/Assets of the Debtors on the Effective Date

On the Effective Date, the authority, power and incumbency of the persons then acting as directors and officers of the Debtors shall be terminated and such directors and officers shall be deemed to have resigned or to have been removed without cause, *provided, however*, that the Debtors shall retain at least one acting officer for the purposes of complying with Article IV.G.2 at the expense of the HUB Liquidating Trust. On the Effective Date, all the then existing Equity Interests in the Debtors (including all instruments evidencing such Equity Interests) shall be cancelled and extinguished without further action under any applicable agreement, law, regulation or rule.

17

### 8. Liquidation of the Debtors

a.    All of the Debtors shall be deemed to have been liquidated as of the Effective Date, and all Equity Interests in any Debtor shall automatically be cancelled and extinguished as of the Effective Date without the need for any further action by the Bankruptcy Court or any Entity.

b.    Notwithstanding the foregoing, as soon as practicable after the Effective Date, each of the Debtors shall: (a) file its certificate of dissolution, together with all other necessary corporate documents, to effect its dissolution under the applicable laws of its state of incorporation; and (b) complete and file its final federal, state and local tax returns, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws. The filing by each Debtor of its certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders or the board of directors of each such Debtor.

c.    On the Effective Date, each Debtor shall assign, transfer and distribute to the HUB Liquidating Trust (a) any of its remaining assets, properties or interests; and (b) all of its books and records relating to the foregoing. For purposes of the Plan, books and records include computer generated or computer maintained books and records and computer data, as well as electronically generated or maintained books and records or data, along with books and records of any Debtor maintained by or in the possession of third parties, wherever located.

d.    As soon as is reasonably practicable following the Effective Date and upon the filing by or on behalf of the Debtors of a certification to that effect with the Bankruptcy Court, the Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of each of the Debtors or payments, including, without limitation, the payment of any franchise or similar taxes to the state or commonwealth of incorporation or organization of such Entity, to be made in connection therewith; *provided, however,* that the Debtors or the Liquidating Trustee shall file with the Office of the Secretary of State for their respective states of incorporation a certificate of dissolution which may be executed by an officer of the Debtors without the need for approval by the Board of Directors or stockholders.

### 9. Operations of the Debtors Between the Confirmation Date and the Effective Date

The Debtors shall continue to operate as Debtors in Possession during the period from the Confirmation Date through and until the Effective Date.

### 10. Establishment of the Administrative Bar Date

a.    The Plan establishes the Administrative Bar Date, which was approved by the Bankruptcy Court pursuant to the Confirmation Order.

b.    Except as otherwise provided in Article IV.I.4 of the Plan, on or before 5:00 p.m., prevailing Eastern time, on the Administrative Bar Date, each holder of an Administrative Claim shall file with the Bankruptcy Court a request for payment of Administrative Claim (a) by mailing, hand delivering or delivering by courier service such

request for payment of Administrative Claim to the Clerk of the Bankruptcy Court at 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801 or (b) by using the Bankruptcy Court's CM/ECF electronic filing system.

     c.    The request for payment of an Administrative Claim will be timely filed only if it is *actually received* by the Bankruptcy Court by 5:00 p.m., prevailing Eastern time, on the Administrative Bar Date.

     d.    Notwithstanding anything in Article IV.I.2 of the Plan, the Debtors' and the Creditors' Committee's professionals shall not be required to file a request for payment of any Administrative Claim on or before the Administrative Bar Date for fees and expenses arising under sections 330, 331 or 503(b)(2-5) of the Bankruptcy Code, as such Professionals will instead file final fee applications as required by the Bankruptcy Code, Bankruptcy Rules and Confirmation Order.

## 11. Term of Injunctions or Stays

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date shall remain in full force and effect until the Chapter 11 Cases are closed.

## 12. Cancellation of Equity Interests

     a.    On the Effective Date, except to the extent otherwise provided herein, all notes, stock, instruments, certificates and other documents evidencing the Equity Interests shall be deemed automatically cancelled and shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtors thereunder or in any way related thereto, including any obligation of the Debtors to pay any franchise or similar type taxes on account of such Equity Interests, shall be discharged.

     b.    On the Effective Date, except to the extent otherwise provided herein, any indenture relating to any of the foregoing shall be deemed automatically cancelled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be discharged.

## 13. Creditors' Committee

As of the Effective Date, the Creditors' Committee shall dissolve, and its members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Cases. The retention and employment of the Professionals retained by the Creditors' Committee shall terminate as of the Effective Date, *provided, however,* that the Creditors' Committee shall exist, and its Professionals shall be retained, after such date with respect to (a) applications Filed pursuant to sections 330 and 331 of the Bankruptcy Code and (b) motions seeking the enforcement of the provisions of the Plan or the Confirmation Order.

RLF1 3761176v. 1

### F. Procedures for Resolving and Treating Disputed Claims

#### 1. No Distribution Pending Allowance

Notwithstanding any other provision of the Plan, the Liquidating Trustee shall not Distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed.

#### 2. Resolution of Disputed Claims

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Liquidating Trustee shall have the right to the exclusion of all others (except as to the Professionals' applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code) to make, File, prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court, objections to Claims. The costs of pursuing the objections to Claims shall be borne by the HUB Liquidating Trust. From and after the Confirmation Date, all objections with respect to Disputed Claims shall be litigated to a Final Order except to the extent, subject to the approval of the Liquidation Trust Committee in accordance with the terms of the Liquidation Trust Agreement, the Liquidation Trustee elects to withdraw any such objection or the Liquidation Trustee and the claimant elect to compromise, settle or otherwise resolve any such objection, in which event they may settle, compromise or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court.

#### 3. Objection Deadline

All objections to Disputed Claims shall be Filed and served upon the holders of each such Claim not later than ninety (90) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing.

#### 4. Estimation of Claims

At any time, (a) prior to the Effective Date, the Debtors, and (b) subsequent to the Effective Date, the Liquidating Trustee, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the HUB Liquidating Trust have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Court. If the estimated amount constitutes a maximum limitation on the Claim, the Debtors or the HUB Liquidating Trust, as applicable, may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Court.

#### 5. Disallowance of Claims

Except as otherwise agreed, any and all proofs of Claim Filed after the General Bar Date or Section 503(b)(9) Bar Date, as applicable, shall be deemed disallowed and expunged as of the Effective Date without any further notice or action, order or approval of the Bankruptcy Court, and holders of such Claims may not receive any Distributions on account of such Claims, unless on or before

the Confirmation Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed. Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors.

### 6. Adjustment to Claims Without Objection

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Noticing Agent at the direction of the Debtors or the Liquidating Trustee, as applicable, without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### G. Treatment of Executory Contracts and Unexpired Leases

#### 1. Rejection of Executory Contracts and Unexpired Leases

The Plan shall constitute a motion to reject such executory contracts and unexpired leases, and the Debtors shall have no further liability thereunder. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code and that the rejection thereof is in the best interest of the Debtors, their Estates and all parties in interest in the Chapter 11 Cases.

#### 2. Claims Based on Rejection of Executory Contracts or Unexpired Leases

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article VII.A of the Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Debtors no later than thirty (30) days after the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article VII.A of the Plan for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtors, the Estates, their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in III.I.5 of the Plan. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article III of the Plan.

### H. Conditions Precedent to Effective Date of the Plan

#### 1. Conditions Precedent to the Effective Date

The following are conditions precedent to the Effective Date that must be satisfied or waived:

    a.     The Confirmation Order has become a Final Order.

    b.     The Confirmation Order shall be in full force and effect.

c.    Notwithstanding the foregoing, the Debtors reserve, in their sole discretion, the right to waive the occurrence of any condition precedent to the Effective Date or to modify any of the foregoing conditions precedent. Any such written waiver of a condition precedent set forth in Article VIII.A. of the Plan may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## I.    Release, Injunction and Related Provisions

### 1.    Compromise and Settlement

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtors, the Estates and holders of Claims and Equity Interests.

### 2.    Releases

a.    Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Releasees, including, without limitation: (a) the discharge of debt and all other good and valuable consideration paid pursuant to the Plan or otherwise; and (b) the services of the Debtors' officers and directors in facilitating the expeditious implementation of the sales of the Debtors' assets or the liquidation, each of the Debtors hereby provides a full discharge and release to the Releasees (and each such Releasee so released shall be deemed released and discharged by the Debtors) and their respective properties from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including, without limitation, those that any of the Debtors or the Liquidating Trustee would have been legally entitled to assert or that any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of any of the Debtors or Estates and further including those in any way related to the Chapter 11 Cases or the Plan; *provided, however,* that the foregoing provisions of III.I.2.a of the Plan shall not operate to waive or release from any Causes of Action expressly set forth in and preserved by the Plan or Plan Supplement or any defenses thereto, *provided, further, however,* notwithstanding anything to the contrary in the Plan, none of the Debtors' current or former officers and directors who served in such capacity prior to the Petition Date (the "D&O's") shall be released from any Cause of Action if the Liquidating Trustee files suit against such D&O's for any Claim or Cause of Action arising from any action or inaction taken by such D&O's prior to the Petition Date within 180 days of the Effective Date (as may be extended solely as set forth in the following sentence, the "Deadline to Commence Suit"). The Deadline to Commence Suit may be extended only on motion of the Liquidating Trustee for cause shown (with notice of any such motion to be provided by the Liquidating Trustee to each of the affected D&O's) on one

occasion by a period of not more than 90 days, *provided, however*, that if the Liquidating Trustee produces evidence that any of the D&O's have not been reasonably cooperative in the Liquidating Trustee's investigation of any Causes of Action against such D&O's, then the Deadline to Commence Suit solely as to those D&O's alleged to have not acted reasonably cooperatively may be further extended on motion of the Liquidating Trustee for cause shown (with notice of any such motion to be provided by the Liquidating Trustee to each of the affected D&O's) so long as such motion is filed with the Bankruptcy Court (and served on each of the affected D&O's) prior to the expiration of the Deadline to Commence Suit. In the event that the Liquidating Trustee does not file suit against such D&O's by the Deadline to Commence Suit (or such longer date only if agreed to in writing by the affected D&O's), such D&O's shall automatically be released and entitled to the benefit of all of the release and similar provisions of the Plan including, without limitation, all of the protections of Article IX of the Plan from and after the Deadline to Commence Suit without the need to seek a further order of the Court.

b.       Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in III.I.2 of the Plan pursuant to Bankruptcy Rule 9019 and its finding that they are: (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action thereby released; (b) in the best interests of the Debtors and all holders of Claims; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to any of the Debtors or the Liquidating Trustee.

### 3.       Exculpation

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have nor incur any liability to any Entity for any and all Claims and Causes of Action arising on or after the Petition Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, Liquidating Trust Agreement, DIP Facility, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the Settlement or the sales of the Debtors' assets or liquidation of the Debtors; *provided, however*, that the foregoing provisions of III.I.3 of the Plan shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; *provided, further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents; *provided, further*, that the foregoing provisions of III.I.3 of the Plan shall not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or Plan Supplement or any defenses thereto.

### 4.       Preservation of Rights of Action

a.       Vesting of Causes of Action

(i)       Except as otherwise provided in the Plan or Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors may hold against any Entity shall vest upon the Effective Date in the HUB Liquidating Trust.

(ii)       Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Liquidating Trustee shall have the exclusive right to

institute, prosecute, abandon, settle or compromise any Causes of Action, in accordance with the terms of the Liquidating Trust Agreement and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases.

(iii)     Causes of Action and any recoveries therefrom shall remain the sole property of the HUB Liquidating Trust (for the sole benefit of the holders of General Unsecured Claims), as the case may be, and holders of Claims shall have no right to any such recovery.

b.     Preservation of All Causes of Action Not Expressly Settled or Released

(i)     Unless a Cause of Action against a holder or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors and the Liquidating Trustee expressly reserve such Cause of Action for later adjudication by the Debtors or the Liquidating Trustee (including, without limitation, Causes of Action not specifically identified or described in the Plan Supplement or elsewhere or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan or Confirmation Order, except where such Causes of Action have been released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in III.I.2.a) or any other Final Order (including the Confirmation Order). In addition, the Debtors and Liquidating Trustee expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

(ii)     Subject to the immediately preceding paragraph, any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that any such obligation, transfer, or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (i) such Entity has filed a proof of claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors or Liquidating Trustee have objected to any such Entity's proof of claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors or Liquidating Trustee have objected to any such Entity's scheduled Claim; or (v) any such Entity's scheduled Claim has been identified by the Debtors or Liquidating Trustee as disputed, contingent or unliquidated.

**5.     Release and Injunction**

a.     From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Releasees, their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding,

on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order.

b.     Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Releasees or their successors and assigns and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

c.     The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtors or any of their assets or properties. On the Effective Date, all such Claims against, and Equity Interests in, the Debtors shall be satisfied and released in full.

d.     Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Parties and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released hereby, from:

(i)     commencing or continuing in any manner any action or other proceeding of any kind against any of the Debtors, their successors and assigns and their assets and properties;

(ii)     enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Debtor, their successors and assigns and their assets and properties;

(iii)     creating, perfecting or enforcing any encumbrance of any kind against any Debtor or the property or estate of any Debtor;

(iv)     asserting any right of setoff or subrogation of any kind against any obligation due from any Debtor or against the property or estate of any the Debtor, except to the extent a right to setoff or subrogation is asserted with respect to a timely filed proof of claim or a non-residential real property lease; or

(v)     commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder.

**6.     Releases of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, liens, pledges or other security interests against property of the Estates shall be fully released and discharged and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens, pledges or other security interest shall revert to the Debtors and the Liquidating Trustee.

## 7. Substantive Consolidation

a.      The Plan shall serve as a motion by the Debtors seeking entry of an order substantively consolidating all of the Estates of all of the Debtors into a single consolidated Estate for all purposes associated with confirmation and consummation of the Plan. Intercompany Claims and Intercompany Interests are deemed to be satisfied and resolved by the substantive consolidation provided for herein.

b.      The entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of the substantive consolidation of the Debtors and their respective Estates for all purposes relating to the Plan, including for purposes of voting, confirmation and Distributions, *provided, however*, that the obligation of the Debtors or the Liquidating Trustee, as applicable, to file post-confirmation quarterly reports in a form and manner proscribed by the U.S. Trustee and to pay the statutory fees described in Article XI.B of the Plan for each of the Debtors shall continue until entry of a final decree closing the respective subsidiary-Debtor's chapter 11 case. If this substantive consolidation is approved, then for all purposes associated with the confirmation and consummation of the Plan, all assets and liabilities of the Debtors shall be treated as though they were merged into a single economic unit, and all guarantees by any Debtor of the obligations of any other Debtor shall be considered eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be treated as one collective obligation of the Debtors. Moreover, (a) no Distribution shall be made under the Plan on account of any Claim held by any one of the Debtors against any of the other Debtors and such Intercompany Claims will be extinguished; (b) no Distribution shall be made under the Plan on account of any Intercompany Interest held by any one of the Debtors in any of the other Debtors except to the extent necessary to effect the substantive consolidation provided for herein; (c) all guaranties of any one of the Debtors of the obligations of any of the other Debtors shall be eliminated so that any Claim against any one of the Debtors, and any guaranty thereof executed by any of the other Debtors, shall be one obligation of the consolidated Debtors' Estates; and (d) every Claim that is timely Filed or to be Filed in the Chapter 11 Cases of any of the Debtors shall be deemed Filed against the consolidated Estates and shall be one Claim against, and one obligation of, the Estates.

c.      In addition, notwithstanding any provision of the Plan to the contrary, any holder of multiple Allowed Claims against more than one Debtor that arise from the contractual, joint, joint and several, or several liability of such Debtors, the guaranty by one Debtor of another Debtor's obligation or other similar circumstances, shall be entitled to one Allowed Claim that, in the aggregate, does not exceed the amount of the underlying Claim giving rise to such multiple Claims. Claims against more than one of the Debtors arising from the same injury, damage, cause of action, or common facts shall be Allowed only once as if such Claim were against a single Debtor.

d.      Any alleged defaults under any applicable agreement, including executory contracts and unexpired leases, with the Debtors arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.

## J.      Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11